IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BILLY F. BRITT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. CV1:07CV696 |
| | § | |
| U.S. HELICOPTER, d/b/a/ | § | |
| HELICOPTER SUPPORT | § | |
| COMPANY, INC., and BELL | § | |
| AEROSPACE SERVICES, INC., | § | |
| d/b/a U.S. HELICOPTER, | § | |

**U.S. HELICOPTER'S MEMORANDUM BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Defendant U.S. Helicopter, and pursuant to Rule 56 of the
Federal Rules of Civil Procedure states no genuine issue of material fact exists as to any
of Plaintiff, Billy Britt's claims, and thus, Defendants are entitled to a judgment as a
matter of law. Accordingly, Defendant states as follows:

**I.    UNDISPUTED SUMMARY OF FACTS.**

1.     On November 10, 1999, Mr. Britt applied for a position with U.S.
Helicopter in Ozark, Alabama.[1]

2.     Thereafter, he was hired on December 6, 1999 as an aircraft mechanic.[2]

3.     Plaintiff remained in the mechanics department until December 17, 2001
when he was transferred to the avionics section.[3]

---

[1] See Application for Employment Bates Labeled Britt v. US Helicopter 0283-0287, attached as Exhibit
"A".
[2] See Payroll Change Notice Bates Labeled Britt v. US Helicopter 0388, attached as Exhibit "B".
[3] See Employee History Bates Labeled Britt v. US Helicopter 0395, attached as Exhibit "C".

4.     Mr. Britt acknowledged U.S. Helicopter's Equal Employment Opportunity Policy Statement on December 6, 1999. [4]

5.     Mr. Britt saw the phrase "KKK was still alive" sometime between 1999 and 2001 in the men's restroom. [5]

6.     Mr. Britt did not see any other graffiti of a racial nature after he moved into the avionics section.[6]

7.     Mr. Britt cannot recall anyone using any racially offensive remarks in front of him or towards him.[7]

8.     As part of his employment, Mr. Britt signed the Standards and Conditions of Employment which outlines certain situations which may result in discipline or discharge.[8]

9.     Jim Ellis was the Plaintiff's supervisor from December 16, 2002 until April 18, 2005.[9]

10.     In the summer of 2005, Mark Robison became Mr. Britt's supervisor.[10]

11.     On August 1, 2005, Mr. Britt was terminated for sleeping on duty.

12.     On August 1, 2005, Mr. Britt received a Letter of Discharge for sleeping on duty. The Letter of Discharge outlined previous disciplinarily actions he had received in the year and a half preceding his termination. These violations consisted of standing around during cleanup; violation of tool control; and abusing phone privileges.[11]

---

[4] See Employment Policies Bates Labeled Britt v. US Helicopter 0342, attached as Exhibit "D".
[5] See Britt Depo., dated June 11, 2008, at p. 157, line 15-19, Exhibit "E".
[6] See Britt Depo., dated June 11, 2008, at p. 159, line 23 – p. 60, line 3, attached as Exhibit "E".
[7] See Britt Depo., dated June 11, 2008, at p. 190, line 23 – p. 191, line 14, attached as Exhibit "E".
[8] See Standards and Conditions of Employment Bates Labeled Britt v. US Helicopter 0339, attached as Exhibit "G".
[9] See Employee History Bates Labeled Britt v. US Helicopter 0395, Exhibit "C".
[10] See Employee History Bates Labeled Britt v. US Helicopter 0395, Exhibit "C".
[11] See Letter of Discharge Bates Labeled 00329, Exhibit "H".

13.    On August 3, 2005, Mr. Britt filed a Charge of Discrimination with the EEOC against U.S. Helicopter for race discrimination and discrimination under the Americans with Disability Act.[12]

14.    Thereafter, the EEOC issued a Determination establishing reasonable cause to believe that U.S. Helicopter violated Title VII. The EEOC further determined that there was no reasonable cause to believe that U.S. Helicopter discriminated against Mr. Britt because of a disability.[13]

15.    On August 1, 2007, Mr. Britt instituted this action against U.S. Helicopter for race discrimination, discrimination under the Americans with Disability Act, retaliation and various state law claims.[14]

16.    Thereafter, the EEOC issued a Notice of Right to Mr. Britt.[15]

17.    On September 21, 2007, Mr. Britt amended his Complaint to name correct party; however, he made the same allegations.[16]

## II.    STANDARD OF REVIEW.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only if the record shows there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. *See Rojas v. Florida*, 285 F.3d 1339, 1341 (11th Cir. 2002); Fed. R. Civ. P. 56(c). The moving party bears the "initial burden to show the district court, by reference to material on file, that there are no genuine issues of material fact that should be cited at trial." *See Clark v. Coats & Clark*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has met its burden, the

---

[12] See Britt EEOC Charge attached as Exhibit "I".
[13] See EEOC Determination attached as Exhibit "J".
[14] See Complaint attached as Exhibit "K".
[15] See Notice of Right to Sue attached as Exhibit "L".
[16] See Amended Complaint, attached as Exhibit "M".

burden then shifts to the non-moving party to show the existence of a genuine issue of material fact. *See id.* When considering a motion for summary judgment, the district court must view the evidence in the light most favorable to the non-moving party and draw all inferences in the non-moving party's favor. *See Matsushita Electric Indust. Co. v. Zenith Radio Corp.*, 475 US 574, 587 (1986).

## III.    ARGUMENT.

### A.    As a matter of law, Mr. Britt cannot establish a prima facie case of a hostile work environment based on race.

To prove a prima facie case of hostile work environment or harassment based on race an employee must show:  "(1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee …; (4) that the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and create a discriminatorily abusive work environment; and (5) that the employer is responsible for such environment of either a theory of vicarious or of direct liability." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  The United States Supreme Court has stated that an "objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *see also, Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231-32 (11th Cir. 2001) (noting the 11th Circuit "has required pervasive conduct by employers before finding that a hostile work environment existed").

"In assessing whether harassment is objectively severe and pervasive, courts typically look to:  (1) the frequency of the conduct; (2) the severity of the conduct; (3)

whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1247-48 (11th Cir. 2004). Moreover, "[i]n a race based case, harassing statements and conduct must be of a racial nature before they can be considered in determining whether the severe and pervasive requirement is met." *See Laosebikan v. Coca-Cola Co.*, 167 F. Appx. 758, 765-66 (11th Cir. 2006); *see also Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).

In *Laosebikan*, the employee alleged he was subjected to a racially hostile environment. *See Laosebikan*, 167 F. Appx. at 765-66. Specifically, the employee alleged the supervisor verbally assaulted him in the presence of other employees. *See id.* However, the Eleventh Circuit noted that the supervisor made only one comment referring to a "black Nigerian boy" which was of an objectively racial nature. *See id.* As most of the "complained-of incidents [were] entirely devoid of racial conduct" and the employee could not demonstrate how the alleged incidents interfered with his job performance, the Eleventh Circuit held that the employee failed to establish his claim for hostile work environment. *See id.* at 766.

Mr. Britt alleges that his supervisor, Jim Ellis would assign jobs according to race.[17] He also states that he was not assigned overtime by Mr. Ellis.[18] However, he admits that overtime was based on the aircraft itself and Mr. Ellis did not use racially offensive remarks in front of him or directed towards him, nor did any other employees at

---

[17] See Britt Depo., dated June 11, 2008, pp. 90, line 20 – p. 91, line - 1; p. 94, line 17 – p. 97, line 5, Exhibit "E".

[18] See Britt Depo., dated June 11, 2008, at p. 98, line 1-4, Exhibit "E".

U.S. Helicopter.[19]  In addition, Mr. Britt admits that the contractors that worked at U.S. Helicopter received more overtime than the employees.[20]

He also admits that no one used any racially offensive remarks in front of him or towards him.[21]  Mr. Britt also claims that he was receiving lower performance evaluations because of his race.[22]  However, the only Caucasian employee that Mr. Britt could recall who received higher evaluations than he was an employee by the name of "Carl".  However, Mr. Britt admitted that Carl was doing different work than he was and that Carl's work required a different level of skill.[23]  In addition, Mr. Britt admits that he was not counseled with regard to his "low performance evaluations." [24]  He further could not remember one Caucasian who told them what their evaluations were.[25]  In fact, during Mr. Britt's employment, he was noted that he met the job requirements.[26]

Mr. Britt states that some time between 1999 and 2001, he saw the phrase "KKK was still alive" on the men's bathroom wall.[27]  He admits that the phrase was painted over the two times he saw it. [28]  He did not see anything else in the plant of a racial nature other than that graffiti from that limited time period between 1999 and 2001 on two occasions.[29]  After he was transferred to the avionics section in 2001, Mr. Britt did not see any type of graffiti about race.[30]

---

[19] See Britt Depo., dated June 11, 2008, at p. 100, line 7 - p. 107, line 11, Exhibit "E".
[20] See Britt Depo., dated June 26, 2008, p. 14, line 1-9, attached as Exhibit "F".
[21] See Britt Depo., dated June 11, 2008, pp. 190, line 23 - p. 191, line 4, Exhibit "E".
[22] See Britt Depo., dated June 26, 2008, p. 46, line 12-13, Exhibit "E".
[23] See Britt Depo., dated June 26, 2008, p. 46, line 13 – p. 48, line 2, Exhibit "F".
[24] See Britt Depo., dated June 26, 2008, p. 34, line 16-21, Exhibit "F".
[25] See Britt Depo., dated June 26, 2008, p. 35, line 1-11, Exhibit "F".
[26] See Performance Evaluation Bates Labeled Britt v. U. S. Helicopter 0353, 0357, 0361, attached as Exhibit "N".
[27] See Britt Depo., dated June 11, 2008, at p. 157, line 12, Exhibit "E".
[28] See Britt Depo., dated June 11, 2008, p. 158, line 14 – p. 159, line 1, Exhibit "E".
[29] See Britt Depo., dated June 11, 2008, at p. 159, line 12-22, Exhibit "E".
[30] See Britt Depo., dated June 11, 2008, at p. 159, line 23, Exhibit "E".

Plaintiff has offered no proof that his job assignments were assigned on the basis of race and the only time Mr. Britt saw a racially offensive remark was on two occasions some time between 1999 and 2001, more than four years prior to his termination. Two incidents of graffiti over the course of Mr. Britt's five and one-half years of employment is not so severe and pervasive as to alter the terms and conditions of Mr. Britt's employment. Further, Mr. Britt cannot provide any evidence that he received different evaluations based on his race or that his evaluations were lower than Caucasian employees. Simply, Mr. Britt cannot establish his claim for racially hostile work environment and U.S. Helicopter is entitled to judgment as a matter of law with respect to Mr. Britt's hostile work environment claim.

**B.   As a matter of law, Mr. Britt cannot establish his claim of race discrimination and termination.** [31]

The United States Supreme Court stated the basic framework for establishing a prima facie case as set forth in *McDonnell Douglas* is flexible and is "not necessarily applicable in every respect in differing factual situations." *See McDonnell Douglas*, 411 U.S. 792, 802, n. 13 (1973); *Furnco Construction Corporation v. Waters*, 438 U.S. 567, 575-76 (1978), (reiterating with respect to *McDonnell Douglas* paradigm, "the facts necessarily will vary in Title VII cases, and the specification of the prima facie proof required" will also vary). *See also, Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir.

---

[31] Mr. Britt has instituted this action for alleged race discrimination and retaliation pursuant to Title VII and 42 U.S.C. § 1981. The Eleventh Circuit Court of Appeals has recognized both Title VII and § 1981 have the same requirements of proof and use the same analytic framework. *See Stanard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Accordingly, U.S. Helicopter will address Mr. Britt's Title VII claims with the understanding that its arguments apply equally to Mr. Britt's § 1981 claims.

1999) ("the requisite showings that make up a prima facie case are not meant to be rigid or inflexible").

The Eleventh Circuit has adopted two meanings by which a Plaintiff may prove his prima facie case of discriminatory termination. However, Mr. Britt cannot prove his prima facie case under either paradigm.

### (1)    Mr. Britt cannot prove his prima facie case of discriminatory termination, as he cannot demonstrate that he was replaced by someone outside of his protected class.

Mr. Britt has not produced any direct evidence.[32] It is undisputed that Mr. Britt has no direct evidence of race discrimination.[33]

Accordingly to prevail in a claim for discriminatory termination under Title VII based on circumstantial evidence, the employee must show, (1) [he] is a member of a protected class; (2) [he] was qualified for the position; (3) [he] suffered an adverse employment action; and (4) [he] was replaced by a person outside his protected class or was treated less favorably than a similarly situated individual outside his protected class." *See Maynard v. Bd. Of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

The Eleventh Circuit Court of Appeals has held an employee fails to establish a prima facie case of race discrimination if the employee cannot show he was replaced by a Caucasian. *See Hawkins v. Zeco Corp.*, 883 F.2d 977, 984 (11th Cir. 1989) (because [the employee] did not meet the fourth requirement of showing that he was replaced by a white, he failed to establish a prima facie case). *See also Cullman v. Braniff Airways*,

---

[32] "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact [an issue] without an inference or presumption. Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race] ... constitute direct evidence of discrimination." *Bass v. Bd. Of County Comms.*, 256 F.3d 1095, 1105 (11th Cir. 2001) (internal quotation marks and citations omitted).

[33] See Britt Depo., dated June 11, 2008, p. 100, line 7 – p. 107, line 11, Exhibit "E".

*Inc.*, 664 F.2d 1282 (5th Cir. 1982) (holding employees may not prevail where they fail to establish replacement by a non-minority).

It is undisputed that Mr. Britt is a member of protected class, African-American. It is also undisputed that he was qualified.[34] However, Mr. Britt cannot demonstrate he was replaced by someone outside of his protected class. In November of 1999, Mr. Britt applied for and was hired for a position at U.S. Helicopter.[35] He continued to work at U.S. Helicopter until his termination in August of 2005. After Mr. Britt's termination, his position was not filled by a direct hire but contract employees were utilized.[36] Mr. Britt did not talk to anyone about reapplying at U.S. Helicopter.[37] Thus, as a matter of law, Mr. Britt cannot show that he was replaced by a person outside of the protected class. Accordingly, this Court should grant summary judgment in favor of U.S. Helicopter.

**(2)    Mr. Britt cannot show a similarly situated Caucasian employee engaged in the same conduct but was not terminated.**

To establish his prima facie case of discriminatory termination under Title VII, Mr. Britt must demonstrate: (1) he belongs to a race minority; (2) he was terminated; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified for the job. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (*citing McDonnell Douglas Corp. v. Green*, 411 US 792, 802 (1973)).

---

[34] U.S. Helicopter admits Mr. Britt was qualified only as to the extent for his prima facie case. U.S. Helicopter does not contend an employee who violates company policy and is found asleep on the job preformed the job satisfactorily. *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 n. 3 (11th Cir. 1993) (noting "whether an employee possesses the qualifications for a position is ... generally distinct from the issue whether he performed the job satisfactorily.").

[35] See Application for Employment Bates Labeled Britt v. US Helicopter 0283-0287, attached as Exhibit "A".

[36] See Bates Label 00102, attached as Exhibit "O".

[37] See Britt Depo., dated June 26, 2008, p. 71, line 22 – p. 72, line 1, Exhibit "F".

It is undisputed that Mr. Britt is African-American and thus belongs to a race minority. It is further undisputed that he was terminated. However, Mr. Britt can offer no similarly situated Caucasian employee who violated the same policies or who had the same performance issues as Mr. Britt, but was not terminated.

Mr. Britt has alleged that Kevin Brion, a Caucasian, who was also found sleeping on the job, was not terminated. However, Mr. Brion was terminated after he was found sleeping on the job in 1999.[38] Mr. Brion was terminated on April 8, 1999.[39]

However, Mr. Britt's and Mr. Brion's employment terminations are distinct from one another. In Mr. Britt's situation, he did not have a medical condition which caused drowsiness. Mr. Britt stated that he told his employer he was "dozing" because of medication he was taking.[40] He did not notify his employer that the condition for which he was taking medication was controlled and he no longer needed the medication. He simply provided a note from his doctor, following his termination, stating that one of the possible side effects of the medication was drowsiness.[41] Mr. Britt has not asked his doctor to prescribe a different medication that would not cause drowsiness.[42]

Mr. Brion was found sleeping on the job and terminated. Mr. Brion was diagnosed with severe obstructive sleep apnea.[43] It was not until he sought treatment that his doctor advised that his medical condition was under control and that he would have

---

[38] See Letter of Discharge Bates Labeled 260, attached as Exhibit "P".
[39] See Payroll Change Notice Bates Labeled 263, attached as Exhibit Q".
[40] See Britt Depo., dated June 11, 2008, p. 139, line 10-15, Exhibit "E" and Letter of Discharge.
[41] Plaintiff's Bates Label 0057-0058 and 00101, Exhibit "R".
[42] See Britt Depo., dated June 26, 2008, p. 59, line 15-17, Exhibit "F".
[43] See Letter from Dr. Alan Prince, Bates Labeled 259, attached as Exhibit "S".

no more difficulties if he was rehired. [44]    Mr. Britt admitted that he did not know what Mr. Brion's medical condition was or if Mr. Brion was even taking medication.[45]

Furthermore, in support of U.S. Helicopter's position that it does not terminate employees because of race, it would point out that between August of 2004 and October of 2005, no African-American employees with the exception of Mr. Britt were terminated.  However, two Caucasian employees were terminated for cause during that same time period.[46]  Thus, as a matter of law, Mr. Britt cannot show a similarly situated employee outside of his protected class received more favorable treatment and this Court should grant summary judgment in favor of U.S. Helicopter.

> **(3)    U.S. Helicopter has legitimate, non-discriminatory reasons for Mr. Britt's termination.**

If an employee establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate, non-discriminatory reason" for the termination.    *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  The Eleventh Circuit Court of Appeals has held that the employer's burden is "exceedingly light." *See Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983).  Once the employer articulates the legitimate, non-discriminatory reason for the termination, "[t]he presumption of discrimination is rebutted and the employer is entitled to summary judgment unless the Plaintiff proffers evidence sufficient to create a genuine issue of material fact that discrimination was actually the reason for the challenged action." *See Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002).

---

[44] See Letter from Dr. Alan Prince Bates Labeled 259, attached as Exhibit "S".
[45] See Britt Depo., dated June 11, 2008, p. 69, line 7 – p. 71, line 9, Exhibit "E".
[46] See Personnel Discharged for Cause Bates Labeled 322, attached as Exhibit "T".

The Eleventh Circuit Court of Appeals has held an employee's violation of company policies regarding procedures and poor job performance constitute legitimate, non-discriminatory reasons for an adverse employment action. *See Bogle v. Orange County Bd of Com.*, 162 F.3d 653, 657 (11th Cir. 1998); *see also, Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (holding "poor technical performance" and "failure to complete the work probation program satisfactorily" are legitimate, non-discriminatory reasons for a termination). Moreover, in reviewing employers proffered legitimate, non-discriminatory reasons, the Eleventh Circuit has opined, "we must be careful not to allow Title VII Plaintiffs simply to litigate whether they are, in fact, good employees." *See Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002). To the contrary, the inquiry should focus on whether the conclusion was an honest one and not a cover up for a discriminatory decision. *See id.*

In his deposition, Mr. Britt admits that he "nodded off." [47] While Mr. Britt attempts to distinguish "nodding off" with sleeping, he does not dispute that he closed his eyes while on the job.[48] Mr. Britt further admitted that he had lost four tools during his employment.[49] Mr. Britt explained that the significance of a lost tool is that if it is not found and remains in the aircraft, it could cause damage to the aircraft and injuries to the pilot. [50] In the Letter of Discharge, it is noted that Mr. Britt had had other violations prior to his termination of August 1, 2005.[51]

The Eleventh Circuit Court of Appeals recently refused to second guess an employer who terminated its employee for violation of work rules. *See Moore v.*

---

[47] See Britt Depo., dated June 11, 2008, at p. 65, line 20 – p. 66, line 7, Exhibit "E".
[48] See Britt Depo., dated June 11, 2008, p. 67, line 12-16, Exhibit "E".
[49] See Britt Depo., dated June 11, 2008, at p. 135, line 12 – p. 136, line 4, Exhibit "E".
[50] See Britt Depo., dated June 11, 2008, at p. 126, line 3-11, Exhibit "E".
[51] See Letter of Discharge, Bates Labeled 00329, Exhibit "H".

*Alabama Dept. of Corrections*, 137 F. Appx. 235, 238 (11th Cir. 2005). In *Moore*, an African-American employee was demoted for violating a number of his employer's regulations pertaining to use of excessive force. *See id.* at 237. The employee alleged white employees violated other work rules, but were not demoted. *See id.* at 3. However, each alleged comparator the employee offered violated different rules than the employee or the comparatives alleged misconduct could not be confirmed. *See id.* In addition, the one comparator who was similarly accused of excessive force was disciplined for only a single violation, whereas the employee was found guilty of five separate violations. *See id.*

The Eleventh Circuit Court of Appeals held, "a difference in the charged offenses can preclude a comparison for Title VII purposes." *See id.* at 238. The Court of Appeals further stated "Title VII does not prevent an employer from interpreting its rules as it chooses in making determinations as it sees fit under such rules." *See id.* Thus, the Eleventh Circuit affirmed the district court's grant of summary judgment in favor of the employer. *See id.*

In Mr. Britt's Amended Complaint, he states that he was treated differently than other Caucasian employees in the area of discipline.[52] He specifically states two Caucasian employees were involved in an altercation and only one was suspended.[53] However, the examples Mr. Britt provides are not similar to Mr. Britt's infractions. Mr. Britt admitted that he had never gotten into an altercation on the job.[54]

U.S. Helicopter terminated Mr. Britt for his violation of company rules and policies. Specifically, Mr. Britt was terminated for falling asleep on the job, a violation

---

[52] See Plaintiff's Amended Complaint ¶87, Exhibit "M".
[53] See Britt Depo, dated June 26, 2008, p. 94, line 1 – p. 95, line 11, Exhibit "F".
[54] See Britt Depo., dated June 26, 2008, p. 95, line 21-22, Exhibit "F".

of company policy.    Accordingly, U.S. Helicopter has articulated a legitimate, non-discriminatory reason for Mr. Britt's termination, and Mr. Britt cannot demonstrate pretext.    U.S. Helicopter should be granted summary judgment as to Mr. Britt's discrimination claim.

**C.**    **As a matter of law, Mr. Britt cannot establish his claim for discriminatory treatment in terms and conditions of his employment.**

To establish a prima facie case for discriminatory treatment, an employee must show: "(1) he is a member of protected class, (2) was similarly situated with a person outside of the protected class, but (3) was denied a condition of employment afforded that person." *See Thompkins v. Morris Brown College*, 752 F.2d 558, 567 n. 7 (11th Cir. 1985).

The Eleventh Circuit Court of Appeals has held a condition of employment must be something which effects "salaries, benefits or position." *See Wu v. Thomas*, 996 F.2d 271, 273 (11th Cir. 1993); *see also Malladi v. Brown*, 987 F. Supp. 893, 914 (M.D. Ala. 1997) (noting the 11th Cir. indicated in Wu, a term or condition of employment "must be something like loss of salary, benefits or position."). Thus, to be actionable under Title VII, the employer's conduct must constitute an "adverse employment action" such as "discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *See Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality." *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998). In evaluating what actions meet that required level of substantiality, the Eleventh Circuit "recognize[s]

Title VII is neither a general stability code nor a statute making actionable the ordinary tribulations of the workplace." *See Gupta*, 212 F.3d at 587 (*quoting Anderson v. Coors Brewing Company*, 181 F.3d 1171, 1178 (10th Cir. 1999); *see also, Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996) ("[a] materially adverse change in terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities").

In *Gupta*, the employee alleged she was subjected to an adverse employment action because she was not assigned to teach the class she desired. *See Gupta*, 212 F.3d at 588. The Eleventh Circuit noted her employer could assign her to teach whatever class it needed her to teach. *See id.* The Eleventh Circuit further noted the employee failed to present any evidence she was "particularly deserving" of the desired class as opposed to the other classes, or that other similarly situated employees "routinely got to cherry pick the classes they taught." *See id.* Thus, the Eleventh Circuit held as a matter of law the assignment of class did not constitute an actionable adverse employment action. *See id.*. Mr. Britt alleges that Mr. Ellis assigned all the less desirable jobs to him.[55] Mr. Britt also alleges that he attempted to speak to Ron Donahue about the assignments he was given by Mr. Ellis, but could not recall what Mr. Donahue said.[56]

Just as the employer in *Gupta*, Mr. Ellis was free to assign tasks to employees in his department. Moreover, Mr. Britt cannot demonstrate the assignments he was given adversely affected his status as employee. In fact, Mr. Britt testified that he did not know what his next advancement would have been if he had been "exposed to the right type of work." He further admitted that no one ever told him that he would become a lead

---

[55] See Britt Depo., dated June 26, 2008, p. 22, line 10 – p. 23, line 6, Exhibit "F".
[56] See Britt Depo., dated June 11, 2008, p. 170, line 4 – p. 172, line 11, Exhibit "E".

man.[57]  Simply, Mr. Britt cannot establish the assignments he was given affected a material condition of his employment and thus, U.S. Helicopter is entitled to summary judgment as to Mr. Britt's claimed discrimination and terms and conditions of employment.

### D.    As a matter of law, Mr. Britt has failed to establish his claim for retaliation under Title VII.

Mr. Britt cannot establish a prima facie case of retaliation.  To maintain a claim for retaliation under Title VII, an employee must prove:  (1) he engaged in protective activity in opposition to Title VII discrimination; (2) simultaneously or subsequent to the protected opposition, he suffered an adverse employment action; and (3) there is a causal connection or link between the participation and the protected activity and the adverse employment decision.  *See Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004); *see also Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989).

### (1)    As Mr. Britt did not engage in any protected activity, he cannot establish a prima facie case of retaliation.

Under the opposition clause of Title VII, an employer may not retaliate against an employee because the employee opposed "an unlawful employment practice by this subchapter."  *See 42 U.S.C.* § 2000(e-3)(a).  Specifically, to succeed on a retaliation claim, an employee must present evidence indicating that he voiced some opposition to the discrimination or participated in some proceedings concerning the allegation of discrimination.  *See Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir. 1992).  Although informal complaints of discrimination can constitute protected activity for purposes of retaliation, at the very least, the employee must establish "the employer was

---

[57] See Britt Depo., dated June 26, 2008, p. 55, line 3-12, Exhibit "F".

aware of the protected expression at the time it took adverse action." *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163, n. 11 (11th Cir. 1993); *see also Brungart v. Bellsouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (stating that a decision-maker could not have been motivated to retaliate by something unknown to him). *See also Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 2d 1176, 1177 (N.D. Ala. 1999) (holding employee's complaints to a supervisor about pay disparity unrelated to race discrimination did not constitute protected activity as a matter of law).

Mr. Britt alleges that he contacted the EEOC prior to his termination to complain of discrimination on the basis of race because he was not obtaining overtime.[58] However, Mr. Britt testified that he does not even recall if the EEOC conducted an investigation. He also testified that he does not even remember what happened to the "overtime EEOC charge".[59] According to documents from the EEOC, Mr. Britt's initial charge was assigned to EEOC staff on May 16, 2005; however, the inquiry was closed on June 2, 2005, more than two months prior to his termination.[60]

However, Mr. Britt did not file a formal charge with the EEOC and while Mr. Britt testified that he advised Mr. Ellis of his Charge of Discrimination, Mr. Ellis was not his supervisor at the time of his termination.[61] Moreover, Kim Durden, in Human Resources, who was at the termination meeting with Mr. Britt, was not aware of his EEOC charge.[62]

---

[58] Mr. Britt has produced a Questionnaire View presumably from the EEOC regarding a complaint he made. See Questionnaire View, 00071-00072, attached as Exhibit "U".
[59] See Britt Depo., dated June 26, 2008, p. 14, line 10 – p. 16, line 13, attached as Exhibit "F".
[60] See Bates Labeled Document 00037, attached as Exhibit "V".
[61] See Britt Depo., dated June 11, 2008, p. 79, line 17 – p. 80, line 1, attached as Exhibit "E".
[62] See Britt Depo., dated June 26, 2008, p. 22, line 17 – p. 23, line 6, attached as Exhibit "F".

Therefore, Mr. Britt has offered no evidence that the decision maker at the time of his termination was aware of the presumed charge of discrimination.[63] Thus, U.S. Helicopter is entitled to summary judgment on Mr. Britt's claim for retaliation as a matter of law.

### (2)  U.S. Helicopter has a legitimate, non-retaliatory reason for Mr. Britt's termination.

Even assuming Mr. Britt established a prima facie case of retaliation, which he has not, U.S. Helicopter had a legitimate, non–retaliatory reason for his termination. "Once a prima facie case has been established, the [employer] may come forward with legitimate reasons for the employment action to negate the inference of retaliation." *See Goldsmith v. Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991). "If the [employer] offers legitimate reasons for the employment action, the [employee] then bears the burden of proving by a preponderance of the evidence that the reasons offered by the [employer] are pretextual." *See Goldsmith*, 996 F.2d 1155 at 1163.

This Court has previously held an employee's failure to follow written employment policies constitutes a legitimate, non-retaliatory reason for an adverse employment action. *See Phillips v. Hibbett Sporting Goods, Inc.*, 329 F. Supp. 2d 1280, 1293 (M.D. Ala. 2004). As argued *supra*, U.S. Helicopter terminated Mr. Britt for sleeping on the job. As U.S. Helicopter has articulated legitimate, non-retaliatory reasons for Mr. Britt's termination, it is entitled to summary judgment on Mr. Britt's retaliation claim as a matter of law.

---

[63] See Britt Depo., dated June 26, 2008, p. 22, line 10 – p. 23, line 6, Exhibit "F".

**E.     The Plaintiff has failed to demonstrate that he is a qualified individual with a disability under the Americans with Disabilities Act.**

The Americans with Disability Act ("ADA") provides that an employer may not discriminate against an individual with a disability because of that disability with respect to "job application procedures, the hiring, the advancement, or discharge of employee, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 *U.S.C.* § 12112(a).

Mr. Britt, who has alleged discrimination in violation of the ADA bears the burden of establishing a prima facie case, including, that he is disabled. *See Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 n. 3 (11th Cir. 1996). To establish a prima facie case of disability discrimination, Plaintiff must demonstrate that he (1) has a disability, (2) is a qualified individual with a disability, and (3) was subjected to unlawful discrimination because of his disability. *Hillburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220 (11th Cir. 1999).

**(1)     U.S. Helicopter denies that Mr. Britt is a qualified individual with a disability or even that he is "disabled" under the ADA.**

Under the general definition section of the ADA, the term "disability" is defined as follows:

> *"(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."*

42 *U.S.C.* § 12102(2).

Mr. Britt has not asserted in his Complaint under which provision of the Americans with Disabilities Act that he is disabled; however, under each of the three statutory definitions of disability, Mr. Britt does not qualify as disabled. Mr. Britt alleges

that he advised his supervisor, Jim Ellis, that he was taking Remeron, a prescription medication for depression, and that drowsiness was one of the side effects of this medication.[64]    He further states that he asked Mr. Ellis for special consideration and/or an accommodation.[65]  With regard to this request, the Plaintiff states in his Amended Complaint that he requested to have more challenging assignments that would ensure that he would stay busy throughout the entire day.[66]  He also testified that he did not want to work alone[67] acknowledging that his medication made him drowsy.[68]  This alleged impairment of Mr. Britt does not qualify as a disability under the ADA.

<div style="margin-left: 2em;">

**(a)**    **Plaintiff does not qualify as disabled under the ADA merely because he gets sleepy as a result of taking a prescription medication.**

</div>

The Americans with Disability Act defines a person with a disability as one who (1) "has a physical or mental impairment that substantially limits one or more of the major life activities of that person ....  The impairment must be severe enough to pose substantial limitations on the ability to perform a major life activity, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working."  *See* 42 *U.S.C.* § 12102(2).  Regulations promulgated by the Equal Employment Opportunity Commission state that "[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 *C.F.R.* § 1630.2(i).    Under these regulations, Mr. Britt is not disabled.  Moreover, on June 2, 2005, Mr. Britt completed an Addendum to his Employment Application and noted that he was not an individual with a

---

[64] See Britt Depo., dated June 11, 2008, p. 54, line 2 – 6, Exhibit "E".
[65] See Britt Depo., dated June 11, 2008, p. 62, line 1 – 9, Exhibit "E".
[66] See Plaintiff's Amended Complaint, ¶¶ 67-69, attached as Exhibit "M".
[67] See Britt Depo., dated June 11, 2008, p. 62, line 12-16, Exhibit "E".
[68] See Britt Depo., dated June 11, 2008, p. 63, line 10-14, Exhibit "E".

disability[69], although Mr. Britt offered testimony that he had been taking the medication sine 2004.[70]

In *Cash v. Smith*, 231 F.3d 1301 (Ala. 2001), it was found that Ms. Cash, while employed with Alabama Power Company ("APCO"), had suffered from various medical problems including diagnosis of mitral valve prolapse, migraine headaches, depression, high blood pressure and the removal of a brain tumor as well as being diagnosed with a seizure disorder and adult-onset diabetes. *Id.* at 1303. Ms. Cash began missing significant periods of work and was eventually reassigned to another position. Ms. Cash brought this lawsuit alleging that she had been discriminated against in violation of the Americans with Disability Act. The Court held that while Ms. Cash suffered from a number of medical conditions that could be regarded as impairments; the Court found that there was no evidence that these "impairments" had limited her in a major life activity. *Id.* at 1306. In addition, the Plaintiff had produced no evidence of a "record of such impairment" under 42 *U.S.C.* § 12102(2)(B).

The only major life activity that Mr. Britt claims that he is "substantially limited" in this case is the life activity of working.[71] Mr. Britt also offered that his taking the prescription did not alter other activities in his daily life and therefore, Mr. Britt is not disabled as defined by the ADA.[72]

In *Toyota Motor Manufacturing Co. of KY, Inc., v. Williams*, the Supreme Court reversed the 6th Circuit decision that found a former employee disabled because she could no longer perform her manual tasks at work due to carpal tunnel syndrome. *See Toyota*,

---

[69] See Addendum to Employment Application, Bates Labeled 335, attached as Exhibit "W".

[70] See Britt Depo., dated June 11, p. 54, line 17-23, Exhibit "E".

[71] See Plaintiff's Responses to Defendant's Interrogatories, attached as Exhibit "X".

[72] See Britt Depo., dated June 11, 2008, p. 80, line 2 – 14, Exhibit "E".

534 U.S. 184, 192-93, 122 S. Ct. 681, 689 (2002). Curtailing previous case law defining "major life activities," the Court held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of essential importance to most people's daily lives." *Id.* 122 S. Ct. at 691. Specifically, the Court stated that "[w]hen addressing the major life activities of performing manual tasks, the essential inquiry must be whether the Claimant is unable to perform the variety of tasks essential to most people daily lives. The Court noted that testimony that the Toyota plaintiff could brush her teeth, wash her face, bathe, tend to her garden, fix breakfast, do laundry and pick up around the house was the very type of evidence the 6th Circuit should have focused on, as these are the type of manual tasks of essential importance to daily life. *See Toyota*, 122 S. Ct. at 693. Mr. Britt has offered similar evidence that he is able to perform daily life activities:

> Q: In 2005, Mr. Britt, when you were taking Remeron, did it prevent you from any other activities in your life?
>
> A: Like what are you talking about? Explain it.
>
> Q: Well, were you able to take care of yourself, such as cooking, taking showers?
>
> A: Yes, I think I - - yes, I can. I don't think it prevented me from doing too much of anything, it just made me drowsy.[73]

Clearly, Mr. Britt can perform the tasks essential to his daily life and therefore is not disabled under the Americans with Disability Act. Furthermore, Mr. Britt has also not produced any evidence of a "record of such impairment" under 42 *U.S.C.* § 12102(2)(B).

---

[73] See Britt Depo., dated June 11, 2008, p. 180, line 2-14, Exhibit "E".

Finally, Plaintiff has produced no evidence that U.S. Helicopter "regarded" him as having an impairment that substantially limited a major life activity under 42 *U.S.C.* § 12102(2)(C). Mr. Britt admitted that when Mr. Robison became his supervisor that he did not advise Mr. Robison that he was taking prescription medication until he was terminated.[74] Moreover, in June 2005, two months before his termination, Mr. Britt advised U.S. Helicopter that he was not disabled.[75]

Mr. Britt claims that he told Mr. Ellis about the medication he was taking; however, as Mr. Britt has presented no evidence that his supervisor at the time of his termination was aware that he was taking medication and therefore, Mr. Britt has adduced no evidence that the decision makers regarding his employment regarded him as having a disability.

In addition, the Plaintiff is unable to prove that U.S. Helicopter considered him as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 *C.F.R.* § 1630.2(j)(3)(i); *see Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1327 (11th Cir. 1998).

In analyzing such a disability claim, the Supreme Court has instructed that the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Airlines,* 527 U.S. 471, 491, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999). Although the Sutton plaintiffs alleged that their employer regarded their impairment as preventing them from working as global airline pilots, the Court held that disqualification from working in a single job does not

---

[74] See Britt Depo., dated June 11, 2008, p. 76, line 16-23, attached as Exhibit "E".
[75] See Addendum to Employment Application, Bates Labeled 335, attached as Exhibit "W".

support the claim that a plaintiff has a substantially limiting impairment. *See id.* at 493, 119 S. Ct. 2139.

In this particular case, Mr. Britt has held a variety of jobs. Specifically, he has worked as a plumber, and as an aircraft mechanic.[76] In addition, while in the military, Mr. Britt was a missile repairman and field radio repairman.[77] Moreover, following his termination, he worked at the Veterans Administration in house cleaning.[78] Mr. Britt is not substantially limited in major life activities as he is able to perform different jobs in a variety of areas of employment.

42 *U.S.C.* 12102(2)(C) provides that having a disability includes "being regarded as having a physical or mental impairment that substantially limits one or more of the major life activities of such individual"). Our courts have recognized that "[a]s with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of the individual." *Bonner v. The Home Depot*, 323 F. Supp. 2d 1250, 1262 *quoting Hillburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1230 (11th Cir. 1999) *citing Standard v. A.B.E.L. Service, Inc.,* 161 F.3d 1318, 1327 (11th Cir. 1998). "To show that he was regarded as substantially limited in his ability to work, Plaintiff must prove that [Defendant] considered [him] as significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes compared to the average person having comparable training, skills, and abilities." *Steadman*, 219 F. Supp. 2d at 1222 *quoting Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000).

Mr. Britt can present no evidence that his employer perceived him as having a disability. As argued supra, Mr. Britt advised U.S. Helicopter that he did not have a

---

[76] See Bates Labeled Plaintiff's 771, attached as Exhibit "Y".
[77] See Britt Depo., dated June 26, 2008, p. 79, line 1-3, Exhibit "F".
[78] See Britt Depo., dated June 11, 2008, p. 11, line 2-22, Exhibit "E".

disability as of June of 2005, two months before his termination.[79]  Furthermore, Mr. Britt has admitted that no decision maker at U.S. Helicopter was aware that he was taking prescription medication which caused drowsiness.  Therefore, U.S. Helicopter is entitled to summary judgment as a matter of law as he was not disabled as defined under the Americans with Disability Act.

**F.**     **Mr. Britt cannot show that he was retaliated in violation of the ADA.**

With regard to Mr. Britt's claim that U.S. Helicopter retaliated against him for asserting his rights under the ADA, U.S. Helicopter argues that Mr. Britt cannot establish a prima facie case of retaliation because he never made any complaint of discrimination prior to his termination.  Mr. Britt has offered no testimony that he complained to anyone at U.S. Helicopter that he believed he was being discriminated against because of his "disability."  Mr. Britt simply stated that he told Mr. Ellis that he was taking medication and that Mr. Ellis requested to see the bottle.  He does not remember anything else Mr. Ellis said.[80]  In addition, the Plaintiff's EEOC Charge as to his ADA claim was not filed with the EEOC until after his termination.  And as stated above, Mr. Britt advised U.S. Helicopter that he did not have a disability as of June of 2005, two months before his termination.[81]

The analysis for retaliation actions under the ADA is similar to the analysis required by *McDonnell Douglas.  Stewart v. Happy Herman's Cheire Bridge, Inc.* 117 F.3d 1278, 1287 (11th Cir. 1997).  Therefore, to establish a retaliation claim under the ADA, the Plaintiff must show (1) statutory protected expression, (2) adverse employment action, and (3) a causal link between the expression and the adverse action.  *Griffin v.*

---

[79] See Addendum to Employment Application, Bates Labeled 335, Exhibit "W".
[80] See Britt Depo., dated June 11, 2008, p. 61, line 2-15, Exhibit "E".
[81] See Addendum to Employment Application, Bates Labeled 335, Exhibit "W".

*GTE Florida, Inc.*, 182 F.3d 1279, 1281 (11th Cir. 1999). In this particular case, Mr. Britt did not engage in a statutory protected expression because he did not request a reasonable accommodation before his termination. In addition, no evidence has been adduced that Mr. Britt's termination is causally linked by any request and his termination. Mr. Britt admits that he did not advise Mr. Robison that he was taking medication at the time Mr. Robison became his supervisor.[82] Mr. Robison was not aware Mr. Britt was taking this medication until the termination meeting.[83]

U.S. Helicopter has proffered legitimate nondiscriminatory reasons for terminating Plaintiff. Moreover, Mr. Britt admits that the supervisor that terminated him was not aware he was taking medication. *Id.* U.S. Helicopter is therefore entitled to summary judgment as a matter of law with regard to Mr. Britt's claim of retaliation under the Americans with Disabilty Act.

**G.    As a matter of law, Mr. Britt is barred from pursuing his retaliation claim for failure to exhaust his administrative remedies.**

"Prior to filing a Title VII action ... a plaintiff first must file a Charge of Discrimination with the EEOC." *See Gregory v. Georgia Dept. of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004); *see also* 42 *U.S.C.* § 2000E – 5(e). The purpose of this requirement is that the EEOC "should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *See Gregory*, 355 F.3d at 1279; *see also Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1319 (11th Cir. 2001). According to the Eleventh Circuit, an employee's complaint is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of the

---

[82] See Britt Depo., dated June 11, 2008, p. 76, line 17-23, Exhibit "E".
[83] *See id.*

discrimination." *See Gregory*, 355 F.3d at 1280.  Similarly, the United States Supreme Court has repeatedly upheld dismissal or summary judgment in cases when an employee failed to pursue an administrative discrimination complaint in a timely manner.  *See Lorance v. AT&T Technologies, Inc.*, 490 U.S. 900 (1989); *see also Baldwin County Welcome Center v. Brown*, 466 U.S. 147 (1984) (per curiam); *see also Delaware State College v. Ricks*, 449 U.S. 250 (1980); *see also United Airlines, Inc. v. Evans*, 431 U.S. 553 (1977); *see also Davis v. BellSouth Mobility, LLC*, 2002 WL 31720597 at *5 (N.D. Ala. 2002).

In *Davis*, the employee marked the box on her EEOC charge for age, race and disability discrimination.  *See Davis*, 2002 WL 31720597 at *5.  However, the employee failed to mark the box for retaliation.  *See id.*  In addition, the employee failed to state she felt she had been retaliated against in the text of her EEOC charge.  Accordingly, the Court held the employee's retaliation claim failed for lack of exhaustion of administrative remedies.  *See id.; see also Pearson v. Prime Healthcare Corp.*, 2000 WL 33224801 (M.D. Ala. 2000) (holding the court lacked jurisdiction over employee's retaliation claim as she failed to include a retaliation charge in her EEOC complaint).

Like the employee in *Davis*, Mr. Britt failed to check the box on his EEOC charge for retaliation.[84]  Further, Mr. Britt failed to state in the text of his EEOC charge his termination stemmed from any form of retaliation.[85]  To the contrary, Mr. Britt stated he "believed he had been discriminated against because of [his] race ... and discriminated against because of [his] disability in violation of the Americans with Disability Act." Mr. Britt never amended his Charge.  Thus, as Mr. Britt failed to include his allegation of

---

[84] See Britt EEOC Charge, Exhibit "I".
[85] *See id.*

retaliation in his EEOC charge, this Court lacks subject matter jurisdiction over his claim

for retaliation.

**H.**    **Mr. Britt's claim of negligent supervision, training and retention fail as a matter of law.**

Under Alabama law, summary judgment is due to be granted in favor of U.S.

Helicopter on Mr. Britt's claim of negligent training, supervision and retention.  In order

to recover on such grounds, "Plaintiff must show that the alleged incompetence of the

employee was actually known to the employer or was discovered by the employer if it

had exercised care and proper diligence." *Portera v. Winn-Dixie of Montgomery, Inc.*,

996 F. Supp. 1418, 1438 (M.D. Ala. 1998) (*citing Ledbetter v. United American Ins. Co.*,

624 So. 2d 1371 (Ala. 1993)).

The Supreme Court of Alabama has stated in regard to a claim for negligent

supervision, training and retention that:

> *"[I]n the master and servant relationship, the master is held responsible for his servants and competency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him.  Liability depends upon it being established by affirmative proof that such incompetency was actually known by the master, or that he exercised due and proper diligence, he would have learned that which would have charged him in the law with such knowledge."*

*Armstrong Bus Service v. AmSouth Bank*, 817 S. 2d 665, 667 (Ala. 2001).

Mr. Britt has failed to offer any evidence that any employee of U.S. Helicopter

that dealt with him is incompetent.  Additionally, Mr. Britt has not produced any

evidence suggesting that, even if an U.S. Helicopter employee is incompetent, U.S.

Helicopter knew or should have known of the allegedly incompetent employee.

In order for Mr. Britt's negligent supervision, training and retention claim to exist, U.S. Helicopter must or should have known of its employees' propensity to intentionally discriminate or retaliate against an employee taking advantage of the protection of those statutes. Mr. Britt has not alleged a continuing pattern of violations, or any prior discrimination or retaliation as such that U.S. Helicopter should have been aware of the problem. In addition, no proof has been adduced that the negligent training, retention and supervision caused the injuries in this case. *Norman v. Southern Guar. Ins. Co.*, 191 F. Supp. 2d 1321 (M.D. Ala. 2002). Mr. Britt admits that no one at U.S. Helicopter used any racially offensive remarks in front of him or towards him.[86] The only time he saw a racially offensive phrase was sometime between 1999 and 2001 on two occasions and the phrase was painted over.[87] In addition, Mr. Britt has failed to offer any testimony that anyone at U.S. Helicopter regarded him as disabled as defined under the Americans with Disability Act.

In addition, the Alabama Supreme Court has held that a plaintiff is required to prove an underlying common law tort in order to prevail in a claim for negligent supervision, training or retention. *Univ. Fed. Credit Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003); *Voyager Ins. Co. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003); *Stevenson v. Precision Standard Inc.*, 762 So. 2d 820 (Ala. 1999). "In order to establish to a claim against an employer for negligent supervision, training and/or retention, the Plaintiff must establish that the allegedly incompetent employee committed a common law Alabama tort." *Evans v. Mobile Infirmary Med. Ctr.*, 2005 WL 1840235 *17 (S.D. Ala. 2005). Alabama does not recognize a common law tort for race discrimination in

---

[86] See Britt Depo., dated June 11, 2008, p. 190, line 23 – p. 191, line 4, Exhibit "E".
[87] See Britt Depo., dated June 11, 2008, p. 158, line 14 – p.159, line 1, Exhibit "E".

employment or a claim under the Americans with Disability Act and therefore Mr. Britt is unable to maintain an action for negligent supervision, training and/or retention. *Id.* Therefore, summary judgment is due to be granted as a matter of law to U.S. Helicopter on Mr. Britt's state law claims.

## I.   Mr. Britt's claims of negligence fail as a matter of law.

"To prove negligence, a plaintiff must establish (1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; (3) that the plaintiff was damaged or injured; (4) that the defendant's breach of duty proximately caused the damage or injury to the plaintiff." *Banks v. SCI Alabama Funeral Services, Inc.*, 801 So.2d 20, 254 (Ala. Civ. App. 2001). Mr. Britt has failed to allege or prove what specific duty was owed to the plaintiff in the context of this negligence claim, nor has the plaintiff adduced any evidence showing any breach by the defendants that constituted general negligence in this case. "Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new and independent causes, produces an injury or harm and without which the injury or harm would not occur." *Dillard v. Pittway Corp.*, 719 So.2d 188, 192 (Ala. 1998). The plaintiff has the burden of presenting substantial evidence of proximate cause. *Morguson v. 3M Co.*, 857 So.2d 796, 800 (Ala. 2003). Proof that shows only the alleged harm could have happened in a certain way does not warrant a conclusion that it did occur, where there is an equal probability that the harm could have been caused in a different manner. *See Ervin v. Excel Properties, Inc.*, 831 So.2d 38, 44 (Ala. Civ. App. 2001). Mr. Britt has not shown any series of events or chain of causation linking U.S. Helicopter's alleged negligence with his alleged harm. Mr. Britt has not proffered sufficient evidence to show that any act or omission of

the defendants, standing along, proximately caused the alleged harm and he has not satisfied his burden of adducing substantial evidence of proximate cause. Mr. Britt has filed to provide any evidence that U.S. Helicopter's alleged negligence caused his damages. Because Mr. Britt has failed to provide the requisite basis for a cause of action in negligence, the defendants are due judgment as a matter of law on this claim.

## IV.    CONCLUSION.

Mr. Britt cannot establish his claim for race discrimination. It is undisputed that Mr. Britt violated U.S. Helicopter's established policies and procedures as he was found sleeping on the job. Accordingly, U.S. Helicopter has articulated a legitimate, non-discriminatory reason for Mr. Britt's termination. Thus, U.S. Helicopter is entitled to summary judgment as to his claims for race discrimination.

Further, Mr. Britt cannot establish his claim under the Americans with Disabilty Act. Mr. Britt does not have a disability as defined by the Americans with Disability Act.

Mr. Britt also cannot establish his claim for retaliation. It is undisputed that Mr. Britt did not complain to his supervisor at the time of his termination of the alleged discrimination. Moreover, Mr. Britt states that he did not tell anyone in Human Resources regarding his EEOC claim. Mr. Britt's violation of U.S. Helicopter's polices and procedures constitute a legitimate, non-retaliatory reason for his termination. Moreover, Mr. Britt is barred from pursuing his retaliation claim because he failed to exhaust his administrative remedies. Thus, U.S. Helicopter is entitled to summary judgment as to Mr. Britt's claims of retaliation.

In addition, Mr. Britt cannot establish his state law claims for negligent supervision, training, retention and negligence.

WHEREFORE, PREMISES CONSIDERED, U.S. Helicopter respectfully requests this Court grant its Motion for Summary Judgment as to all of Mr. Britt's claims.

/s/ Martha Leach Thompson
Christopher S. Rodgers
Martha Leach Thompson

**OF COUNSEL:**
Huie, Fernambucq & Stewart, LLP
2801 Highway 280 South, Suite 200
Birmingham, AL 35223
Telephone: (205) 251-1193
Facsimile: (205) 251-1256

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon counsel of record via the CM/ECF System and/or by U.S. Mail on this the 18th day of July, 2008.

M. Wayne Sabel, Esq.
Sabel & Sabel, P.C.
Hillwood Office Center
2800 Zelda Road, Suite 100-5
Montgomery, AL 36106

/s/ Martha Leach Thompson
Of Counsel

# Application
# or Employment



**US Helicopter**

P.O Box 1088, Ozark, AL  36361, (205) 774-2529

**EXHIBIT A**
tabbles

---

We Consider applicants for all positions without regard to race, color, religion, creed, gender, national origin, age, disability, marital or veteran status, sexual orientation, or any other legally protected status.

**(PLEASE PRINT)**

Date of Application
11-10-99

| Last Name | First Name | Middle Name |
|---|---|---|
| Britt | Bibby | Fred |

Address   Number   Street        City          Zip Code
100 Seminole Drive, Enterprise, Al    36330

Telephone Number(s)
334-347-6708

Social Security Number
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

If you are under 18 years of age can you provide required proof of your eligibility to work?   ✓ Yes   ___ No

Do you have a valid drivers license?   ✓ Yes   ___ No

Have you ever filed an application with us before?   ___ Yes   ✓ No
If Yes, give date _____

Are you currently employed?   ___ Yes   ✓ No

May we contact your present employer?   ___ Yes   ✓ No

Are you prevented from lawfully becoming employed in this country because of VISA or Immigration Status?   ___ Yes   ✓ No
*Proof of citizenship or immigration status will be required upon employment.*

On what date would you be available for work?   Any time

I understand US Helicopter may require me to work full-time, shift work, and overtime.   ✓ Yes   ___ No

---

Are you currently on "lay-off" status and subject to recall?   ___ Yes   ✓ No

I understand I may be required to participate in foreign and domestic travel   ✓ Yes   ___ No

---

Have you been convicted of a felony within the last 7 years?   ___ Yes   ✓ No
If Yes, please explain _____

Britt v. U.S. Heli 0283

EQUAL OPPORTUNITY EMPLOYER

# Education

| | Name and Address of School | Course of Study | Years Completed | Diploma Degree |
|---|---|---|---|---|
| Elementary School | Carroll St. Elem. Carroll Street Enterprise, Ala | All Subjects Given | 6 years | Yes |
| High School | Coppinville High School Ouida Street Enterprise, Ala | All Subjects Required | 6 years | Yes |
| Undergraduate College | | | | |
| Graduate Professional | | | | |
| Other (Specify) | Geo. Wallace Tech. School Napier Fields Dothan, Ala | Radio & T.V. | 1½ years | |

| | Fluent | Good | Fair |
|---|---|---|---|
| Speak | | English | |
| Read | | English | |
| Write | | | |

Describe any specialized training, apprenticeships, skills and extra-curricular activities.

Fishing & Hunting

Describe any job-related training received in the United States military.

Hawk Missile Repair & Field Radio Repair

Britt v. U.S. Heli 0284

# Additional Information

## Specialized Skills

| | |
|---|---|
| _ CDL (Commercial Drivers License) | __ FCC-(Federal Communications Classification |
| _ A&P Airframe and Power Plant | Avionics License |
| _ Airframe (Only) | __ Power Plant (Only) |
| _ IA Inspector of Aircraft | |

| | |
|---|---|
| _ CRT | ✓ LOTUS 123 |
| _ PC | ✓ WordPerfect |
| _ GreatPlains | __ Automatic Circuit Analyzer |
| ✓ Typewriter _40_ WPM | __ Fax |

## Other Qualifications

Summarize special job-related skills and qualifications acquired from employment or other experience.

From 1969 - 1974 work for Page AirCraft Inc. as a AirCraft
Mechanic on different type aircrafts. From 1978 - 1984 work
for Northrop AirCraft Inc. As an aircraft mechanic & Elect.
Inst. & Avionic Tech. Can explain in more details Otah.

---

State any additional information you feel may be helpful to us in considering you application.

Britt v. U.S. Heli 0285

## References

1. _Debra J. Jones, 420 Grimes St, Enterprise, Al 334-347-6708_
   (Name)                Address                Phone #

2. _Jimmy Boykins, 206 Boykins St, Enterprise, Al 334-347-6715_
   (Name)                Address                Phone #

3. _Brenda Jackson, 110 Andrews St, Enterprise, Al 334-347-0680_
   (Name)                Address                Phone #

t with your present or last job. Include any job-related military service assignments and volunteer activities
may exclude organizations which indicate race, color, religion, gender, national origin, disabilities or othe
tected status.

| ployer DynCorp Technical Services | Dates Employed From - To | | Worked Performed |
|---|---|---|---|
| ddress Building) 415 H. Rucker, Ah 36362-0039 | 27Sept 99 | 28 Oct 99 | Repaired and over haul Components of different type aircrafts. Aircraft such as UH-1's, OH-58c + D |
| lephone Number(s): 334-598-0483 | Hourly Rate/ Salary | | AH-60, AH-64 + CH- |
| b Title Aircraft mechanic | Supervisor Mr. Jerry Parris | Starting $11.44 | Final $11.44 | 47's. (also Cobras) |
| eason for Leaving Security Clearance didn't go thought (Can explain in details Orgn) | | | |
| nployer V.A. Hosp. (Tuskegee) | Dates Employed From - To | | Worked Performed |
| ddress 2400 Hosp. Road Tuskegee, Ah 36083 | Dec. 98 | July 99 | Preform all the duties |
| lephone Number(s): | Hourly Rate/ Salary | | of a pipe fitter. |
| ob Title Pipe fitter | Supervisor Ms. Joyce Daniels | Starting 13.34 | Final 13.34 | |
| eason for Leaving Temporary Appointment | | | |
| mployer Greg Const. Company | Dates Employed From - To | | Worked Performed |
| Address 2 Sheridan Street Fort Rucker, Al | Jan. 96 | Jan. 98 | Preform all the duties |
| Telephone Number(s): Unknown | Hourly Rate/ Salary | | of a Plumber. |
| Job Title Plumber | Supervisor Mr. Nick Nichols | Starting $9.50 | Final $10.50 | Britt v. U.S. Heli 0286 |
| Reason for Leaving Completed Contract | | | |
| Employer Self Employed | Dates Employed From - To | | Worked Performed |
| Address 418 Grimes Street Enterprise, Ah 36330 | Mar. 91 | Dec. 95 | Preform Carpenture, |
| Telephone Number(s): 334-347-6708 | Hourly Rate/ Salary | | Plumber, + Elect. |
| Job Title Carpenture Plumber, Electric | Supervisor Billy F. Britt | Starting Depended on the | Final work. | Jobs |
| Reason for Leaving (Needed study work) | | | |

Applicant's Statement

I certify that answers given herein are true and complete to the best of my knowledge.

I authorize **USH** to investigate all statements contained in this application for employment as may be necessary in arriving at an employment decision.

This application for employment shall be considered active for a period of time not to exceed 45 days. Any applicant wishing to be considered for employment beyond this time period should inquire as to whether or not applications are being accepted at that time.

I hereby understand and acknowledge that unless otherwise defined be applicable law, any employment relationship with this organization is of an *"at will"* nature, which means that the Employee may resign at any time and the Employer may discharge Employee at any time with or without cause. It is further understood that this *"at will"* employment relationship may not be changed by any written document or by conduct unless such change is specifically acknowledged in writing by an authorized executive of this organization.

In the event of employment, I understand that false or misleading information given in my application or interview(s) may result in discharge. I understand, also that I am required to abide by all rules and regulations of the employer.

_Billy J. Britt_                    _11-10-99_
Signature of Applicant              Date

---

FOR PERSONNEL DEPARTMENT USE ONLY

Arrange Interview ——— Yes ——— No

Remarks: _____

---

Employed ——— Yes ——— No  Date of Employment _____

Job Title _____  Hourly Rate/Salary _____  Department _____

By _____  Date _____
          Name & Title

Britt v. U.S. Heli 0287



# PAYROLL CHANGE NOTICE

Date: _12-6-99_    Employee # _0586_    SSN # _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_

Name: _Billy Britt_    Position: _Mechanic_

## Check appropriate box:

✓ Enter on Payroll                    ___ Change Rate

___ Transfer to:                      ___ Address/Information Change
     Dept ___
     Div ___                          ___ Change withholding rate (complete
                                          new W-4/A-4)

___ Remove from payroll

Date Effective: _12-6-99_    Hour: ___

Old Rate: ___    Per hr ___
New Rate: $ _11.45_    Per _hr_ ___

## Reason for Payroll Change:

___ Merit Increase                    ___ See Performance Appraisal

___ Promotion                         ✓ Other _New Employee_

Submitted By: _Kim Durden_    Date: _12-6-99_

Approved By: _____    Date: _____

Accounting: _H. Wilson_    Date: _12-6-99_

Payroll: ___

Britt v. U.S. Heli 0388

EXHIBIT
C

**Employee History**

Employee **Billy Britt**

Badge # **D586**

| Date | Position | Supervisor | Level | Rate | Comments |
|------|----------|-----------|-------|------|----------|
| 12-6-99 | Mechanic | Bob Nasler | Entry | $11.45 | New Hire |
| 4-24-00 | Mechanic | Bob Nasler | Entry | 11.82 | General increase |
| 6-19-00 | Mechanic | Bob Nughn | II | 11.79 | NAHP- Lvl II |
| 12-18-00 | Mechanic | Bob Nasler | | 13.5 | Annual |
| 4-23-01 | Mechanic | Bob Nasler | | 13.4 | COLA |
| 12-17-01 | Avionics | Chuck Shaw | | 14.84 | Annual |
| 4-8-02 | Avionics | Chuck Shaw | | 14.52 | COLA |
| 12-16-02 | Avionics | Jim Ellis | | 15.02 | Annual |
| 4-21-03 | Avionics | Jim Ellis | | 15.51 | COLA (April .50) |
| 4-21-03 | Avionics | Jim Ellis | | 16.01 | General Increase |
| 12-15-03 | Avionics | Jim Ellis | | 16.46 | Annual |
| 4-19-04 | Avionics | Jim Ellis | | 16.96 | General Increase (.50) |
| 12-13-04 | Avionics | Jim Ellis | | 17.41 | Annual |
| 4-18-05 | Avionics | Jim Ellis  M.Robison | | 17.91 | General Increase |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

EXHIBIT
D

# EMPLOYMENT POLICIES

## Equal Employment Opportunity Policy Statement

US Helicopter has always maintained policy of nondiscrimination in all matter relating to employment practices and procedures and the treatment of our employees.  It is now time to reaffirm this policy.

US Helicopter is strongly committed to the policy and principles of equal employment opportunity.  All employment decisions and practices which include, but are not limited to, recruitment, selection, job assignment, transfer promotion/demotion, layoff, return from layoff, discipline (including termination), training education, compensation and benefits will be made without regard to race, color, religion, national origin, citizenship, marital status, sex, age, handicap and/or U.S. Veteran status.

All employment decisions will be based upon an individual's qualifications, such as skill, knowledge and/or ability to perform the position being filled, as reflected in, among other things, educational experience, demonstrated competence, and applicable government security requirements.

Dick Joyce, General Manager of US Helicopter had overall responsibility for coordinating all aspects of our policy.  He is available to answer questions or to assist you with any problems pertinent to equal employment opportunity.

My signature below certifies that I have read and understand the company's Equal Employment Opportunity Policy Statement.

Print Name: _Billy Fred Britt_     Emp # _586_

Signature: _Billy F. Britt_     Date _12-6-99_

# FREEDOM COURT REPORTING

EXHIBIT

E

1    IN THE UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF ALABAMA

3        NORTHERN DIVISION

4

5    CASE NUMBER:  CV 1:07 CV 696-MEF

6

7    BILLY F. BRITT,                    COPY

8         Plaintiff(s),

9         vs.

10   BELL AEROSPACE SERVICES, INC. d/b/a

11   U.S. HELICOPTER,

12        Defendant(s).

13

14        S T I P U L A T I O N

15        IT IS STIPULATED AND AGREED

16   by and between the parties through

17   their respective counsel, that the

18   deposition of BILLY F. BRITT may be

19   taken before TAMIE J. STORY,

20   Commissioner, at the offices of SABEL &

21   SABEL, P.C., 2800 Zelda Road, Suite

22   100-5, Montgomery, Alabama, on the 11th

23   day of June, 2008.

## FREEDOM COURT REPORTING

2

1    IT IS FURTHER STIPULATED AND

2  AGREED that the signature to and the

3  reading of the deposition by the witness

4  is waived, the deposition to have the

5  same force and effect as if full

6  compliance had been had with all laws and

7  rules of Court relating to the taking of

8  depositions.

9    IT IS FURTHER STIPULATED AND

10  AGREED that it shall not be necessary for

11  any objections to be made by counsel to

12  any questions except as to form or

13  leading questions, and that counsel for

14  the parties may make objections and

15  assign grounds at the time of the trial,

16  or at the time said deposition is offered

17  in evidence, or prior thereto.

18    IT IS FURTHER STIPULATED AND

19  AGREED that the notice of filing of the

20  deposition by the Commissioner is waived.

21

22

23

# FREEDOM COURT REPORTING

11

1    2005, where have you been employed?

2        A.    I have worked as a

3    compensation work therapist for the

4    V.A.

5        Q.    I'm sorry, a what?

6        A.    It's work compensation.

7    It's really a therapist -- a therapist

8    type job; compensation work therapist.

9        Q.    Compensation work therapy.

10   Throughout the V.A.?

11       A.    Yes.

12       Q.    And where did you perform

13   that work; what city?

14       A.    Tuskegee and Columbus;

15   Tuskegee, Alabama and Columbus,

16   Georgia.

17       Q.    What exactly -- what type

18   of work were you doing?

19       A.    It was a house cleaning

20   type.

21       Q.    House cleaning?

22       A.    Yes.

23       Q.    Were you cleaning for the

## FREEDOM COURT REPORTING

28

1    worked there for a year-and-a-half.

2        A.    All I know, I worked for

3    about a year-and-a-half.  I done forgot

4    what -- it was -- I just finished up

5    about two months ago, I think.

6        Q.    So you worked in 2007?

7        A.    '6 -- 2006 and part of

8    2007.

9        Q.    We're in 2008 now.  So if

10   you worked for a year-and-a-half --

11       A.    It must have been 2006 to

12   -- 2007 to 2008.  That's got to be it.

13       Q.    Did you work anywhere in

14   2006?

15       A.    Yes, with the V.A.  I think

16   it started in -- it must have been -- I

17   don't know.  I really don't -- no, I

18   didn't.

19       Q.    Did you work anywhere

20   between August 1, 2005 and August 31,

21   2005?

22       A.    2005 and August 31, 2005?

23       Q.    Excuse me.  August 1, 2005

54

1    recollection.

2         A.    I told Jim that I was

3    taking some medication that was

4    prescribed to me for depression, and I

5    told him what it would cause,

6    drowsiness and sometimes sleepiness.

7         Q.    And you told him this in

8    2004?

9         A.    As far as I can remember,

10   yes.

11        Q.    Who prescribed this

12   medication?

13        A.    Who prescribed it?

14        Q.    Yes, sir, in 2004.

15        A.    I think it was Dr. Clark

16   Riley.

17        Q.    And what was the medication

18   Dr. Riley prescribed?

19        A.    It was Remeron.

20        Q.    Remeron.  And that's the

21   medication he prescribed for you in

22   2004?

23        A.    Yes.

**FREEDOM COURT REPORTING**

61

1    Jim.

2         Q.    And you said you think Jim

3    wanted to see the bottle; is that

4    correct?

5         A.    Yeah.  I told him about it

6    one day, and the next day I brought the

7    bottle in.

8         Q.    So now you remember, the

9    next day you brought the bottle?

10        A.    I believe that's the way it

11   happened.

12        Q.    And when Mr. Ellis saw the

13   bottle, what did he say?

14        A.    I don't remember exactly

15   what he said.  All I know is he read it

16   and confirmed that -- you know, he read

17   the label on it.

18        Q.    Well, did he give you the

19   bottle back?

20        A.    Yes.

21        Q.    What did you ask Mr. Ellis

22   to do about this; the fact that you had

23   depression and was taking Remeron?

# FREEDOM COURT REPORTING

62

1      A.      I wanted him to know

2   that -- what type of -- the effect the

3   medicine had on me.   That's what I

4   wanted him to know.

5      Q.      And what did you want Mr.

6   Ellis to do about that?

7      A.      Anything that would be

8   accommodating for me, you know, that

9   might could help me.

10      Q.      What were you thinking that

11   would be?

12      A.      I would think maybe put me

13   -- don't let me work so much alone,

14   you know, give me some type of support

15   around the other employees of that

16   sort.   You know what I'm saying?

17      Q.      No, sir.   You need to

18   explain that to me, please.

19      A.      I mostly worked on aircraft

20   by myself where I was taking out --

21   doing things -- you know, really taking

22   out electrical equipment and stuff of

23   that sort, I would mostly be working by

## FREEDOM COURT REPORTING

63

1    myself.  Even when I worked on

2    transmissions and tail booms, I would

3    be by myself because it don't take but

4    one man to do it.  I never did work

5    around the other employees that much.

6         Q.    So one thought that you had

7    was don't work alone, wanted support

8    from other employees; correct?

9         A.    Yes.

10        Q.    What were some other

11   thoughts that you had where they could

12   accommodate your employment?

13        A.    Acknowledging the fact that

14   the medicine did make me drowsy.

15        Q.    How does that accommodate

16   your employment, Mr. Britt?

17        A.    I reckon it would

18   accommodate it the same way that it

19   accommodated Mr. Kevin when he dozed

20   off, they didn't really say nothing to

21   him.

22        Q.    All right.  Mr. Britt, I'm

23   talking about you right now.  How does

## FREEDOM COURT REPORTING

65

1          MR. SABEL:  Object to the
2    form.
3          A.    How does that accommodate
4    it?
5          Q.    Yes, sir.
6          A.    By them acknowledging it?
7          Q.    Yes, sir.
8          A.    They wouldn't have fired
9    me.
10         Q.    Okay.  But how does that
11   accommodate your employment?
12         A.    I would still be working.
13         Q.    If you're falling asleep on
14   the job?
15         MR. SABEL:  Object to the
16   form.
17         A.    If they acknowledged me
18   nodding, they wouldn't have fired me
19   for nodding.
20         Q.    Okay.  Mr. Britt, are you
21   denying that you fell asleep on the
22   job?
23         A.    I'm saying that I nodded

## FREEDOM COURT REPORTING

66

1    out, I nodded.

2             Q.      Nodded off?

3             A.      Yes.

4             Q.      Nodded off to sleep?

5             MR. SABEL:  Object to the

6    form.

7             A.      I said just nodded.

8             Q.      Nodded -- what's the

9    difference between that, Mr. Britt?

10            A.      I think sleep is you sleep

11   for a period of time, you don't just go

12   like that (demonstrating).  That's what

13   I think it is.  I think nodding is

14   something like this (demonstrating) --

15            Q.      Is nodding --

16            A.      -- and sleeping is, you

17   know, you are sleeping for a period of

18   time.

19            Q.      What period of time?

20            MR. SABEL:    Object.  Let

21   me just note for the record that when

22   Mr. Britt was describing nodding, he

23   was making gestures with his head that

67

1   can't be depicted on the court

2   reporter's record.

3       Q.   Mr. Britt, how long do you

4   consider sleeping to be?

5       A.   Well, you know, I really

6   hadn't looked at what I would consider

7   sleeping to be.  It would be more than

8   ten seconds or a couple of seconds.

9       Q.   That you close your eyes

10  when you're nodding?

11      A.   Yes.

12      Q.   Mr. Britt, so you admit

13  that when you nodded off, you would

14  close your eyes?

15      A.   As far as I remember, yes,

16  I think I did.

17      Q.   All right.  Other than not

18  work alone and U.S. Helicopter

19  acknowledging that you would get sleepy

20  on the medication, how else could they

21  have accommodated your employment?

22      A.   By, I think, choosing the

23  -- I did say working with others,

**FREEDOM COURT REPORTING**

69

1    A.    Mr. Brian wasn't the only

2    one I seen nodding either.

3    Q.    That's the one you brought

4    up, so we are going to talk about him

5    for a minute.

6    A.    Okay.

7    Q.    Was Mr. Brian --

8    A.    I don't know what he was

9    taking.

10    Q.    So you don't know anything

11    about Mr. Brian's situation, do you?

12    MR. SABEL: Object to the

13    form.

14    A.    The only thing I know is

15    that he slept, that's all.

16    Q.    He slept and was

17    terminated; correct?

18    A.    That's what they said.  I

19    wasn't there when they terminated him.

20    Q.    Okay.  So you don't know,

21    do you?

22    MR. SABEL:  Object to the

23    form.

## FREEDOM COURT REPORTING

70

1       A.    I don't know firsthand.  I

2  know what the people told me.

3       Q.    Well -- and I understand

4  what people told you, but based on your

5  firsthand knowledge, you have no

6  knowledge that Mr. Brian wasn't

7  terminated?

8             MR. SABEL:  Object to the

9  form.

10      A.    Are you saying I wasn't

11  there when it happened?

12      Q.    Yes, sir.  Isn't that

13  correct?

14      A.    No, I wasn't.

15      Q.    And so that is correct?

16      A.    I wasn't there when it

17  happened.

18      Q.    All right.  And, Mr. Britt,

19  you have no knowledge, firsthand

20  knowledge, that Mr. Brian also -- or

21  wasn't taking Remeron?  Do you know one

22  way or the other?

23      A.    I don't know what type of

## FREEDOM COURT REPORTING

71

1    medicine he was taking.

2           Q.    Do you know if he was

3    taking any type of medication?

4           A.    I don't know anything of

5    that.  The only thing I know, that he

6    was sleeping on the job.

7           Q.    Do you know what his

8    medical condition was?

9           A.    I never did ask him that.

10          Q.    Okay.  You've also

11   mentioned some other employees were

12   sleeping on the job.  Who were those

13   employees, Mr. Britt?

14          A.    One was -- doggone it.  He

15   was an inspector.  I know his name.  I

16   went blank.  I can't think of his name

17   right now, but I'll think of it before

18   it's over.

19          Q.    What department did he work

20   in?

21          A.    He was a TI, a technical

22   inspector.

23          Q.    Was he an employee or

**FREEDOM COURT REPORTING**

76

1    this -- this medication.

2         Q.    Are you still taking

3    Remeron?

4         A.    Yes, I do.

5         Q.    And what is your

6    prescription dosage?

7         A.    It's thirty milligrams.

8         Q.    And how often do you take

9    it?

10        A.    Once a day.

11        Q.    When's the last time you

12   took this dosage of Remeron?

13        A.    I took one yesterday.

14        Q.    Evening or morning?

15        A.    I take it in the evening.

16        Q.    So other than Mr. Ellis --

17   did you tell Mr. Robison when he became

18   your supervisor that you were taking

19   this Remeron?

20        A.    No, I didn't tell him.  I

21   told him at the hearing that afternoon

22   that I was taking some medicine that

23   would cause me to doze off.

**FREEDOM COURT REPORTING**

79

1    job back.  He was just a leadman.

2          Q.    And what was Mr. Ellis?

3          A.    Mr. Ellis was my super-

4    visor.

5          Q.    Was Mr. Ellis a leadman?

6          A.    No, he was a supervisor.

7          Q.    So he was over the leadman?

8          A.    A supervisor is a lot

9    higher than a leadman.

10         Q.    A lot higher?

11         A.    Yeah, it's higher than a

12    leadman.

13         Q.    Who was your leadman?

14         A.    As a matter of fact, I

15    don't think we had a leadman in my

16    section.  We just had supervisors.

17         Q.    Who else other than Mr.

18    Ellis was your supervisor?

19         A.    I think Ellis was the only

20    one at that particular time in avionics

21    that was my supervisor with the

22    exception of Mark coming about two

23    weeks before the termination; Mark

# FREEDOM COURT REPORTING

80

1    Robison.

2        Q.    In 2005, Mr. Britt, when

3    you were taking Remeron, did it prevent

4    you from any other activities in your

5    life?

6        A.    Like what you talking

7    about?  Explain it.

8        Q.    Well, were you able to take

9    care of yourself such as cooking,

10   taking showers?

11       A.    Yes, I think I -- yes, I

12   can.  I don't think it prevented me

13   from doing too much of anything, it

14   just made me drowsy.

15       Q.    Did you ask Mr. Ellis to

16   put you to work with other employees so

17   you wouldn't have to work alone?

18       A.    I asked Jim Ellis about

19   doing -- working with other employees

20   several times, and he never would do

21   it.  Especially on the installation

22   part, he assigned the jobs that he

23   wanted to assign the way he wanted to

**FREEDOM COURT REPORTING**

90

1   avionics or mechanics?

2         A.     I wouldn't say.   It depends

3   on your schooling.   It depends on what

4   you like the best, I think.

5         Q.     Well, which was easier for

6   you?

7         A.     I liked both of them.   My

8   problem was the way I was getting

9   treated in different sections, it

10  wasn't the job itself.

11        Q.     When you say that, was Mr.

12  Nestler treating you better than Mr.

13  Ellis?

14        A.     I wouldn't say better, but

15  I would say there was a lot of

16  difference in the way things were did

17  over in the avionics and the electrical

18  and the mechanical part.

19        Q.     Give me an example, please.

20        A.     Well, first, the selection

21  of jobs.   Mr. Nestler selected his jobs

22  a lot different than Jim did.   Jim

23  would select jobs, I think, according

91

1 to race, the way it seemed to me,

2 because I always got the same job every

3 time.  I didn't get no job that would

4 help me out with trying to advance in

5 that particular field.

6   Q. All right.  Let me stop you

7 there then.  We'll talk about that for

8 a few minutes.

9   Were there any other

10 African Americans who were working

11 under Mr. Ellis in the avionics

12 department?

13   A. At one time, there wasn't

14 nobody but me, then the lady came in,

15 and she worked under him for a small

16 period of time.

17   Q. What was her name?

18   A. Yvette Williams.

19   Q. When did Ms. Williams work

20 under Mr. Ellis?

21   A. I don't know the exact time

22 or what year or the time frame, but I

23 know she worked there for a period of

**FREEDOM COURT REPORTING**

94

1  in Jim's section.  She was in the

2  wiring section, they transferred her to

3  the wiring section.

4        Q.    Of those fifteen to sixteen

5  employees then, thirteen to fourteen

6  were white; is that correct?

7        A.    Yes.  One time there wasn't

8  nobody but me; after she got trans-

9  ferred, wasn't nobody but me.

10        Q.    So then fifteen to sixteen

11  -- excuse me, fourteen to fifteen

12  employees then would be white and you

13  would be the only African American?

14        A.    Uh-huh (nodding head).

15        Q.    Is that a "Yes"?

16        A.    Yes.

17        Q.    And you mentioned something

18  about Mr. Ellis selecting jobs

19  according to race.  Why do you say

20  that?

21        A.    Simply because I was the

22  only one that got assigned to the shop

23  for cleaning, and it had to be because

# FREEDOM COURT REPORTING

95

1    of race, because I was the only one

2    that did it.  None of the other white

3    employees did that.

4        Q.    No other employees had to

5    clean the area where they worked in?

6        A.    I said the shop.

7        Q.    The shop.  Tell me how

8    that's different from the area.

9        A.    The area you work in is the

10   aircraft you work on and the shop is

11   where you go in and probably get some

12   parts or go in and get some more forms,

13   you know, to write on, work forms or

14   something like that, or get some more

15   equipment out or something like that.

16   The aircraft is the area you work on,

17   and that's the area you would work on.

18   That's the area, not the shop.  The

19   shop is for everybody, the area is just

20   your area that you're assigned to that

21   particular day.

22       Q.    And how big is the shop,

23   Mr. Britt?

96

1        A.    About the size of this room

2   (indicating), maybe a little larger.

3        Q.    And when you say "clean

4   it," what did you have to do?

5        A.    Sweep, dust, sometimes mop.

6        Q.    Would the reason why you

7   would be asked to clean that particular

8   area is because you had completed your

9   job assignment for the day?

10       A.    No, it was because I was

11  black.

12       Q.    And who told you that?

13       A.    It was obvious.  I was the

14  only one that got assigned to it.  It

15  had to be that, there's was no other

16  reason.  I couldn't see no other

17  difference in what was the difference.

18       Q.    Well, do you know if Mr.

19  Ellis asked other employees in the

20  department to clean it?

21       A.    I was the only one that

22  cleaned the shop.  I don't know what

23  Jim did.

# FREEDOM COURT REPORTING

97

1        Q.    Did you ever ask Mr. Ellis?

2        A.    No, I didn't.

3        Q.    Did you ever ask any of the

4  other employees if they --

5        A.    No, I didn't.

6        Q.    So that's your opinion;

7  correct?

8        MR. SABEL:  Object to the

9  form.  Mr. Britt, you need to let her

10  finish her question.

11        THE WITNESS:  Okay.

12        Q.    All right.  Mr. Britt, so

13  to make sure you and I are on the same

14  page --

15        A.    Okay.

16        Q.    -- I had asked you about

17  your statement about Mr. Ellis

18  selecting jobs according to race, and

19  you said the reason was because you

20  were the only one that got assigned to

21  the shop for cleaning; is that correct?

22        A.    That is one of the reasons.

23        Q.    What are the other reasons?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

98

        A.    The other reason I think he
assigned them according to race is
because he didn't want to give me no
overtime, and the overtime was
considered -- you get overtime
according to the job that you was
working on, and I got assigned jobs
that didn't require overtime, which was
the -- which was transmissions.

        Q.    Were you ever assigned
overtime when you worked at U.S.
Helicopter?

        A.    I think I got two to three
hours -- it might have been -- mostly
-- no.  Three to eight hours, if I got
that much.  I don't think I got that
much of a check.  I didn't get hardly
none, not in the avionics department.

        Q.    Did you work when you were
working overtime; did you do the job?

        A.    When I worked overtime?

        Q.    Yes, sir.

        A.    The little time I worked,

# FREEDOM COURT REPORTING

100

1  give overtime, I used to ask him for

2  it.  I don't know how regular it was or

3  -- because it came in different spurts,

4  and I don't know.

5      Q.    Well, when you say it came

6  in spurts, what do you mean by that?

7      A.    Overtime was given

8  according to demand of the aircraft

9  that you was working on, so I can't

10  say, you know, how regular it came or

11  how it did because I don't know.  All I

12  know, I didn't get no overtime.

13      Q.    Was overtime based on

14  seniority?

15      A.    Overtime was based on the

16  aircraft itself.

17      Q.    Explain that.

18      A.    If it was based on

19  seniority, I would have been getting a

20  whole bunch of it because I was there

21  before a lot of them.

22      Q.    Explain to me about

23  overtime being based on the aircraft

**FREEDOM COURT REPORTING**

101

1      itself.

2          A.     The aircraft, the type --

3      we did refurbishing work, which was

4      considered -- different modifications

5      go on a certain aircraft, and if this

6      aircraft come in that had a certain

7      amount of different type of work did to

8      it, it's going to need more work did on

9      it.  And they had a certain time period

10     to get it out, and that's when the

11     overtime was allotted.

12         Q.     What part of the aircraft

13     were you working on in the avionics

14     department?

15         A.     Mostly transmissions, tail

16     boom, and taking out the old avionic

17     equipment.

18         Q.     What work did you perform

19     on the transmission?

20         A.     I wired up the trans-

21     mission.

22         Q.     How long would it take for

23     you to do that job?

# FREEDOM COURT REPORTING

102

1          A.      Eight hours.

2          Q.      You also mentioned that you

3     worked in the tail boom; is that

4     correct?

5          A.      The tail boom, wired up

6     tail booms.  They had new tail booms

7     come in, and I wired up those.

8          Q.      How long would it take you

9     to do that job?

10          A.      I can't remember the exact

11     time it took to do that one because I

12     had so many over there I did, and I

13     worked on different ones at different

14     times depending on -- I can't remember

15     exactly.  I can't remember the exact

16     time it would take because I would have

17     tail booms lined up all the way down.

18     I can't remember the time limit given

19     for that right now.

20          Q.      Would it take -- is that a

21     day job or is that a week-long job?

22          A.      It depends on how many tail

23     booms you had in that particular time.

# FREEDOM COURT REPORTING

103

1    You would have tail booms for different

2    aircraft all in one section, you know,

3    and most tail booms would be -- they

4    come in at different times, so I --

5    yeah, it would be -- it would be -- it

6    wouldn't be a demanding job like the

7    aircraft that they was working on for

8    modifications, but it would be -- what

9    do you mean a day job?

10        Q.    I mean, would working on a

11   tail boom, would that take you a --

12        A.    A whole day you --

13        Q.    Yes, sir, or would that

14   take you multiple days, like several

15   days?

16        A.    Just like I said, it

17   depends on how many you had over there

18   and --

19        Q.    Well, how long would it

20   take for you to wire up one tail boom?

21        A.    That's what I'm trying to

22   figure.  I can't remember that exact

23   time.  I wish I could, but I can't

# FREEDOM COURT REPORTING

104

1    remember the exact time on that.

2         Q.    And correct me if I'm

3    wrong, but my understanding is that the

4    tail boom actually is at the back of

5    the aircraft; correct?

6         A.    Yeah.   That's the back of

7    the aircraft.  It don't have anything

8    on it, tail rotary or nothing.  It was

9    just the tail boom itself.

10        Q.    And would you climb up on a

11   ladder to get up into the tail boom to

12   wire it up?

13        A.    That tail boom was mostly

14   for me, simply because of my size -- I

15   had to get up in that tail boom

16   itself --

17        Q.    So that's a "Yes"?

18        A.    -- on several occasions.

19              You're saying now what?

20        Q.    My question was:  Would you

21   do -- just climb up --

22        A.    No, you didn't have to

23   climb or do no climbing or anything of

105

1    that sort.  You mostly have to be down

2    low.  It was down low because it would

3    be on a stand.

4         Q.    I see.

5         A.    It wouldn't be up in the

6    air on the aircraft itself.  That's

7    before it even get on the aircraft;

8    you work the tail boom before it get on

9    the aircraft except for parts.

10        Q.    You said you were asked to

11   work on that because of your size?

12        A.    I believe that was one

13   reason, and I believe it was because I

14   was so good at it.

15        Q.    Who told you that you were

16   so good at working on the tail boom?

17        A.    Jim, and all the guys in

18   the shop knew it.

19        Q.    Who were the other guys in

20   the shop?

21        A.    All of them.

22        Q.    What are their names, sir?

23        A.    I don't remember their

**FREEDOM COURT REPORTING**

106

1    names right offhand because they had

2    contractors going back and forth, back

3    and forth.  It's been so long on those

4    -- I'm not good at names, I'm really

5    not.  I'm not good at names at all.

6         Q.    Does any name stick out to

7    you?

8         A.    Joshua Gray, he was there.

9    Robison would know how good I was on

10   the tail boom, even the old -- because

11   he was there before he made inspector

12   -- I mean, supervisor; Robison.

13        Q.     Was he an employee or a

14   contractor?

15        A.    He was a contractor from

16   the get-go, but they changed him over

17   to a regular supervisor.

18        Q.    So Mr. Gray, Mr. Robison.

19   Anyone else who --

20        A.    Joshua Gray.  There was

21   another guy there by the name of Doug,

22   he would know.  It was -- Mr. Jim

23   Donahue, he was there, he would know.

## FREEDOM COURT REPORTING

107

1    It was a lot of them.  Most any of

2    those guys in the avionics section

3    would tell you about it.

4         Q.    Were you ever found

5    sleeping in the tail boom?

6         A.    No.

7         Q.    Did you ever sleep when you

8    worked in the tail boom?

9         A.    None that I can remember.

10        Q.    You don't know one way or

11   the other?

12        A.    I said none that I can

13   remember.

14        Q.    So you could have possibly

15   fallen asleep in the tail boom?

16        A.    None that I can remember.

17        Q.    Which means yes, you could

18   have possibly?

19        A.    No, none that I can

20   remember.

21        Q.    You also said then you

22   cleaned out wire; is that correct?

23        A.    Well, aircraft would come

**FREEDOM COURT REPORTING**

126

1    supervisor who signed off?

2        A.    Yes, he is.

3        Q.    What's the significance of a

4    lost tool?

5        A.    Well, I guess if it's lost

6    in there and it's moving parts and it's

7    in the aircraft, it's causing some

8    damage to the aircraft.

9        Q.    And possibly the pilot,

10   couldn't it?

11       A.    Yes.  If you don't find it,

12   but they mostly find them.  And several

13   people get wrote up on that, it's not

14   just to one person.

15       Q.    And it looks like it took

16   you an hour-and-a-half for the tool to

17   be located?

18       A.    I don't remember the time

19   or how long it took.

20       Q.    Well, you see where it says

21   "Search initiated 13:30, search

22   terminated 15:00"?

23       A.    I don't remember signing

1    hadn't of found it, I would have been

2    gone probably at that time then.

3         Q.    So losing a tool can be a

4    terminable offense?

5         A.    Not finding it can; not

6    finding it.

7

8         (Whereupon, Defendant's Exhibit 8

9         was marked for identification and

10        same is attached hereto.)

11

12        Q.    Mr. Britt, let me show you

13    what's Exhibit 8.  It's a Letter of

14    Warning Bates labeled 149.

15             Is that your signature at

16    the bottom?

17        A.    Yes, it is.  This is the

18    same as one I had already received;

19    isn't it?

20        Q.    Yes, sir.  And you see the

21    recommendation that says "Although

22    Billy does follow company procedures in

23    reporting lost tools, four incidents is

# FREEDOM COURT REPORTING

136

1  excessive.  Billy needs to be more

2  responsible with tool control"?

3       A.    Uh-huh (nodding head), yes,

4  I see that.

5       Q.    Do you think losing four

6  tools is excessive?

7       A.    It depends on the time

8  limit.  If you look at the time limit

9  in that, it was -- you know, it was

10 different years.

11      Q.    So if you have --

12      A.    I think if you lose one

13 tool once a year, it shouldn't be

14 excessive.

15      Q.    Well, you're losing more

16 than one tool a year, aren't you?

17           MR. SABEL:  Object to the

18 form.

19      Q.    We've got two in 2004.

20      A.    (Witness looks through

21 document).  I think it seemed like

22 four --

23      Q.    Okay.

# FREEDOM COURT REPORTING

139

1           Is that your signature at

2    the bottom?

3           A.    Yes, it is.

4           Q.    Do you recall receiving

5    that or signing it?

6           A.    Yes, I do.

7           Q.    Do you recall having any

8    discussions with Mr. Robison or Ms.

9    Durden about your discharge?

10          A.    I remember them telling me

11   I was terminated because I was asleep,

12   and I explained my situation, that I

13   wasn't sleeping, that I was dozing, and

14   the medication was the cause of me

15   doing this.

16          Q.    And how did they respond?

17          A.    They fired me.

18          Q.    Did they say anything to

19   you?

20          A.    I don't remember exactly

21   what was said.

22          Q.    Did they say anything to

23   you about the medication you were

# FREEDOM COURT REPORTING

157

1      Q.    What about Bob Nestler when

2   he was your supervisor, did you have

3   any trouble with Mr. Nestler?

4      A.    Yes.

5      Q.    What trouble did you have

6   with Mr. Nestler?

7      A.    When I mentioned the

8   graffiti on the bathroom wall.

9      Q.    What graffiti was that?

10     A.    That the KKK was still

11   alive.

12     Q.    Was Mr. Nestler your

13   supervisor when that occurred?

14     A.    Yes, he were.

15     Q.    So that would have been

16   sometime between 1999 and 2001?

17     A.    Yes.

18     Q.    And it said "KKK is still

19   alive"?

20     A.    Yes.

21     Q.    And what did -- how did you

22   find it?  Was it in the men's bathroom?

23     A.    It was in the men's

158

1  bathroom.

2       Q.    Was anyone with you when

3  you saw it?

4       A.    It was in a stall.

5       Q.    Did you show it to anyone?

6       A.    I came back and brought it

7  to Mr. Nestler's attention.

8       Q.    And what did Mr. Nestler

9  say?

10      A.    The first time he painted

11 over it.  The second time, he told me

12 "You're just in the real world now,

13 those things exist."

14      Q.    You mentioned a second

15 time.  When was the second time you saw

16 graffiti?

17      A.    It was about a couple of

18 months after first time, I think.

19      Q.    So, again, Mr. Nestler, was

20 he still your supervisor?

21      A.    Yeah, he were.  It wasn't

22 too much longer after that it showed

23 back up again and they painted over it

**FREEDOM COURT REPORTING**

159

1     again.  Wasn't no action taken but the

2     paint.

3          Q.    I'm sorry, how many times

4     did you see graffiti on the wall?

5          A.    I've seen it twice -- at

6     least twice.

7          Q.    At least twice.  Were there

8     any other times?

9          A.    I didn't use that bathroom

10     any more after I got transferred to

11     avionics, so I don't know.

12          Q.    What about anywhere in the

13     plant, did you see any type of graffiti

14     such as "KKK is still alive"?

15          A.    I seen that -- no, that's

16     all I seen.

17          Q.    Just those two times when

18     you were working as an aircraft

19     mechanic?

20          A.    Uh-huh (nodding head).

21          Q.    Is that a "Yes"?

22          A.    Yes.

23          Q.    Did you see any type of

## FREEDOM COURT REPORTING

160

1   graffiti about race when you were in

2   the avionics section?

3        A.    No.

4        Q.    Did you have any trouble

5   with employee Debbie Ellwood?

6        A.    No.

7        Q.    And did you and Ms. Ellwood

8   work in the avionics section?

9        A.    Yes.

10       Q.    What was Ms. Ellwood's job

11  in the avionics section?

12       A.    She checked out the wire

13  and harnesses in the aircraft that was

14  left in the aircraft.

15       Q.    And --

16       A.    She had a checkpoint where

17  she checked out the wire and harnesses;

18  she hooked up -- mostly checked about

19  the wire and harnesses.

20       Q.    And what race is Ms.

21  Ellwood?

22       A.    She's white.

23       Q.    Did you have any problems

## FREEDOM COURT REPORTING

170

1    A.    Yes, I did all those

2    sometime or another on some type of

3    aircraft.

4         Q.    On Number 24 you say "Ellis

5    assigned all of the less desirable jobs

6    to the plaintiff," and then in 25 you

7    go on to talk about you were the only

8    one assigned to clean the shop area.

9    Do you see that?

10        A.    Yes.

11        Q.    It also says you were to

12   make coffee for the employees.  Did no

13   other employees make coffee?

14        A.    I was the only one that

15   made coffee in the morningtime; the

16   only one.

17        Q.    Were you the first employee

18   to get to the avionics section?

19        A.    I was the first one to get

20   there on the job a lot of times, yes.

21        Q.    Well, were you making

22   coffee for yourself?

23        A.    I didn't drink coffee.  I

## FREEDOM COURT REPORTING

171

might have drunk coffee -- if I drunk

coffee, it would be once a month, maybe

once every two months.  I didn't like

the caffeine.

Q.    Who told you to make coffee

for all the employees?

A.    I didn't make it for all

the employees.  The shop, just for

avionics.

Q.    Who told you to make --

A.    Jim would ask me to make

coffee, Jim Ellis would ask me to make

the coffee.

Q.    Was that because you were

the first one there?

A.    It's because I was black.

Q.    Who told you that?

A.    Because I was the only one

asked; that's the reason I think it

was, because I was black.

Q.    Well -- but you were the

first employee in the avionics section;

correct, to get there in the morning?

## FREEDOM COURT REPORTING

172

1        A.   I be the first one there,

2  you know, a lot of times, uh-huh

3  (nodding head).

4        Q.   Well, during the day, did

5  other employees in your section make

6  coffee?

7        A.   I don't think they made it

8  but once a day, and that was in the

9  morning.

10       Q.   Did you ever complain about

11  making coffee?

12       A.   Yes.

13       Q.   And what did Mr. Ellis say?

14       A.   "Make the coffee."

15       Q.   Did he give you any other

16  reason?  Did he say anything else to

17  you?

18       A.   I don't remember -- no, he

19  didn't.

20       Q.   Did you ask him or tell

21  him "I don't want to make coffee"?

22       A.   On several occasions.

23       Q.   What did he say?

## FREEDOM COURT REPORTING

179

1    clarify, you just took a Remeron

2    during the break?

3             THE WITNESS:  No.  That is

4    that Coke that got me.

5             Q.    Okay.  Did you take any

6    medication during the break?

7             A.    No, huh-uh (shaking head).

8             Q.    Have you taken any

9    medication since we started the

10   deposition?

11            A.    No, huh-uh (shaking head).

12            Q.    Any of those medications

13   affect your memory?

14            A.    I think what affected my

15   memory is -- I don't know.  I haven't

16   read all the side effects of it.

17            Q.    Did you ever speak with Mr.

18   Donahue about the assignments?

19            A.    Yes, I did.

20            Q.    And what did you say to Mr.

21   Donahue?

22            A.    I think I mentioned to him

23   about my job assignment, that I

## FREEDOM COURT REPORTING

180

1  couldn't get no overtime because of my

2  job assignment.

3      Q.    Do you recall when that

4  conversation took place?

5      A.    No, I don't.

6      Q.    And what did Mr. Donahue

7  say?

8      A.    I don't remember.

9      Q.    In Paragraph 33 it says

10 "Plaintiff requested to be transferred

11 back to his position as an aircraft

12 mechanic so he could receive better

13 assignments, better treatment, and

14 overtime.  Plaintiff brought his

15 request to Ellis and Nestler, his

16 former supervisor."  Did your bring it

17 to them at the same time?

18     A.    No, it was at different

19 times.

20     Q.    You spoke to them

21 separately?

22     A.    Yes.

23     Q.    And it says in 34, "Ellis

## FREEDOM COURT REPORTING

190

1    aircraft to work on when I couldn't get

2    on an aircraft unless I was working on

3    that particular aircraft, and I

4    couldn't be on that particular aircraft

5    if I'm doing something else.

6         Q.    When did this occur with

7    Big Jim?

8         A.    I seen it occur on several

9    occasions, but I don't remember the

10   exact time and how many times it were.

11        Q.    Well, did it occur in

12   2005 --

13        A.    Yes.

14        Q.    -- with Big Jim?

15        A.    Yes, uh-huh (nodding head).

16        Q.    Was that the only time it

17   occurred was in 2005?

18        A.    No.  It occurred a lot of

19   times before then for different

20   people.  Ron Redd was one.  I don't

21   know was it Ron Redd in 2005, but it

22   occurred with Ron Redd too.

23        Q.    Did anyone ever use any

**FREEDOM COURT REPORTING**

191

1    racially offensive remarks in front of

2    you, Mr. Britt, or towards you?

3         A.    No, none that I can

4    remember.

5         Q.    "Debbie Ellwood, a white

6    female, was also allowed to work

7    overtime as often as she liked although

8    her daily assignments did not require

9    her to do so."

10              What were her daily

11   assignments?

12        A.    She was assigned to

13   checking the cables out, like I said

14   before.  She checked the cables out

15   that was remaining.  In some of the

16   aircraft, they done taken all of the

17   cables out, and the ones they took out,

18   that was the ones that she had a

19   checkpoint in, and she would put on the

20   machine and check them out and see if

21   the wiring was any good.  If the wiring

22   was good, she would check that off and

23   then she would probably call it in and

# FREEDOM COURT REPORTING



1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3    NORTHERN DIVISION
4

BILLY F. BRITT,

5       Plaintiffs,

6

7    vs.              CASE NO. CV1:07CV696
8

U.S. HELICOPTER, d/b/a
9    Helicopter Support Company, Inc.,
and BELL AEROSPACE SERVICES, Inc.,
10   d/b/a U.S. Helicopter,
11   Defendants.
12

* * * * * * * * * * * *
13

DEPOSITION OF BILLY F. BRITT taken
14

pursuant to stipulation and agreement
15

before Kristie Pearson, Certified Court
16

Reporter and Commissioner for the State
17

of Alabama at Large, in the Law Offices
18

of Sable & Sable, Hillwood Office
19

Center, 2800 Zelda Rd., Montgomery,
20

Alabama, on Thursday, June 26, 2008,
21

2008, commencing at approximately
22

9:40 a.m.
23

* * * * * * * * * * * *

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

2

<pre>
 1                    APPEARANCES
 2
      FOR THE PLAINTIFF:
 3
      MR. MARK SABEL, ESQ.
 4    SABEL & SABEL, P.C.
      2800 Zelda Rd.
 5    Montgomery, AL   36106
 6
 7    FOR THE DEFENDANT:
 8    MS. MARTHA LEACH THOMPSON
              and
 9    CHRISTOPHER S. RODGERS, ESQ.
      Huie, Fernambucq & Stewart, LLP
10    2801 Highway 280 South
      Suite 200
11    Birmingham, AL   35223-2484
      (205) 251-1193
12
13
14                      INDEX
15    EXAMINATION BY                    PAGE
16        MS. THOMPSON.................4, 132
17        MR. SABEL.....................127
18
      DEFENDANT'S NUMBER               PAGE
19
20        13............................19
          14............................37
          15............................90
21        16...........................115
          17...........................117
22
23
</pre>

## FREEDOM COURT REPORTING

14

1   A.   Contractors got overtime, too.  That's

2        who got most of the overtime was the

3        contractors.

4   Q.   Not the employees?

5   A.   The employees got it, too, but the

6        contractors definitely got it.

7   Q.   More than the employees?

8   A.   Yes, I believe they did get it more than

9        the employees.

10  Q.   Do you remember who you talked to at the

11       EEOC when you filed this --

12  A.   No, I don't.

13  Q.   Do you remember if they conducted an

14       investigation?

15  A.   I don't think it was -- I had enough time

16       to do that after a lot of things started

17       happening.  I was in a car wreck and my

18       mama died, and things of that sort

19       happened.  So I don't remember whether or

20       not it got to that stage, but I

21       definitely had filed a complaint.

22  Q.   Did anyone help you draft the complaint

23       with the EEOC?

# FREEDOM COURT REPORTING

15

1    A.  No.

2    Q.  Did you have to go to Birmingham?

3    A.  No.  I did it on the phone and wrote

4        letters.

5    Q.  I'm sorry.  You did it on the phone

6        and --

7    A.  Wrote letters.

8    Q.  Do you remember who you wrote the letters

9        to?

10    A.  No, I don't.

11    Q.  Do you remember having any -- How many

12       conversations did you have with the EECO?

13    A.  I don't remember.

14    Q.  What happened with regard to your

15       complaint with the EEOC on overtime

16       hours?

17    A.  It didn't never bloom because I got

18       terminated.

19    Q.  Did they dismiss the EEOC claim, this

20       first one?

21    A.  I just didn't follow it up.  I got tied

22       up in terminated.  I didn't get a chance

23       to work it all the way through, because I

**FREEDOM COURT REPORTING**

16

1     got terminated and I filed another claim.

2  Q.  What do you mean you didn't get a chance

3     to work it all the way through?  If it

4     was filed --

5  A.  What it was, I got terminated and I filed

6     another claim for being discriminated

7     against because of my color.  And I

8     forgot what happened, to tell you the

9     truth.  I don't remember.

10  Q.  You don't remember what happened to the

11     overtime EEOC charge?

12  A.  No, I don't.  All I know, we didn't carry

13     it to a certain stage.

14  Q.  When you say we, who are you referring

15     to?

16  A.  Me.

17  Q.  Anyone else?

18  A.  Me.

19  Q.  Mr. Britt, I recall from your earlier

20     deposition testimony that you had

21     begun -- You testified that you began

22     taking the Remeron for depression in 2004

23     when Dr. Riley prescribed it.  Do you

## FREEDOM COURT REPORTING

22

1    Q.   You don't remember at all one way or the

2         other?

3    A.   No, I don't, sure don't.

4    Q.   Do you know if he even heard you?

5    A.   He heard me.

6    Q.   How do you know he heard you?

7    A.   Because I was right in his face.   I

8         wasn't but about two feet from him.   He

9         heard me.

10   Q.   Is Mr. Ellis the only one you told about

11        the EEOC charge, about the overtime, the

12        May 13th?

13   A.   I don't remember telling anybody else.   I

14        might have discussed it with somebody,

15        but I don't remember who it was.   I know

16        I told Jim.

17   Q.   Did you tell Kim Durden?

18   A.   We didn't see Kim Durden on a daily

19        basis.

20   Q.   But isn't Ms. Durden in human resources?

21   A.   Yes.

22   Q.   Did you go to human resources and tell

23        them that you had filed a charge with the

## FREEDOM COURT REPORTING

23

1      EEOC on May 13, 2005?

2  A.   Things like that we go to the supervisor,

3      lead supervisor, and he goes to the --

4  Q.   Mr. Britt, that wasn't my question.  My

5      question was did you --

6  A.   No, I didn't.  I told Jim Ellis.

7  Q.   So you did not tell Kim Durden about the

8      May 13, 2005, charge against EEOC?

9  A.   I don't remember whether I did or not.

10 Q.   Mr. Britt, what medications have you

11     taken this morning?

12 A.   I took some prostate medicine, took some

13     medicine for my stomach, digestion

14     medicine, and I took some medicine for my

15     bowels in case they going to get loose,

16     and I took a little Remeron.

17 Q.   Do any of those medications affect your

18     memory?

19 A.   Since I've been taking medication and got

20     out of work, I have to think pretty hard

21     about a lot of things.

22 Q.   Mr. Britt, that wasn't my question.  You

23     need to listen to my question.

## FREEDOM COURT REPORTING

34

1    Q.    Was it on a scale of one to five? one to

2          ten?

3    A.    I don't remember.

4    Q.    Were you ever admonished by anyone for

5          these low ratings?

6    A.    Admonished, would you describe that --

7          define that?

8    Q.    Yes, sir.  I would be happy to.  Were you

9          ever counseled?  Was there ever any

10         discussions about your low ratings on

11         your evaluations?

12   A.    I don't remember.

13   Q.    You don't remember one way or the other?

14   A.    I don't remember whether I was counseled

15         on anything about low ratings.

16   Q.    Well, were you ever told by anyone,

17         Mr. Ellis or another supervisor,

18         Mr. Britt, your ratings are low, we need

19         to get better?

20   A.    No.  I don't remember having nothing like

21         that.

22   Q.    How do you know what evaluations the

23         white employees received?

# FREEDOM COURT REPORTING

35

1    A.   They told me.

2    Q.   Who told you?

3    A.   You keep asking me who and I can't

4        remember all those names because it's

5        been so long.  I wish I could remember

6        some of those people's names that you're

7        wanting me to remember.

8    Q.   You can't remember one person who told

9        you what their rating was, one white

10       person, you can't remember?

11   A.   No, not right offhand.  I sure don't.

12   Q.   How did this conversation come up?

13   A.   It would be after they have a rating.

14       You know when you get a rating, they will

15       come out and tell you about what kind of

16       rating they got.  And, you know, you just

17       shuck it off it.

18   Q.   No, sir, I don't know.  You have to tell

19       me.

20           MR. SABEL:  Object to the form.

21   Q.   Mr. Britt, what month did the ratings

22       come out?

23   A.   They came out at different times.  I

## FREEDOM COURT REPORTING

46

1      would expect.

2    Q.  What rating did you expect to receive?

3    A.  By the compliments he gave me, I really

4      would expect a higher rating than a lower

5      rating.

6    Q.  What was Mr. Ellis' explanation?

7    A.  I don't remember that either.

8    Q.  You don't remember?

9    A.  Huh-hu (negative response).  He would say

10      something, but I don't remember exactly

11      what he said.

12    Q.  Why do you think you were getting lower

13      ratings because of your race?

14    A.  I think I was getting lower ratings

15      because of my race because Carl used to

16      tell me about his rating, and he was

17      white and he would get higher ratings and

18      when I would get mine, mine would be

19      lower and I'm black.  So it's just that

20      simple.

21    Q.  But didn't you say also Carl was doing

22      troubleshooting work?

23    A.  Avionics.  I was still in avionics.

**FREEDOM COURT REPORTING**

47

1    Q.  But you weren't doing troubleshooting

2        work, were you?

3    A.  I was doing really removal of equipment,

4        which was avionics work.  All of it was

5        in avionics, so I should have got a

6        rating just as good.

7    Q.  But, Mr. Britt, is removing equipment

8        different than troubleshooting?

9    A.  Yes, it's different.  But all of it is

10       avionics.

11   Q.  Is there a different level of skill

12       required in removing equipment as

13       compared to troubleshooting?

14   A.  I thought the rating would depend on the

15       type of job you do.

16   Q.  Mr. Britt, listen to my question.  Does

17       removing equipment require a different

18       level of skill than troubleshooting?

19   A.  Yes, it does.

20   Q.  Do you know if Mr. Smith ever lost any

21       tools?

22   A.  At one time everybody looses tools.

23   Q.  No, Mr. Britt.  Again, you're not

# FREEDOM COURT REPORTING

48

1           listening to my question.

2      A.   No, I don't.

3                MR. SABEL:  Object to the form.

4      A.   No, I don't remember.

5                MR. SABEL:  Objection to the form.

6                And you'll need to wait for

7                Ms. Thompson to finish her

8                question.

9      Q.   Let me reask my question so the record is

10          clear.  Do you recall if Mr. Smith ever

11          lost any tools?

12     A.   Yes.

13     Q.   Okay.  When did Mr. Smith lose a tool?

14     A.   I don't know when, but he lost tools.

15     Q.   What kind of tool did he lose,

16          Mr. Britt?

17     A.   I don't remember.

18     Q.   Was it in 2005?

19     A.   It was over the time that I was there he

20          lost a tool.

21     Q.   How many tools did Mr. Smith --

22     A.   I don't remember.

23     Q.   You don't remember?

# FREEDOM COURT REPORTING

55

1    advancements when you didn't know how to

2    on the new equipment.

3    Q.    Where was your next advancement?  Where

4          would have been your next advancement?

5    A.    I really don't know.  I might have became

6          a lead man, or something of that sort, if

7          I had been exposed to the right type of

8          work.

9    Q.    Did anyone ever tell you you would become

10         a lead man if you were exposed to that

11         type of work?

12   A.    Not that I remember.

13   Q.    Sixty-one, I think we've talked about

14         that.  Sixty-three, let's jump down to

15         there.  It says, Plaintiff discussed the

16         fact that the phrase had been written on

17         the walls of the restroom with other

18         African American employees.  Who were

19         those other African American employees

20         you discussed that phrase with?

21   A.    One was Allen Davis.

22   Q.    I'm sorry.  Who?

23   A.    Allen Davis.  I don't remember that I

## FREEDOM COURT REPORTING

59

1    Q.    In your deposition last time you told him

2          that -- you testified that you thought it

3          was around 2004.

4    A.    It might have been, yes.  I told him

5          several times.  I told him so many times,

6          I don't remember.

7    Q.    So many times, how do you define --

8    A.    I would tell him about the Remeron, the

9          affect it had on me.

10   Q.    Did you ever go to Dr. Riley and ask him,

11         between 2004 and your termination of

12         August 1, 2005, the affects the Remeron

13         was having on you?

14   A.    I don't remember.

15   Q.    Did you ever ask Dr. Riley to prescribe a

16         different medication for depression?

17   A.    No, I didn't.

18   Q.    If you jump down to Number 70:  Ellis was

19         also aware that Plaintiff had

20         participated in an alcohol and drug

21         program and received treatment for same

22         while working in the avionics section.

23                When did you participate in an

# FREEDOM COURT REPORTING

71

1        tools and go.

2   Q.   Did you try to talk to Ms. Durden when

3        you went to get your tools?

4   A.   No, I didn't.  I think I asked to see

5        somebody about giving them that slip I

6        had, and they wouldn't let me present it.

7   Q.   What slip you had?

8   A.   I had a slip that I got from a doctor.  I

9        had several slips -- two slips, I think,

10       two different slips I had got from my

11       doctor.

12  Q.   From Dr. Riley?

13  A.   Yes.

14  Q.   What did the slips say?

15  A.   I done forgot exactly what it said, but

16       it said something about my medicine would

17       cause drowsiness.  One of them said

18       that.  And the other one said it would

19       cause me to sleep.

20  Q.   What were you hoping the slips would do?

21  A.   Reconsider me for getting my job back.

22  Q.   Did you talk to anyone about reapplying

23       for work?

## FREEDOM COURT REPORTING

72

1   A.   No, I didn't.  I didn't get a chance to.

2        See, I wasn't from that area.  I was

3        coming from out of town.  And I didn't

4        stay right there in that specific town.

5   Q.   You were in Enterprise; right?

6   A.   Uh-huh (positive response.)

7   Q.   How far away is Enterprise from --

8   A.   It's twenty miles.

9   Q.   Well, did you ever consider driving the

10       twenty miles and reapplying to U.S.

11       Helicopter?

12  A.   I called two times.

13  Q.   When did you call?

14  A.   It was right after that.  I done forgot.

15       It was about a week or two after that I

16       called.  They never did get -- I never

17       did talk to anybody of authority.  They

18       supposed to have gave me a call back.  I

19       think I left a message and nobody ever

20       called me back.

21  Q.   Who did you leave a message with?

22  A.   I can't remember who it was either.  It

23       was somebody in the office.  I done

## FREEDOM COURT REPORTING

79

1    Q.   What was your job in the Army?

2    A.   Radio repairman.  I was a missile

3         repairman and field radio repairman.

4    Q.   Were you diagnosed with post traumatic

5         stress disorder while you were in the

6         military?

7    A.   No, I wasn't.

8    Q.   Were you diagnosed with post traumatic

9         stress disorder from 1967 until 2006?

10   A.   They just recently -- Well, after all

11        these series of things happened,

12        accidents and stuff, just a series of

13        things, they ran some tests on me and

14        found out I had post traumatic stress by

15        the series of events and the nightmares

16        and stuff I was having.

17   Q.   When did you start having nightmares?

18   A.   I had them on and off all through life,

19        but they started getting worser and

20        worser.  I had them every since I got out

21        of the military.

22   Q.   Were they nightmares about your military

23        experience?

# FREEDOM COURT REPORTING

95

1      with Bill Riley?

2    A.    Uh-huh (positive response).

3    Q.    Who is Bill Riley?

4    A.    He was an aircraft inspector.

5    Q.    When was this altercation?

6    A.    I don't know when the altercation was,

7      but it happened in -- Langman didn't get

8      but, I think, two weeks suspension, and I

9      don't think Mr. Riley got nothing.

10    Q.    Are both Mr. Riley and Mr. Langman white?

11    A.    Yes.

12    Q.    And you're saying Mr. Langman got

13      suspended, but Mr. Riley was not

14      suspended?

15    A.    I don't think so.

16    Q.    I don't understand how that's being

17      treated differently than you.

18        MR. SABEL:  Object to the form.

19    A.    I got fired.

20        MR. SABEL:  Wait for a question.

21    Q.    Did you ever get in a fight on the job?

22    A.    No.

23    Q.    Then you go on to say Huey, a white male,



EXHIBIT
G

## EXHIBIT G

## STANDARDS AND CONDITIONS OF EMPLOYMENT

For the protection of US HELICOPTER and all employees, the following is a list of certain situations which may result in discipline or discharge.

1.  **INSUBORDINATION** — Failing to perform or unreasonably delaying the performance of instructions given by supervisor or person in authority. Disrespectful to those in position of authority.

2.  **MISCONDUCT** — Fighting or inflicting bodily harm on another person; gambling; being under the influence of or possessing drugs or alcoholic beverages; committing immoral or illegal acts; committing violent acts or using language which adversely affects morale, production, or maintenance of discipline.

3.  **THEFT** — Possessing, taking, removing, destroying or tampering with Company or other employees' property without proper authority.

4.  **FRAUD OR DISHONESTY** — Misusing or abusing Company policy such as: excused absences, leaves of absence; falsifying time sheets; failing to give complete information for personnel and/or security records; making false statements, either oral or written, about the Company, other employees, supervisors, yourself, or work situations.

5.  **ABSENTEEISM** — Being habitually absent from work, failing to return to work promptly from leave of absence or vacation, failing to report absence within 1/2 hour of start of work day.

6.  **TARDINESS** — Failing to be present at the start of the work day.

7.  **MISUSE OF TIME** — Failing or being unable to perform work of an acceptable standard, neglecting job duties. Abusing personal telephone privileges, or begin inattentive to job performance, unauthorized selling of articles or services, distributing or posting of literature, canvassing, polling, or petitioning.

8.  **SAFETY VIOLATIONS** — Failing to observe Company and general safety practices and regulations. Neglecting the safety of others or committing unsafe acts in the use and care of Company property.

9.  **NEGLIGENT DESTRUCTION OF PROPERTY** — Willfully or maliciously destroying Company or an employees' property. Damaging property by failing to use equipment properly and in good judgement.

10. **OPTION TO TERMINATE** — Employment may be terminated, with or without cause, at any time, upon reasonable notice after completion of an applicable probationary period, at the option of myself or the Company

I HAVE READ AND UNDERSTAND

*Billy F. Britt*
EMPLOYEE

WITNESS

*12-6-99*
DATE

Britt v. U.S. Heli 0339

# LETTER OF DISCHARGE

**EXHIBIT**

tabbies&reg;

H

Employee's Name: Billy Britt     Emp # 0586          Date:   01 August 2005

Effective  01 August 2005, Billy Britt is hereby discharged for cause.

1. **State specific violation:**
   *As stated in USH Developmental Guide:*

   *Sleeping on duty.*

2. **State circumstances of violation:**

   At approximately 1:30 pm Mark Robison, AVI Foreman, Billy Riley, Technical Inspector and Ron Brown, Mechanic observed Billy Britt sleeping in his chair. Mark approached Billy and watched him sleep for approximately 1 minute before picking up his clipboard to see if he would wake up, Billy continued to sleep.  Mark then spoke to Billy asking him what he was doing he then woke up.  See attached statements from Mark Robison, Bill Riley and Ron Brown.
   Note: - Other employees have observed Billy sleeping on previous occasions, however a foreman or manager had not observed it until this incident.

3. **State exact date and time of violation:**
   *1:15 – 1:30 pm 1 August 2005*

(Billy Britt) has previously been the subject of the following disciplinary action:

1. **State dates and kinds of previous disciplinary actions:**

   | | |
   |---|---|
   | 14 July 2005 | Verbal concerning not calling in his absences. |
   | 14 July 2005 | Verbal concerning standing around during clean up. |
   | 27 Oct 2004 | Violation of tool control |
   | 13 April 2004 | Abusing phone privileges |

2. **State specific reasons for these previous disciplinary actions:**

   | | |
   |---|---|
   | 14 July 2005 | Billy had taken bereavement leave 6, 7, 8 & 11 of July 2005.  He called in on the 12th and stated he would not be in on the 13th he did not show up or call in.  Willy Wilson, VPO counseled Billy concerning reporting of all absences. |
   | 14 July 2005 | Mark Robison counseled Billy for standing around during clean-up time at the end of the workday. |
   | 27 Oct 2004 | Billy was issued a Letter of Warning concerning a lost tool incident |
   | 13 April 2004 | Billy was issued a Letter of Warning for using the phone for personal business during working hours without permission. |

*I was taking some medication that made me dozes. But not asleep.*

*Billy F. Britt*
Signature of Employee

*Ron Long*
Signature of Supervisor

*Fred West*

00329

D-10

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | | Presented To: | Agency(ies) Charge No(s): |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | | ☐ FEPA | |
| | | ☒ EEOC | 130-2005-04553 |
| | | | and EEOC |

**EXHIBIT I**

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Mr. Billy F. Britt | (334) 347-6708 | 12-16-1946 |

| Street Address | City, State and ZIP Code |
|---|---|
| 100 Seminole Drive, Enterprise, AL 36330 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| U.S. HELICOPTER | Over 15 | |

| Street Address | City, State and ZIP Code |
|---|---|
| Valentine Road,  Ozark, AL | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN | Earliest          Latest |
| ☐ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ OTHER (Specify below.) | 08/03/2005 |
| | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment on December 6, 1999, as an aircraft mechanic. I was discharged on August 3, 2005, for allegedly sleeping on the job.  Similarly situated White employees sleep on the job and they are not disciplined.

I believe I have been discriminated against because of my race, Black in violation of Title VII of the Civil Rights Act of 1964, as amended.  I also believe I have been discriminated against because of my disability in violation of the Americans with Disabilities Act (ADA).

RECEIVED EEOC

SEP 2 8 2005

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 2.0 Sept. 05     Billy F. Britt | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date          Charging Party Signature | |

00350

**EXHIBIT**
J



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, South, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Charge Number:   130 2005 04553

Billy F. Britt
HOUSE OF RESTORATION
1200 - 12th Court
Phenix City, AL 36867

Charging Party

Kim Durden, Human Resource Manager
U. S. HELICOPTER
Blackwell Airport
P.O. Box 1088
Ozark, AL 36361-1088

Respondent

## DETERMINATION

I issue the following determination on the merits of this charge.

Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. 2000e, et. seq. (Title VII), and the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. 12111 et seq. Timeliness and all other requirements for coverage have been met.

Charging Party alleges Respondent discriminated against him because of his race (Black) in violation of Title VII and his disability in violation of the ADA when the Respondent subjected him to disparate treatment. Charging Party alleges he was discharged for allegedly sleeping on the job and a similarly situated White employee was not disciplined.

Respondent denies Charging Party's allegations of race and disability discrimination. Respondent contends Charging Party was discharged according to its policy for being asleep on the job. Respondent also contends it was not aware Charging Party had a disability.

I have determined that the evidence obtained during the investigation establishes reasonable cause to believe the Respondent violated Title VII by subjecting Charging Party to disparate treatment on the basis of his race (Black). Specifically, the Respondent wrongfully discharged Charging Party and failed to reinstate him on the same basis that a similarly situated White employee was reinstated. Evidence obtained during the investigation indicates the Charging Party was discharged and provided Respondent medical documentation similar to that submitted by a similarly situated White employee. Evidence also indicates the White employee was reinstated but Respondent failed to afford the Charging Party the same opportunity for reinstatement.

I have determined that there is no reasonable cause to believe the Respondent discriminated against the Charging Party because of a disability.

00339

Page 2 of 2
Britt v U.S. Helicopter

Upon finding that there is reason to believe that a violation has occurred, the Commission attempts to eliminate the alleged unlawful practice by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter.

If the Respondent declines to discuss settlement or when, for any other reason, a settlement acceptable to the District Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission. A Commission representative will contact each party in the near future to begin conciliation. I have enclosed a proposed conciliation agreement which contains provisions that provide relief for the Charging Party and injunctive/remedial relief in the interest of public policy.

You are reminded that Federal law prohibits retaliation against persons who have exercised their right to inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in Commission investigations is also prohibited. These protections apply regardless of the Commission's determination on the merits of the charge.

On Behalf of the Commission:

5 OCT 2006
_____
Date

*Beverly B. Hinton for*

Bernice Williams-Kimbrough
District Director

Enclosure (Conciliation Agreement)

00340

Charge No.: 130 2005 04553
Page 3

## GENERAL PROVISIONS

1.    EEOC agrees not to use the above-referenced charge as the jurisdictional basis for filing a lawsuit against the Respondent. However, nothing in this Agreement shall be construed to preclude EEOC and/or any aggrieved individual(s) from bringing suit to enforce this agreement in the event that the respondent fails to perform the promises and representations contained herein. Neither does it preclude the Commission from filing charges in the future.

2.    EEOC reserves all rights to proceed with respect to matters like and related to these matters but not covered in this Agreement and to secure relief on behalf of aggrieved persons not covered by the terms of this Agreement.

3.    The Respondent agrees that it shall comply with all requirements of Title VII of the Civil Rights Act of 1964, as amended, and other applicable laws within the jurisdiction of the Equal Employment Opportunity Commission.

4.    The Parties agree that there shall be no discrimination or retaliation of any kind against any person because of opposition to any practice declared unlawful under Title VII of the Civil Rights Act of 1964, as amended; or because of the filing of a charge, giving of testimony or assistance, or participation in any manner in any investigation, proceeding, or hearing under the named statutes.

5.    Respondent agrees that EEOC may review compliance with this Agreement. As a part of such review, EEOC may require written reports regarding compliance, inspect Respondent's premises at reasonable times, interview employees, and examine and copy relevant documents.

6.    This Agreement shall remain in full force and effect for two year from the date of its execution until verification of full compliance with its terms is obtained.

Charge No.: 130 2005 04553
Page 4

## EMPLOYMENT POLICIES AND PRACTICES

1.   Cessation Provision. Respondent agrees to cease discriminating on the basis of race in all phases of employment. Respondent agrees to take corrective, curative and preventive action to ensure that similar situations will not occur.

2.   Respondent agrees that it will conduct periodic training sessions to disseminate information and to ensure that all management and non management personnel are familiar with its non-discrimination policies. Respondent agrees to enforce its policies as outlined in these policies.

## CHARGING PARTY RELIEF

1.   Respondent agrees to pay Charging Party back pay in the sum of $42,560.00, due from the date of the discriminatory act, August 3, 2005 to the present, based on the unlawful discrimination, less all legal withholdings.

2.   Respondent agrees to reinstate Charging Party to his position with all benefits which he would have earned had he been reinstated.

3.   Respondent agree to pay Charging Party compensatory damages in the amount of twenty thousand dollars ($20,000.00) for the emotional distress and embarrassment he has suffered.

4.   Respondent agrees to eliminate from Charging Party's personnel record all documents and entries relating to the facts and circumstances which led to the filing of this charge. Respondent will further prohibit any dissemination, directly or indirectly, to any other employer or potential employer of any facts or circumstances relating to the resolution of the instant charge.

5.   Respondent will provide Charging Party a written letter of apology for the discrimination to which Charging Party was subjected.

Charge No.: 130 2005 04553
Page 5

## REPORTING REQUIREMENTS

Within ten (10) days of the effective date of this Agreement and once yearly thereafter over the life of this Agreement, the Respondent will report and confirm to the District Director, Equal Employment Opportunity Commission, Birmingham District Office, 1130 - 22nd Street South, Ridge Park Place, Suite 2000, Birmingham, Alabama 35205, its compliance with this Agreement. The EEOC reserves the right to conduct on-site reviews to determine compliance during the terms of this Agreement.

## NOTICE REQUIREMENT

Respondent agrees to sign and conspicuously post the Notice to Employees found as Attachment A. Respondent will post copies of the Notice on all employee bulletin boards for a period of two years from the date of execution of this agreement.

## CONSENT FOR RELEASE OF NOTICE

The contents of conciliation discussions between all parties and this Conciliation Agreement (except Attachment A) are excluded from disclosure and will be considered and treated as confidential.

Furthermore, copies of all documents implementing changes in employment policies as described in the Employment Policies and Practices section of this Agreement will be included in the first progress report sent to EEOC.

Charge No.: 130 2005 04553
Page 6

## SIGNATURES

I have read the foregoing Conciliation Agreement and I accept and agree to the provisions contained therein:


_____                    _____
Date                                        Signature of Respondent


_*18 Oct. 2006*_                            _Billy J. Britt_
Date                                        Charging Party


I recommend approval of this Conciliation Agreement:


_____                    _____
Date                                        Devoralyn J. McGhee
                                            Investigator


I concur in the above recommendation for approval of this Conciliation Agreement:


_____                    _____
Date                                        Eddi Abdulhaqq
                                            Enforcement Supervisor


Approved on behalf of the Commission:


_____                    _____
Date                                        Bernice Williams-Kimbrough
                                            District Director
                                            Birmingham District Office

00344

## NOTICE
## AS REQUIRED UNDER
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

1. This **NOTICE** to all employees of U.S. Helicopter is being posted as part of the remedy agreed to pursuant to a Conciliation Agreement between U. S. Helicopter and the U.S. Equal Employment Opportunity Commission (EEOC).

2. Federal law requires that there be no discrimination against any employee or applicant in employment because of the individual's sex, race, color, religion, national origin, age (40 and over) or disability with respect to hiring, promotion, firing, compensation, or other terms, conditions or privileges of employment.

3. U.S. Helicopter, supports and will comply with such Federal law in all respects and it will not take any action against employees because they have exercised their rights under the law.

7. U.S. Helicopter, will not engage in the unlawful conduct which has been conciliated. Specifically, City of Mobile will not discriminate on the basis of disability, retaliation or any other applicable laws within the jurisdiction of the Equal Employment Opportunity Commission.

5. U.S. Helicopter, will take remedial action required by the conciliation agreement. Individuals affected by our conduct will be made whole for any losses they suffered as a result of any discrimination against them.

6. U.S. Helicopter, has adopted an equal employment opportunity policy and will ensure that all supervisory employees and other employees abide by the requirements of that policy, and that employees will not be discriminated against in violation of any laws enforced by the Equal Employment Opportunity Commission.

7. This **NOTICE** will remain posted until_____ by direction of the U.S. Equal Employment Opportunity Commission.


SIGNED _____ day of _____, 2006


_____
Signature of Respondent


ATTACHMENT A

00345

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2007 AUG -1  P 2: 21

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT

|  |  |
|---|---|
| BILLY F. BRITT, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| U.S. HELICOPTER, d/b/a HELICOPTER | ) |
| SUPPORT COMPANY, INC. | ) |
| | ) |
| Defendant. | ) |

CASE NO. CV-03-

1:07CV696- MEF

JURY DEMAND

## COMPLAINT

## I. INTRODUCTION

1.  This is a civil rights action for legal and equitable relief to redress the deprivation
    of rights guaranteed by the Constitutions and laws of the United States and the
    State of Alabama, *i.e.*, unlawful race discrimination and retaliation in
    employment, violations of the American with Disabilities Act (ADA), and
    violations of state tort law.

2.  Plaintiff's claims are based upon Title VII of the Civil Rights Act of 1964 as
    amended, codified at 42 U.S.C. §§ 1981a & 2000(e), *et seq.*, including 42 U.S.C.
    § 2000e-3(a) (retaliation); and pursuant to 42 U.S.C. §§ 2000e-5(f)(3) & (g); 42
    U.S.C. § 1981.

3.  Plaintiff's disability claims are made pursuant to 42 U.S.C. §12101, *et seq.*

## II.  JURISDICTION AND VENUE

4.      This Court has jurisdiction over this cause pursuant to 28 U.S.C. §§ 1331 and

1343.  Jurisdiction over Plaintiff's claims for injunctive relief, costs, expenses and

attorney fees is additionally conferred by 42 U.S.C. § 1988.  Further, jurisdiction

is invoked pursuant to §12117 of the Americans with Disabilities Act, 42 U.S.C.

12101 *et. seq* 42 U.S.C. §1981a. .  In addition, the jurisdiction of this Court is

pursuant to 28 U.S.C. §§ 2201 & 2202 (Declaratory Judgment Act).

5.      Plaintiff has exhausted the necessary administrative remedies.  Prior to filing this

civil action, Plaintiff timely filed a written charge with the Equal Employment

Opportunity Commission ("EEOC") within 180 days of the discriminatory acts

asserting unlawful discrimination.  Plaintiff filed his EEOC charge on  September

20, 2005.  This civil action is filed within 90 days of the EEOC issued Right to

Sue letter dated May 3, 2007.

6.      Jurisdiction over Plaintiff's claims based on Alabama law exists under the

Doctrine of Supplemental Jurisdiction.  28 U.S.C. § 1367.

7.      All acts complained of herein relate to Plaintiff's place of employment within the

Middle District of Alabama and venue is proper in the Middle District of

Alabama. 28 U.S.C. § 1391.

## III. THE PARTIES

8.      Billy F. Britt is an African American male resident of Russell County, Alabama

and a citizen of the United States.  Britt had been employed with U.S. Helicopter

for five and one-half years until his unlawful termination on August 3, 2005.

9.   Defendant is an employer that provides helicopter depot maintenance
     requirements for the U. S. Army, National Guard, Department of State and foreign
     military sales. Defendant U. S. Helicopter also serves domestic and international
     commercial customers. Defendant operates a maintenance shop in Ozark, AL.
     Defendant is an "employer" within the meaning of Title VII and the ADA, and is
     subject to suit under all of the claims alleged herein.

10.  Defendant is subject to personal jurisdiction in the State of Alabama for the
     purpose of this lawsuit.

### IV.    FACTUAL ALLEGATIONS

11.   On December 6, 1999, Plaintiff was hired to work as a full-time aircraft mechanic
     at Defendant's maintenance facility in Ozark, Alabama.

12.  Plaintiff's starting salary was approximately $12.00/per hour.

13.  Bob Nestler, a white male, was Plaintiff's supervisor.

14.  As a mechanic, Plaintiff was awarded overtime on a frequent basis.

15.  In April 2000, Plaintiff was selected as the Employee of the Month.

16.  On or about August 2001, Plaintiff was transferred to work in Defendant's
     Avionics Electrical Instrument ("Avionics") section to assist with the backlog.

17.  Plaintiff was selected because of his background in avionics.

18.  Jim Ellis, a white male, became Plaintiff's supervisor. Mr. Donahue, a white
     male, was Ellis' supervisor.

3

19.   Plaintiff was scheduled to work in Avionics until the backlog cleared.  After this occurred, he would be transferred back to his position as an aircraft mechanic.

20.   Plaintiff was the only African American employee in Avionics.  Plaintiff remained in this section for the remainder of his employment with Defendant.

21.   In Avionics, employees were required to refurbish helicopters based on the customer's specification which included replacing instruments, wiring, and installing antennae and/or other electrical components.

22.   Ellis was responsible for giving assignments to permanent and contract employees working in Avionics.

23.   On several occasions, Ellis demonstrated his racial animus towards African Americans and Plaintiff by the assignments that he gave employees.

24.   Ellis assigned all of the less desirable jobs to Plaintiff.

25.   For example, the entire time that Plaintiff worked in this section, he was the only employee that was assigned to clean the shop area and to make coffee for the employees.

26.   On several occasions, Plaintiff complained about the cleaning assignments.

27.   Ellis responded to these complaints by telling Plaintiff that he "did such a good job cleaning."

28.   Plaintiff felt humiliated and degraded by this explanation.

29.   Ellis refused to give cleaning assignments to any of the white employees.

30. Plaintiff continued to complain about the cleaning assignments and Ellis would provide him with the same response.

31. When Plaintiff attempted to speak with Mr. Donahue about the assignments, Donahue ignored Plaintiff.  Donahue would walk by Plaintiff as if he did not exist and proceed to speak with other white employees in the same area.

32. Plaintiff felt uneasy and uncomfortable by Donahue's behavior.

33. Plaintiff requested to be transferred back to his position as an aircraft mechanic so that he could receive better assignments, better treatment and overtime.  Plaintiff brought his request to Ellis and Nestler, his former supervisor.

34. Ellis refused to allow Plaintiff to be transferred, telling Nestler that Plaintiff was a good employee and that he did not want to lose him.

35. Overtime was awarded based on the aircraft and the employees assigned to work on it that particular day.

36. Ellis frequently assigned installation tasks to the white employees.

37. Ellis intentionally assigned Plaintiff tasks that would not require overtime work.  For example, Ellis would also assign Plaintiff the task of removing the wiring out of the aircraft, another cleaning assignment.

38. When an aircraft was brought into the Avionics section, the wiring and any excess equipment had to be removed from the aircraft before any installation tasks could be performed.  At this stage, the aircraft was usually dirty.

39. Ellis refused to assign this task to any other employee.

5

40.    Ellis commended Plaintiff for being able to work an entire aircraft by himself and quicker than any other employee.

41.    Plaintiff was not flattered by Ellis' remarks because the removal of wiring and excess equipment did not require any particular skill.

42.    Plaintiff continued to request different assignments, including installation tasks that were more challenging and tasks that would provide him with the opportunity to have overtime.  Ellis refused to assign Plaintiff different tasks despite the fact that Plaintiff was capable of performing said tasks in a satisfactory manner.

43.    White employees were allowed to work overtime despite their job assignment. For example, Jim Donahue ("Big Jim"), a white male, was allowed to work overtime even when he was not assigned to a particular aircraft.

44.    On one occasion, "Big Jim" was removing wiring with Plaintiff but was allowed to work overtime.  However, Plaintiff was not allowed to work overtime.

45.    Additionally, Ron Redd, a white male, was assigned to inventory modification kits but was allowed to stay and work overtime on an aircraft that had been assigned to another employee.

46.    Debbie Ellwood, a white female, was also allowed to work overtime as often as she liked although her daily assignments did not require her to do so.

47.    During Plaintiff's tenure in Avionics, he received only three hours of overtime.

48.    Plaintiff complained to Ellis about the lack of overtime hours.

49.    Ellis refused to give Plaintiff duties that would require him to work overtime.

6

50. Ellis also refused to give overtime hours to Josephine Yvette Williams, an African American female. Williams had been hired to work with testing and was briefly assigned to the avionics section.

51. Williams was responsible for testing wiring harnesses. Testing was considered to be a prestigious assignment.

52. Williams also complained to Ellis about the lack of overtime hours.

53. However, instead of giving Williams overtime hours, Ellis instructed Williams to train Debbie Ellwood on the testing procedures. Shortly thereafter, Ellwood replaced Williams as a tester.

54. As a result, Williams resigned because of the discriminatory treatment, including being replaced by a white female and the denial of overtime hours.

55. Plaintiff filed a charge of discrimination with the EEOC regarding the lack of overtime hours.

56. Ellis was aware of Plaintiff's charge and continued to assign him cleaning tasks and deny him overtime work. Ellis also began to retaliate against Plaintiff. For example, when Plaintiff walked across the hanger, Ellis would admonish him for speaking to African American employees in other sections. White employees were not admonished for speaking to other white employees.

57. Although Ellis described Plaintiff as an excellent employee and complimented him on his work performance, Plaintiff received lower ratings on his evaluations than similarly situated white employees solely because of his race.

7

58.    Ellis also refused to provide Plaintiff with opportunities for advancement.

59.    For example, when new modifications for the electrical information for the
       aircrafts were introduced in the section, Ellis did not allow Plaintiff to be trained
       or exposed to the information. Instead, Ellis allowed only white employees to be
       exposed and trained on the information.

60.    Ellis knew that denying Plaintiff the opportunity to be exposed to this information
       would limit his growth and other employment opportunities.   As such, when
       Plaintiff often requested to handle more challenging assignments, Ellis would not
       allow him to do so.

61.    On several occasions, Plaintiff saw the phrase, "KKK is still alive" written on the
       walls of the restroom.

62.    Plaintiff was disturbed by this phrase and felt threatened by the fact that it had
       appeared in the workplace.

63.    Plaintiff discussed the fact that the phrase had been written on the walls of the
       restroom with other African American employees who likewise felt threatened
       and disturbed by the occurrence.

64.    Plaintiff and other African American employees reported the phrase to
       management.

65.    Management did not take any effective steps to investigate or otherwise address
       this language.  Management merely painted over the phrase each time that it
       appeared.

8

66.    Near the end of his employment, Plaintiff told Ellis that he was taking Remeron, a

prescription medicine for depression, and that drowsiness was one of the side

effects of this medication.

67.    Plaintiff asked Ellis for special consideration and/or an accommodation.

68.    Specifically, Plaintiff requested to have more challenging assignments that would

ensure that he would stay busy throughout the entire day.

69.    Ellis acknowledged Plaintiff's medical information, but did not request any

additional information about his disability or treatment, or provide him with any

instructions.  Ellis provided no feedback to Plaintiff.

70.    Ellis was also aware that Plaintiff had participated in an alcohol and drug program

and had received treatment for same while working in the Avionics section.

71.    Kim Durden, a white female, was the human resources manager.

72.    Durden was aware of Plaintiff's participation in and treatment for alcohol and

drug related problems because she had to verify his insurance coverage.

73.    Because of the side effects of the medication, Plaintiff constantly reminded Ellis

that he was taking the drug.  With the medication, Plaintiff was able to perform

his job, but the side effects of the medication required reasonable accommodation

from Defendant.

74.    Defendant made no effort to provide reasonable accommodation for Plaintiff.

75. Plaintiff was unlawfully terminated on August 3, 2005, allegedly after he was observed nodding. At the end of Plaintiff's shift, he was told that he was being terminated for sleeping on the job.

76. Plaintiff was shocked by his termination because he had previously explained the side effects of his medication to his supervisor and requested an accommodation.

77. Karen Karba, an African American secretary who worked in the same area with Durden, overheard Durden tell Donahue, "There's your chance to get [Britt]" when it was reported that he had been nodding.

78. Defendant fired Plaintiff without providing him with a reasonable accommodation.

79. On at least two occasions immediately after his termination, Plaintiff provided Defendant with a doctor's excuses which indicated that one side effect of his prescription medication was drowsiness and asked to be reinstated to his position.

80. Defendant refused to reinstate Plaintiff.

81. Plaintiff's job duties are believed to have been reassigned to a person or persons without a disability or a perceived disability or a record of impairment or a serious medical condition, who have not opposed discrimination, or filed a charge with the EEOC.

82. Plaintiff is substantially impaired in several major life activities. However with medication and treatment, Plaintiff is able to overcome impairment of other major life activities.

10

83. Plaintiff is able to perform the essential functions of his job and was able to do so prior to his termination.

84. Other white employees were observed sleeping on the job at the same time as Plaintiff, however these employees were not terminated or otherwise disciplined.

85. Lewis Carter, an African American male employed as a mechanic with Defendant, observed other white employees sleeping on the job at the same time as Plaintiff. Carter did not observe any white employee being terminated for sleeping on the job.

86. Another example of the difference in the way Plaintiff was treated in comparison to similarly situated white employees is in the area of discipline.

87. For example, Langman, a white mechanic, got into an altercation with Bill Riley, a white aircraft inspector. Langman was not terminated, but received a two week suspension. Riley was not disciplined or otherwise reprimanded.

88. Since that time, Langman has been promoted to a lead mechanic position.

89. Huey, a white male, tested positive for drugs and was suspended for one month. He was allowed to return to work thereafter.

90. Shortly before Plaintiff's termination, Kevin Brian, a white male aircraft inspector, was observed sleeping on the job. Brian was allowed to return to his position following a one day suspension after providing Defendant with a doctor's excuse which indicated that he was taking a prescription drug that caused drowsiness.

11

91.     Plaintiff's treatment is part of a pattern and practice of racial discrimination which includes the denial of overtime hours as compared to the hours granted to white employees, the hostile work environment based on race, the termination of employment, and other adverse terms and conditions of employment.

92.     A racially discriminatory work environment existed from the time of Plaintiff's hire throughout his employment.

93.     Plaintiff believes that racial discrimination is the standard operating procedure at U.S. Helicopter.

94.     Plaintiff was denied reasonable accommodation and terminated because of his disability, and/or because of the perception of a disability by Defendant, and/or because of his record of impairment in violation of the ADA.

95.     Further, Plaintiff has been discriminated against and retaliated against in the terms, conditions and privileges of employment, as stated above, based on his race and because he filed an EEOC charge and because he opposed race discrimination.

96      Plaintiff was directly affected by said discriminatory and retaliatory practices and by being deprived of the opportunity to work in an environment free of racial discrimination and retaliation. Such discrimination and retaliation denied Plaintiff the right to work in a racially integrated work environment and otherwise affected his opportunity for enjoyment of work as compared to white employees.

12

97.    As a result of said injury and damage, Plaintiff is entitled to back pay with interest, reinstatement to full-time employment at a proper location with proper work assignments, front pay, and compensatory and punitive damages, attorneys' fees and costs.

## V. <u>STATEMENT OF CLAIMS</u>

### CLAIM ONE
**VIOLATION OF TITLE VII, 42 U.S. C. § 2000e *et seq*.**
**(Discrimination on the Basis of Race)**

98.    Plaintiff realleges the above paragraphs as if fully set out herein.

99.    Plaintiff is a member of a class protected by 42 U.S.C. § 2000e *et seq.*, and is qualified for employment with U.S. Helicopter.

100.    The conduct of Defendant, U.S. Helicopter, as set forth above, constitutes unlawful discrimination against Plaintiff on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and is part of Defendant's pattern and practice of discrimination on the basis of race. Plaintiff was denied a work environment free of discrimination in violation of 42 U.S.C. §2000e *et seq., as amended*, 42 U.S.C. § 1981a, and was not given equal opportunity in the terms and conditions of his employment.

101.    Defendant's said treatment of Plaintiff on the basis of race altered the terms and conditions of Plaintiff's employment and unreasonably interfered with Plaintiff's opportunity and ability to perform his job.

102.    As a direct and proximate result of said acts, Plaintiff has suffered and continues

to suffer loss of employment, loss of promotion opportunities, loss of income, loss

of other employment benefits, mental and emotional distress, humiliation, loss of

self esteem, depression, expense, embarrassment, and damage to his reputation.

**CLAIM TWO**
**RETALIATION UNDER TITLE VII, 42 U.S.C.§ 2000e-3(a)**
**(Retaliation)**

103.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

104.    The conduct of Defendant, as set forth herein, constitutes unlawful retaliation

against Plaintiff for his having filed an EEOC charge and for having opposed

discriminatory treatment based on race, in violation of Title VII and 42 U.S.C. §

1981a.

105.    As a direct and proximate result of said acts, Plaintiff has suffered and continues

to suffer loss of employment, loss of promotion opportunities, loss of income, loss

of other employment benefits, mental an emotional distress, humiliation loss of

self esteem, depression, expense, embarrassment, and damage to his reputation.

**CLAIM THREE**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12101 *et seq.***
**(Discrimination on the basis of a disability)**

106.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

107.   Plaintiff was discriminated against in the terms and conditions of his employment because of his disability and/or record of disability and/or being regarded as having such an impairment, as defined by the U.S.C. §12102(2).

108.   The adverse treatment was unrelated to job performance.

109.   There was no legitimate or lawful reason to take severe adverse employment actions against Plaintiff, including but not limited to the termination of Plaintiff's employment, or to deny Plaintiff reasonable accommodation.

110.   Because Plaintiff's record of impairment, his being regarded as disabled, and his disability as defined in the ADA were motivating factors and made a difference in the adverse decisions at issue, including to terminate Plaintiff and to engage in a pattern and practice of discrimination, Defendant violated the ADA with knowing or reckless disregard of Plaintiff's rights under the Act.

111.   As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of employment, loss of promotion opportunities, loss of income, loss of other employment benefits, mental and emotional distress, humiliation, loss of self esteem, depression, expense, embarrassment, and damage to his reputation.

## CLAIM FOUR
### VIOLATION OF 42 U.S.C. § 12203
### (Retaliation In Violation of the ADA)

112.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

113.    Plaintiff was willfully retaliated against for seeking reasonable accommodation
and for opposing discrimination, in violation of the ADA, 42 U.S.C. §12203.

114.    Defendant willfully retaliated against Plaintiff for seeking reasonable
accommodation, and Defendant interfered with Plaintiff in the exercise and
enjoyment of, and on account of his having exercised and enjoyed the rights
granted and protected by the ADA.

## CLAIM FIVE
### VIOLATION OF 42 U.S.C. § 1981
### (Discrimination and Retaliation on the Basis of Race)

115.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

116.    Plaintiff is a member of a class protected by 42 U.S.C. §1981 and is qualified for
employment with U.S. Helicopter.

117.    The conduct of Defendant, its agents and employees constitutes unlawful
discrimination and retaliation against Plaintiff on the basis of race, in violation of
42 U.S.C. § 1981, and constitutes part of Defendant's pattern and practice of
retaliation and discrimination on the basis of race.

118.    As a direct and proximate result of said acts, Plaintiff has suffered and continue to
suffer loss of employment, loss of promotion opportunities, loss of income, loss of

16

other employment benefits, mental and emotional distress, humiliation, loss of self esteem, depression, expense, embarrassment, and damage to his reputation.

## CLAIM SIX
### NEGLIGENT SUPERVISION AND TRAINING

119.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

120.    This is a claim arising under the law of the State of Alabama claiming that Defendant committed the tort of negligent supervision and training.

121.    At all relevant times, the Defendant was and continues to be responsible for the training and supervision of its supervisors and management personnel.

122.    The conduct of the Defendant, as set forth above, was a breach of said Defendant's duty to Plaintiff to exercise care in supervising and training employees, and such breach proximately caused Plaintiff to be discriminated and retaliated against, suffer humiliation, mental pain and anguish, and all other injuries outlined herein, all to Plaintiff's damage.

## CLAIM SEVEN
### NEGLIGENT RETENTION

123.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

124.    This is a claim arising under the law of the State of Alabama claiming that Defendant committed the tort of negligent retention.

125.    The conduct of the Defendant, as set forth above, was a breach of its duty to Plaintiff to exercise care in retaining employees, and such breach proximately

17

caused him to be discriminated and retaliated against, suffer humiliation, mental

pain and anguish, and all other injuries outlined herein, all to Plaintiff's damage.

### CLAIM EIGHT
### NEGLIGENCE

126. Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

127. This is a claim arising under the law of the State of Alabama claiming that

Defendant committed the tort of negligence.

128. Defendant, by its actions and omissions, breached the standard of care owed to

Plaintiff while an employee of said Defendant.

129. The conduct of Defendant, as set forth above, was a breach of its duty to Plaintiff

to exercise due care, and such breach proximately caused him to be discriminated

and retaliated against, suffer humiliation, mental pain and anguish and all other

injuries outlined herein, all to Plaintiff's damage.

### VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against

Defendant:

(a) Declaring that the acts and practices complained of herein are in violation of Title

VII, 42 U.S.C. §§ 1981, 1981a, & 2000e *et seq.*, the Americans with Disabilities

Act, 42 U.S.C. § 12101, *et seq.*, 42 U.S.C. §1981a, and state tort law;

(b) Enjoining and permanently restraining the above violations;

18

(c)   Ordering Defendant to make Plaintiff whole by reinstating Plaintiff, providing appropriate front pay, back pay and interest thereon, and reimbursement for lost compensation, social security, prejudgment interest, and all other entitlements and emoluments in an amount to be shown at trial, and other affirmative steps immediately to eliminate the effects of the discriminatory practices complained of herein; and 42 U.S.C. §12205.

(d)   Granting to Plaintiff reasonable attorneys' fees, expert fees, costs, and expenses incurred herein, 42 U.S.C. §§ 1988 & 2000e-5(k); and 42 U.S.C. §12205.

(e)   Granting to Plaintiff compensatory and punitive damages to the extent permitted by law;

(f)   Retaining jurisdiction over this action until the Defendant, U.S. Helicopter has fully complied with the Orders of this Court and requiring said Defendant to file such reports as may be necessary to supervise such compliance;

(g)   Ordering Defendant, U.S. Helicopter, to adopt and strictly enforce written rules prohibiting discrimination and retaliation in the workplace; that such rules provide for the prompt and appropriate investigation of all related complaints; and that such rules require formal disciplinary action to be taken against any employee or agent found to have engaged in such discrimination or retaliation against any employee;

(h)   Granting such other, further, and different relief to Plaintiff which it may deem proper.

19

Respectfully submitted this _1st_ day of _August_, 2007.

_Maricia Woodham_

MARICIA WOODHAM (*BEN050*)
Attorney for Plaintiff

_M. Wayne Sabel_

M. WAYNE SABEL (SAB002)
Attorney for Plaintiff


**OF COUNSEL:**

Sabel & Sabel, P.C.
Hillwood Office Center
2800 Zelda Rd.; Suite 100-5
Montgomery, AL 36106
TELEPHONE:       (334) 271-2770
FACSIMILE:        (334) 277-2882


## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.

_Maricia Woodham_

MARICIA WOODHAM
One of the Attorney's for Plaintiff



## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS  --      Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days** of the date this Notice was *mailed to you* (as indicated where the Notice is signed).

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

### PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: backpay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/96 to 12/1/96, you should file suit **before 7/1/98** -- *not* 12/1/98 -- in order to recover unpaid wages due for July 1996. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA backpay recovery period.

### ATTORNEY REPRESENTATION -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

### ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request** <u>within 6 months</u> of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*        00039

EXHIBIT

tabbies®

M

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **BILLY F. BRITT,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CASE NO. CV1:07CV696** |
| **U.S. HELICOPTER, d/b/a HELICOPTER** | ) | |
| **SUPPORT COMPANY, INC. and** | ) | |
| **BELL AEROSPACE SERVICES, INC., d/b/a** | ) | |
| **U.S. HELICOPTER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED COMPLAINT

## I. INTRODUCTION

1.    This is a civil rights action for legal and equitable relief to redress the deprivation

of rights guaranteed by the Constitutions and laws of the United States and the

State of Alabama, *i.e.*, unlawful race discrimination and retaliation in

employment, violations of the American with Disabilities Act (ADA), and

violations of state tort law.

2.    Plaintiff's claims are based upon Title VII of the Civil Rights Act of 1964 as

amended, codified at 42 U.S.C. §§ 1981a & 2000(e), *et seq.*, including 42 U.S.C.

§ 2000e-3(a) (retaliation); and pursuant to 42 U.S.C. §§ 2000e-5(f)(3) & (g); 42

U.S.C. § 1981.

3.    Plaintiff's disability claims are made pursuant to 42 U.S.C. §12101, *et seq.*

## II.  JURISDICTION AND VENUE

4.      This Court has jurisdiction over this cause pursuant to 28 U.S.C. §§ 1331 and

1343.  Jurisdiction over Plaintiff's claims for injunctive relief, costs, expenses and

attorney fees is additionally conferred by 42 U.S.C. § 1988.  Further, jurisdiction

is invoked pursuant to §12117 of the Americans with Disabilities Act, 42 U.S.C.

12101 *et. seq.* 42 U.S.C. §1981a. .  In addition, the jurisdiction of this Court is

pursuant to 28 U.S.C. §§ 2201 & 2202 (Declaratory Judgment Act).

5.      Plaintiff has exhausted the necessary administrative remedies.  Prior to filing this

civil action, Plaintiff timely filed a written charge with the Equal Employment

Opportunity Commission ("EEOC") within 180 days of the discriminatory acts

asserting unlawful discrimination.  Plaintiff filed his EEOC charge on September

20, 2005.  This civil action is filed within 90 days of the EEOC issued Right to

Sue letter dated May 3, 2007.

6.      Jurisdiction over Plaintiff's claims based on Alabama law exists under the

Doctrine of Supplemental Jurisdiction.  28 U.S.C. § 1367.

7.      All acts complained of herein relate to Plaintiff's place of employment within the

Middle District of Alabama and venue is proper in the Middle District of

Alabama. 28 U.S.C. § 1391.

## III. THE PARTIES

8.      Billy F. Britt is an African American male resident of Russell County, Alabama

and a citizen of the United States.  Britt had been employed with U.S. Helicopter

for five and one-half years until his unlawful termination on August 3, 2005.

9.    Defendants U.S. Helicopter d/b/a the Helicopter Support Company is an employer that provides helicopter depot maintenance requirements for the U. S. Army, National Guard, Department of State and foreign military sales.  Defendant operated a maintenance shop in Ozark, Alabama.  Defendant is an "employer" within the meaning of Title VII and the ADA, and is subject to suit under all of the claims alleged herein.

10.  Defendant Bell Aerospace Services, Inc. d/b/a U.S. Helicopter, a wholly owned subsidiary of Bell Helicopter Textron, Inc., is an employer that provides the equipment to perform all phases of helicopter depot maintenance for the U.S. Department of Defense.   Defendant operates a maintenance shop in Ozark, Alabama. Defendant Bell Aerospace Services, Inc. is an "employer" within the meaning of Title VII and the ADA, and is subject to suit under all of the claims alleged herein.

11.  Defendants are subject to personal jurisdiction in the State of Alabama for the purpose of this lawsuit.

## IV.    FACTUAL ALLEGATIONS

12.  On December 6, 1999, Plaintiff was hired to work as a full-time aircraft mechanic at Defendants' maintenance facility in Ozark, Alabama.

13.  Plaintiff's starting salary was approximately $12.00/per hour.

14.  Bob Nestler, a white male, was Plaintiff's supervisor.

15.  As a mechanic, Plaintiff was awarded overtime on a frequent basis.

3

16. In April 2000, Plaintiff was selected as the Employee of the Month.

17. On or about August 2001, Plaintiff was transferred to work in Defendants' Avionics Electrical Instrument ("Avionics") section to assist with the backlog.

18. Plaintiff was selected because of his background in avionics.

19. Jim Ellis, a white male, became Plaintiff's supervisor. Mr. Donahue, a white male, was Ellis' supervisor.

20. Plaintiff was scheduled to work in Avionics until the backlog cleared. After this occurred, he would be transferred back to his position as an aircraft mechanic.

21. Plaintiff was the only African American employee in Avionics. Plaintiff remained in this section for the remainder of his employment with Defendants.

22. In Avionics, employees were required to refurbish helicopters based on the customer's specification which included replacing instruments, wiring, and installing antennae and/or other electrical components.

23. Ellis was responsible for giving assignments to permanent and contract employees working in Avionics.

24. On several occasions, Ellis demonstrated his racial animus towards African Americans and Plaintiff by the assignments that he gave employees.

25. Ellis assigned all of the less desirable jobs to Plaintiff.

26. For example, the entire time that Plaintiff worked in this section, he was the only employee that was assigned to clean the shop area and to make coffee for the employees.

4

27. On several occasions, Plaintiff complained about the cleaning assignments.

28. Ellis responded to these complaints by telling Plaintiff that he "did such a good job cleaning."

29. Plaintiff felt humiliated and degraded by this explanation.

30. Ellis refused to give cleaning assignments to any of the white employees.

31. Plaintiff continued to complain about the cleaning assignments and Ellis would provide him with the same response.

32. When Plaintiff attempted to speak with Mr. Donahue about the assignments, Donahue ignored Plaintiff. Donahue would walk by Plaintiff as if he did not exist and proceed to speak with other white employees in the same area.

33. Plaintiff felt uneasy and uncomfortable by Donahue's behavior.

34. Plaintiff requested to be transferred back to his position as an aircraft mechanic so that he could receive better assignments, better treatment and overtime. Plaintiff brought his request to Ellis and Nestler, his former supervisor.

35. Ellis refused to allow Plaintiff to be transferred, telling Nestler that Plaintiff was a good employee and that he did not want to lose him.

36. Overtime was awarded based on the aircraft and the employees assigned to work on it that particular day.

37. Ellis frequently assigned installation tasks to the white employees.

38. Ellis intentionally assigned Plaintiff tasks that would not require overtime work. For example, Ellis would also assign Plaintiff the task of removing the wiring out of the aircraft, another cleaning assignment.

39. When an aircraft was brought into the Avionics section, the wiring and any excess equipment had to be removed from the aircraft before any installation tasks could be performed. At this stage, the aircraft was usually dirty.

40. Ellis refused to assign this task to any other employee.

41. Ellis commended Plaintiff for being able to work an entire aircraft by himself and quicker than any other employee.

42. Plaintiff was not flattered by Ellis' remarks because the removal of wiring and excess equipment did not require any particular skill.

43. Plaintiff continued to request different assignments, including installation tasks that were more challenging and tasks that would provide him with the opportunity to have overtime. Ellis refused to assign Plaintiff different tasks despite the fact that Plaintiff was capable of performing said tasks in a satisfactory manner.

44. White employees were allowed to work overtime despite their job assignment. For example, Jim Donahue ("Big Jim"), a white male, was allowed to work overtime even when he was not assigned to a particular aircraft.

45. On one occasion, "Big Jim" was removing wiring with Plaintiff but was allowed to work overtime. However, Plaintiff was not allowed to work overtime.

46. Additionally, Ron Redd, a white male, was assigned to inventory modification kits but was allowed to stay and work overtime on an aircraft that had been assigned to another employee.

47. Debbie Ellwood, a white female, was also allowed to work overtime as often as she liked although her daily assignments did not require her to do so.

48. During Plaintiff's tenure in Avionics, he received only three hours of overtime.

49. Plaintiff complained to Ellis about the lack of overtime hours.

50. Ellis refused to give Plaintiff duties that would require him to work overtime.

51. Ellis also refused to give overtime hours to Josephine Yvette Williams, an African American female. Williams had been hired to work with testing and was briefly assigned to the avionics section.

52. Williams was responsible for testing wiring harnesses. Testing was considered to be a prestigious assignment.

53. Williams also complained to Ellis about the lack of overtime hours.

54. However, instead of giving Williams overtime hours, Ellis instructed Williams to train Debbie Ellwood on the testing procedures. Shortly thereafter, Ellwood replaced Williams as a tester.

55. As a result, Williams resigned because of the discriminatory treatment, including being replaced by a white female and the denial of overtime hours.

56. Plaintiff filed a charge of discrimination with the EEOC regarding the lack of overtime hours.

57. Ellis was aware of Plaintiff's charge and continued to assign him cleaning tasks and deny him overtime work.   Ellis also began to retaliate against Plaintiff.  For example, when Plaintiff walked across the hanger, Ellis would admonish him for speaking to African American employees in other sections.  White employees were not admonished for speaking to other white employees.

58. Although Ellis described Plaintiff as an excellent employee and complimented him on his work performance, Plaintiff received lower ratings on his evaluations than similarly situated white employees solely because of his race.

59. Ellis also refused to provide Plaintiff with opportunities for advancement.

60. For example, when new modifications for the electrical information for the aircrafts were introduced in the section, Ellis did not allow Plaintiff to be trained or exposed to the information. Instead, Ellis allowed only white employees to be exposed and trained on the information.

61. Ellis knew that denying Plaintiff the opportunity to be exposed to this information would limit his growth and other employment opportunities.   As such, when Plaintiff often requested to handle more challenging assignments, Ellis would not allow him to do so.

62. On several occasions, Plaintiff saw the phrase, "KKK is still alive" written on the walls of the restroom.

63. Plaintiff was disturbed by this phrase and felt threatened by the fact that it had appeared in the workplace.

8

64. Plaintiff discussed the fact that the phrase had been written on the walls of the restroom with other African American employees who likewise felt threatened and disturbed by the occurrence.

65. Plaintiff and other African American employees reported the phrase to management.

66. Management did not take any effective steps to investigate or otherwise address this language. Management merely painted over the phrase each time that it appeared.

67. Near the end of his employment, Plaintiff told Ellis that he was taking Remeron, a prescription medicine for depression, and that drowsiness was one of the side effects of this medication.

68. Plaintiff asked Ellis for special consideration and/or an accommodation.

69. Specifically, Plaintiff requested to have more challenging assignments that would ensure that he would stay busy throughout the entire day.

70. Ellis acknowledged Plaintiff's medical information, but did not request any additional information about his disability or treatment, or provide him with any instructions. Ellis provided no feedback to Plaintiff.

71. Ellis was also aware that Plaintiff had participated in an alcohol and drug program and had received treatment for same while working in the Avionics section.

72. Kim Durden, a white female, was the human resources manager.

73. Durden was aware of Plaintiff's participation in and treatment for alcohol and drug related problems because she had to verify his insurance coverage.

9

74. Because of the side effects of the medication, Plaintiff constantly reminded Ellis that he was taking the drug. With the medication, Plaintiff was able to perform his job, but the side effects of the medication required reasonable accommodation from Defendants.

75. Defendants made no effort to provide reasonable accommodation for Plaintiff.

76. Plaintiff was unlawfully terminated on August 3, 2005, allegedly after he was observed nodding. At the end of Plaintiff's shift, he was told that he was being terminated for sleeping on the job.

77. Plaintiff was shocked by his termination because he had previously explained the side effects of his medication to his supervisor and requested an accommodation.

78. Karen Karba, an African American secretary who worked in the same area with Durden, overheard Durden tell Donahue, "There's your chance to get [Britt]" when it was reported that he had been nodding.

79. Defendants fired Plaintiff without providing him with a reasonable accommodation.

80. On at least two occasions immediately after his termination, Plaintiff provided Defendants with a doctor's excuses which indicated that one side effect of his prescription medication was drowsiness and asked to be reinstated to his position.

81. Defendants refused to reinstate Plaintiff.

82. Plaintiff's job duties are believed to have been reassigned to a person or persons without a disability or a perceived disability or a record of impairment or a serious

medical condition, who have not opposed discrimination, or filed a charge with the EEOC.

83. Plaintiff is substantially impaired in several major life activities. However with medication and treatment, Plaintiff is able to overcome impairment of other major life activities.

84. Plaintiff is able to perform the essential functions of his job and was able to do so prior to his termination.

85. Other white employees were observed sleeping on the job at the same time as Plaintiff, however these employees were not terminated or otherwise disciplined.

86. Lewis Carter, an African American male employed as a mechanic with Defendants, observed other white employees sleeping on the job at the same time as Plaintiff. Carter did not observe any white employee being terminated for sleeping on the job.

87. Another example of the difference in the way Plaintiff was treated in comparison to similarly situated white employees is in the area of discipline.

88. For example, Langman, a white mechanic, was involved in an altercation with Bill Riley, a white aircraft inspector. Langman was not terminated, but received a two week suspension. Riley was not disciplined or otherwise reprimanded.

89. Since that time, Langman has been promoted to a lead mechanic position.

90. Huey, a white male, tested positive for drugs and was suspended for one month. He was allowed to return to work thereafter.

11

91. Shortly before Plaintiff's termination, Kevin Brian, a white male aircraft inspector, was observed sleeping on the job. Brian was allowed to return to his position following a one day suspension after providing Defendants with a doctor's excuse which indicated that he was taking a prescription drug that caused drowsiness.

92. Plaintiff's treatment is part of a pattern and practice of racial discrimination which includes the denial of overtime hours as compared to the hours granted to white employees, the hostile work environment based on race, the termination of employment, and other adverse terms and conditions of employment.

93. A racially discriminatory work environment existed from the time of Plaintiff's hire throughout his employment.

94. Plaintiff believes that racial discrimination is the standard operating procedure at Defendants' facilities.

95. Plaintiff was denied reasonable accommodation and terminated because of his disability, and/or because of the perception of a disability by Defendants, and/or because of his record of impairment in violation of the ADA.

96. Further, Plaintiff has been discriminated against and retaliated against in the terms, conditions and privileges of employment, as stated above, based on his race and because he filed an EEOC charge and because he opposed race discrimination.

97. Plaintiff was directly affected by said discriminatory and retaliatory practices and by being deprived of the opportunity to work in an environment free of racial discrimination and retaliation. Such discrimination and retaliation denied Plaintiff the

12

right to work in a racially integrated work environment and otherwise affected his

opportunity for enjoyment of work as compared to white employees.

98. As a result of said injury and damage, Plaintiff is entitled to back pay with interest,

reinstatement to full-time employment at a proper location with proper work

assignments, front pay, and compensatory and punitive damages, attorneys' fees and

costs.

## V. STATEMENT OF CLAIMS

### CLAIM ONE
### VIOLATION OF TITLE VII, 42 U.S. C.  § 2000e *et seq.*
### (Discrimination on the Basis of Race)

99.    Plaintiff realleges the above paragraphs as if fully set out herein.

100.    Plaintiff is a member of a class protected by 42 U.S.C. § 2000e *et seq.*, and is

qualified for employment with Defendants.

101.    The conduct of Defendants, as set forth above, constitutes unlawful discrimination

against Plaintiff on the basis of race, in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.*, and is part of Defendants' pattern and

practice of discrimination on the basis of race. Plaintiff was denied a work

environment free of discrimination in violation of 42 U.S.C. §2000e *et seq.*, *as*

*amended*, 42 U.S.C. § 1981a, and was not given equal opportunity in the terms

and conditions of his employment.

13

102.    Defendants' said treatment of Plaintiff on the basis of race altered the terms and

conditions of Plaintiff's employment and unreasonably interfered with Plaintiff's

opportunity and ability to perform his job.

103.    As a direct and proximate result of said acts, Plaintiff has suffered and continues

to suffer loss of employment, loss of promotion opportunities, loss of income, loss

of other employment benefits, mental and emotional distress, humiliation, loss of

self esteem, depression, expense, embarrassment, and damage to his reputation.

### CLAIM TWO
### RETALIATION UNDER TITLE VII, 42 U.S.C.§ 2000e-3(a)
### (Retaliation)

104.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

105.    The conduct of Defendants, as set forth herein, constitutes unlawful retaliation

against Plaintiff for his having filed an EEOC charge and for having opposed

discriminatory treatment based on race, in violation of Title VII and 42 U.S.C. §

1981a.

106.    As a direct and proximate result of said acts, Plaintiff has suffered and continues

to suffer loss of employment, loss of promotion opportunities, loss of income, loss

of other employment benefits, mental an emotional distress, humiliation loss of

self esteem, depression, expense, embarrassment, and damage to his reputation.

14

**CLAIM THREE**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12101 *et seq.***
**(Discrimination on the basis of a disability)**

107.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

108.    Plaintiff was discriminated against in the terms and conditions of his employment

because of his disability and/or record of disability and/or being regarded as

having such an impairment, as defined by the U.S.C. §12102(2).

109.    The adverse treatment was unrelated to job performance.

110.    There was no legitimate or lawful reason to take severe adverse employment

actions against Plaintiff, including but not limited to the termination of Plaintiff's

employment, or to deny Plaintiff reasonable accommodation.

111.    Because Plaintiff's record of impairment, his being regarded as disabled, and his

disability as defined in the ADA were motivating factors and made a difference in

the adverse decisions at issue, including to terminate Plaintiff and to engage in a

pattern and practice of discrimination, Defendants violated the ADA with

knowing or reckless disregard of Plaintiff's rights under the Act.

112.    As a direct and proximate result of said acts, Plaintiff has suffered and continues

to suffer loss of employment, loss of promotion opportunities, loss of income, loss

of other employment benefits, mental and emotional distress, humiliation, loss of

self esteem, depression, expense, embarrassment, and damage to his reputation.

15

## CLAIM FOUR
### VIOLATION OF 42 U.S.C. § 12203
#### (Retaliation In Violation of the ADA)

113.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

114.    Plaintiff was willfully retaliated against for seeking reasonable accommodation

and for opposing discrimination, in violation of the ADA, 42 U.S.C. §12203.

115.    Defendants willfully retaliated against Plaintiff for seeking reasonable

accommodation, and Defendants interfered with Plaintiff in the exercise and

enjoyment of, and on account of his having exercised and enjoyed the rights

granted and protected by the ADA.

## CLAIM FIVE
### VIOLATION OF 42 U.S.C. § 1981
#### (Discrimination and Retaliation on the Basis of Race)

116.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

117.    Plaintiff is a member of a class protected by 42 U.S.C. §1981 and is qualified for

employment with Defendants.

118.    The conduct of Defendants, its agents and employees constitutes unlawful

discrimination and retaliation against Plaintiff on the basis of race, in violation of

42 U.S.C. § 1981, and constitutes part of Defendants' pattern and practice of

retaliation and discrimination on the basis of race.

119.    As a direct and proximate result of said acts, Plaintiff has suffered and continue to

suffer loss of employment, loss of promotion opportunities, loss of income, loss of

16

other employment benefits, mental and emotional distress, humiliation, loss of

self esteem, depression, expense, embarrassment, and damage to his reputation.

## CLAIM SIX
### NEGLIGENT SUPERVISION AND TRAINING

120.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

121.    This is a claim arising under the law of the State of Alabama claiming that

Defendants committed the tort of negligent supervision and training.

122.    At all relevant times, the Defendants were and continue to be responsible for the

training and supervision of its supervisors and management personnel.

123.    The conduct of the Defendants, as set forth above, was a breach of said

Defendants' duty to Plaintiff to exercise care in supervising and training

employees, and such breach proximately caused Plaintiff to be discriminated and

retaliated against, suffer humiliation, mental pain and anguish, and all other

injuries outlined herein, all to Plaintiff's damage.

## CLAIM SEVEN
### NEGLIGENT RETENTION

124.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

125.    This is a claim arising under the law of the State of Alabama claiming that

Defendants committed the tort of negligent retention.

126.    The conduct of the Defendants, as set forth above, was a breach of its duty to

Plaintiff to exercise care in retaining employees, and such breach proximately

17

caused him to be discriminated and retaliated against, suffer humiliation, mental

pain and anguish, and all other injuries outlined herein, all to Plaintiff's damage.

## CLAIM EIGHT
## NEGLIGENCE

127.   Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

128.   This is a claim arising under the law of the State of Alabama claiming that

Defendants committed the tort of negligence.

129.   Defendants, by their actions and omissions, breached the standard of care owed to

Plaintiff while an employee of said Defendants.

130.   The conduct of Defendants, as set forth above, was a breach of its duty to Plaintiff

to exercise due care, and such breach proximately caused him to be discriminated

and retaliated against, suffer humiliation, mental pain and anguish and all other

injuries outlined herein, all to Plaintiff's damage.


## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against

Defendants:

(a)   Declaring that the acts and practices complained of herein are in violation of Title

VII, 42 U.S.C. §§ 1981, 1981a, & 2000e *et seq.*, the Americans with Disabilities

Act, 42 U.S.C. § 12101, *et seq.*, 42 U.S.C. §1981a, and state tort law;

(b)   Enjoining and permanently restraining the above violations;

18

(c)    Ordering Defendants to make Plaintiff whole by reinstating Plaintiff, providing appropriate front pay, back pay and interest thereon, and reimbursement for lost compensation, social security, prejudgment interest, and all other entitlements and emoluments in an amount to be shown at trial, and other affirmative steps immediately to eliminate the effects of the discriminatory practices complained of herein; and 42 U.S.C. §12205.

(d)    Granting to Plaintiff reasonable attorneys' fees, expert fees, costs, and expenses incurred herein, 42 U.S.C. §§ 1988 & 2000e-5(k); and 42 U.S.C. §12205.

(e)    Granting to Plaintiff compensatory and punitive damages to the extent permitted by law;

(f)    Retaining jurisdiction over this action until the Defendants have fully complied with the Orders of this Court and requiring said Defendants to file such reports as may be necessary to supervise such compliance;

(g)    Ordering Defendants to adopt and strictly enforce written rules prohibiting discrimination and retaliation in the workplace; that such rules provide for the prompt and appropriate investigation of all related complaints; and that such rules require formal disciplinary action to be taken against any employee or agent found to have engaged in such discrimination or retaliation against any employee;

(h)    Granting such other, further, and different relief to Plaintiff which it may deem proper.

19

Respectfully submitted this _17th_ day of _September,_ 2007.

/s/ Maricia Woodham
MARICIA WOODHAM (*BEN050)*
Attorney for Plaintiff


/s/ M. Wayne Sabel
M. WAYNE SABEL (SAB002)
Attorney for Plaintiff


**OF COUNSEL:**

Sabel & Sabel, P.C.
Hillwood Office Center
2800 Zelda Rd.; Suite 100-5
Montgomery, AL 36106
TELEPHONE:          (334) 271-2770
FACSIMILE:          (334) 277-2882


## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.

/s/ Maricia Woodham
MARICIA WOODHAM
One of the Attorney's for Plaintiff

20

# PERFORMANCE APPRAISAL

EXHIBIT

N

## Rating Definitions

(1)  Unacceptable - Performance is deficient enough to justify release.
(2)  Below Average - Performance is below requirements & immediate improvement is required.
(3)  Average - Meets job requirements.
(4)  Above Average - Performance exceeds requirements
(5)  Outstanding - Performance far exceeds requirements.

## Rating - Please explain any rating below (3) (Attach additional comments)

**3.0**  *Accuracy of Work:** Measures the accuracy of work performed.

Comments: _Accuracy of Work is Good_

**3.0**  **Productivity:** Measures the output of work performed.

Comments: _Completes All Job Tasks_

**3.5**  **Job Knowledge:** Measures the employee's knowledge of job duties.

Comments: _Knows His Job Well_

**3.0**  **Initiative:** Measures the employee's aggressiveness in implementing new ideas.

Comments: _aggressiveness is Average_

**3.5**  *Attendance/Dependability:** Measures the reliability of employee's attendance, punctuality and availability for overtime.

Comments: _Attendance is Good_

**3.0**  **Cooperation:** Measures the ability of the employee to relate to other employee in job situations.

Comments: _Works Good with other employees_

**3.5**  **Job Safety:** Measures the employee applies job safety rules.

Comments: _Works vary Safe_

**3.0**  **Supervision Required:** Measures the employee's ability to handle work situations independently.

Comments: _Some Supervision Required, but not vary much_

**3.19**  **Composite:** measures the OVERALL performance of employee (Average Scale)

Comments: _Good Employee_

**A rating below (3) in these categories will result in a rating considered to be below average overall*

✓ Retain Satisfactory          _____ Extended Training          _____ Terminate          Britt v. U.S. Heli 0353
Performance                                    Period

_[signature]_          _15 Nov 02_                    _Billy J. Britt_ 5 Dec. 2002
Supervisor          Date                              Employee          Date

X _Jim Durden_ 5 Dec 02                     _Hartwell B. Wilson_ 8 Dec 02
HR Approval          Date                             Reviewer          Date

_[signature]_ 4 Dec 02                         Additional Comments Attached _____ Yes
Reviewer          Date                                                    _X_ No

**EXHIBIT**

tabbies

# PERFORMANCE APPRAISAL

**Rating Definitions**

(1)          Unacceptable - Performance is deficient enough to justify release.
(2)          Below Average - Performance is below requirements & immediate improvement is required.
(3)          Average - Meets job requirements.
(4)          Above Average - Performance exceeds requirements.
(5)          Outstanding - Performance far exceeds requirements.

**Rating – Please explain any rating below (3) (Attach additional comments)**

__4__    *Accuracy of Work:  Measures the accuracy of work performed.

   Comments:    _accuracy of work is good (He knows the Aircraft)_

__3.5__  **Productivity:**  Measures the output of work performed.

   Comments:    _Completes all work on Time_

__3.5__  **Job Knowledge:**  Measures the employee's knowledge of job duties.

   Comments:    _Knows His Job_

__3.0__  **Initiative:**  Measures the employee's aggressiveness in implementing new ideas.

   Comments:    _aggressiveness in New Ideas is Average._

__4.0__  *Attendance/Dependability:  Measures the reliability of employee's attendance , punctuality and
          availability for overtime.
   Comments:    _Good Attendance , will always work OT if Needed_

__3.5__  **Cooperation:**   Measures the ability of the employee to relate to other employee in job situations.
   Comments:    _Works Good with other employee's_

__4.0__  **Job Safety:**  Measures the employee applies job safety rules.

   Comments:    _Works Safe on All Job Task_

__3.5__  **Supervision Required:**  Measures the employee's ability to handle work situations  independently.
   Comments:    _Little Supervision Required_

__3.62__ **Composite:**  measures the OVERALL performance of employee (Average Scale)

   Comments:    _Meets Job Requirements_

   *A rating below (3) in these categories will result in a rating considered to be below average overall          Britt v. U.S. Heli 0357

__X__  Retain Satisfactory          _____ Extended Training          _____ Terminate
        Performance                          Period

_signature_  _14 Nov 03_                _Billy J. Britt_  _25 Nov. 03_
   Supervisor          Date                  Employee          Date

_Tom Durden_  _12-1-03_                       _25 Nov 03_
   HR Approval          Date                  Reviewer          Date

_signature_  _25 Nov 03_                _signature_  _2 Dec 03_
   Reviewer          Date                  Additional Comments
                                          Attached _____ Yes
                                                   __X__ No

# PERFORMANCE APPRAISAL

EXHIBIT

_____

## Rating Definitions

(1)      Unacceptable -  Performance is deficient enough to justify release.
(2)      Below Average - Performance is below requirements & immediate improvement is required.
(3)      Average - Meets job requirements.
(4)      Above Average - Performance exceeds requirements
(5)      Outstanding - Performance far exceeds requirements.

## Rating – Please explain any rating below (3) (Attach additional comments)

_3.0_    *Accuracy of Work:  Measures the accuracy of work performed.

        Comments:          _Average_

_3.0_    Productivity:  Measures the output of work performed.

        Comments:          _Average_

_3.0_    Job Knowledge:  Measures the employee's knowledge of job duties.

        Comments:    _Average_

_3.0_    Initiative:  Measures the employee's aggressiveness in implementing new ideas.

        Comments:      _aggressiveness is Average in New Ideas_

_4.0_    *Attendance/Dependability:  Measures the reliability of employee's attendance , punctuality and
        availability for overtime.
        Comments:    _Attendance Good / will work O.T . any Time_

_3.0_    Cooperation:     Measures the ability of the employee to relate to other employee in job situations.
        Comments:          _Average_

_4.0_    Job Safety:  Measures the employee applies job safety rules.

        Comments:        _Work Safe on all Job Task_

_3.0_    Supervision Required:  Measures the employee's ability to handle work situations  independently.
        Comments:    _Supervision Required_

_3.25_   Composite:  measures the OVERALL performance of employee (Average Scale)

        Comments:          _Average_

        *A rating below (3) in these categories will result in a rating considered to be below average overall

_X_  Retain Satisfactory              _____  Extended Training              _____  Terminate
        Performance                              Period

_____  _14 Nov 04_        _Lilly J. Britt_  _19 Nov. 04_
Supervisor              Date                Employee            Date

_Km Durden_  _11/23/04_                _Paul West_  _22 Nov 04_
HR Approval          Date                Reviewer            Date

_Hartwell B. Wilson_  _02 Dec 04_
Reviewer              Date

                                        Additional Comments
                                        Attached _____ Yes
                                                  _X_ No

Britt v. U.S. Heli 0361



EXHIBIT

US Helicopter

Blackwell Airport
P.O. Box 1088
Ozark, Alabama 36361-1088
(334) 774-2529  Fax: (334) 774-6756

08 December 2005

Birmingham District Office
Ridge Park Place
1130 22nd Street, South
Birmingham, Al 35205

Attn:  Devoralyn J. McGhee

Subject:       EEOC Charge No 130-2005-04553

Ms. McGhee;

In response to your request for further information, US Helicopter provides the following
information:

1.   We have enclosed a copy of Mr. Britt's personnel file.
2.   We have enclosed a copy of Mr. Brion's personnel file.
3.   Mr. Britt's position has not been filled by a direct hire, we are utilizing a
     contingent (contract) worker until we fill the D-mod avionics position with a
     direct hire.  Contract workers are not selected by US Helicopter we utilize two
     different contract companies that select and send personnel to our facility to
     fill positions.
4.   We have enclosed a copy of our work force roster as of August 1, 2005.
5.   We have provided a list of all discharged employees August 2004 – October
     2005.
6.   Mr. Britt's immediate supervisor: Mr. Mark Robison, Avionics Foreman,
     Caucasian, his date of hire is 11 July 2005.
7.   Mark Robison, Caucasian, 7/11/2005;  Bill Riley, Caucasian, 6/19/1992; Ron
     Brown, Caucasian 5/8/2000.

Again, US Helicopter denies that Mr. Britt's termination had anything to do with his race
or alleged medical disability.

If you have any questions or need further information concerning this matter please feel
free to contact me at 334/774-2529 or email kdurden@ushelo.com.

Kim Durden
HR Manger

Enclosures

Cc: G. Kelley

00102



EXHIBIT
P

**US Helicopter**

Blackwell Airport
P.O. Box 1088
Ozark, Alabama 36361-1088
(334) 774-2529  Fax: (334) 774-6756

## LETTER OF DISCHARGE

Employee's Name:    Kevin Brion (0237)                    Date:    April 8, 1999

Effective April 8, 1999, Kevin Brion (0237) is hereby discharged for cause.

    1.    State specific violation:

        Gross Misconduct, sleeping on duty.

    2.    State circumstances of violation:

        Mr. Brion was noted sleeping while working on production aircraft
        Serial Number 69-15219, April 6, 1999 at 10:00 am by Mr. Dick Joyce,
        President/General Manager of US Helicopter, Inc.

    3.    State exact date and time of violation(s):

        April 6, 1999 10:00 am

Kevin Brion (0237) has previously been the subject of the following

    1.    Verbal counselling by M. Whitman, Quality Control Manager, for
        sleeping while on duty September 24, 1998.

_____                    _____
Signature of Employee                            Signature of Manager

00260

**EXHIBIT**

Q

# Separation Notice

Employee Name: Kevin Brion          Emp # 0237          Position: Su Mechanic

Department: Su Mechanic          Supervisor: Jerry Seagers

Hire Date: _____          Last Sched. Day: 4/8/99          Date of Notice/Termination: 4/8/99

## Type of Separation

| | | |
|---|---|---|
| ____ **Resignation** | ✓ **Discharge** | ____ **Training Period** |
| ____ Personal | ____ Unacceptable Performance | ____ Unacceptable Performance |
| ____ Mutual Agreement | ____ Lay-Off | |
| ____ Other Employment | ✓ Gross Misconduct  See attached statement | |
| ____ **Leave of Absence** | ____ **Other: Reason/Comments** _____ | |

## Documentation

____ Letter of Resignation          ✓ Letter of Discharge

____ Military Orders          _____ Request for Leave of Absence

## Returned Items

Tool Room          BR

Production Control          RL

Uniforms          KD Per Sw 4/19/99

will Pick-up last Check

Human Resources:

ID Card          KD

Sep. Notice          KD

Cobra          Anf

Life/D          Anf

401(k)          Anf

Credit Cards          N/A

Birthday          Dea - Not Eligible until Dec.

Vacation          80hrs unless taken this payperiod

***When the above check-out items are completed, payroll will be notified and a final paycheck will be issued on the next regular pay day.***

Employee Signature: _____          Print Name: Kevin O Brion

Address: Rt 1 Box 423          Date: _____

Daleville, Al   36322

Foreman: Jerry Seag          Date: 4-8-99

Manager: _____          Date: _____

Director of Operations: _____          Date: _____          00263

EXHIBIT
R

# Enterprise Medical Clinic
**101 Professional Lane, Enterprise, Alabama 36330**

Name: _Billy Britt_   D.O.B. _12/16/60_  Clinic # _83547_   Date of Service: _1/11/06_   Time: _____

Allergies: _Sulfa_         Current Meds: _____ Ø_____   [ ] see med list   Nurse: _____

Chief Complaint: _____ Hx of C.C. _lost_ _his work at_ _____

__Job.__

**Medical History (chronic disease)** _____

**Review of Systems**

1. - lost his job for sleeping while at work. Now he wants me
2. to tell his employer that Fioricet can cause sleepiness. I
3. already did this in the form of a note at the last visit. He now
4. me to tell his boss verbally now, over the phone. He also

**Physical Exam:** wants records faxed to "Equal Opportunity Employment Commission"

**Constitutional:**
Vital Signs:  blood pressure _12%/80_ pulse _70_ respiratory rate _20_ temperature _97.7_ weight _1__ pain _0_ y 10
General Appearance: [ ] normal [ ] abnormal [ ] NAD [ ] obese _____

**Eyes**
Conjunctiva and Lids [ ] normal [ ] abnormal [ ] injected _____
Pupils and irises      [ ] normal [ ] abnormal _____
Optic discs            [ ] normal [ ] abnormal _____

**ENT**
Nasal mucosa, septum [ ] normal [ ] abnormal [ ] congested _____
TM's and EAC's       [ ] normal [ ] retracted [ ] bulging [ ] erythema _____
Oropharynx           [ ] normal [ ] erythema [ ] edema [ ] exudate [ ] tonsillar hypertrophy [ ] PND
Hearing (subjective)  [ ] normal [ ] abnormal _____
Lips, teeth, gums    [ ] normal [ ] abnormal _____
Ext. ears and nose   [ ] normal [ ] abnormal _____

**Neck**
Soft Tissues  [ ] normal [ ] abnormal _____
Thyroid       [ ] normal [ ] abnormal _____

**Respiratory**
Auscultation  [ ] normal [ ] abnormal [ ] rhonci [ ] wheezes [ ] rales _____
Effort        [ ] normal [ ] increased _____

**Cardiovascular**
Ausculation        [ ] normal [ ] abnormal _____
Pedal Pulses       [ ] normal [ ] diminished [ ] absent _____
Carotids           [ ] normal [ ] abnormal _____
Ankles/feet for edema [ ] none [ ] 1+ [ ] 2+ [ ] 3+ _____

**Chest ( Breasts )**
Inspection           [ ] normal [ ] abnormal _____
Palpation of Breasts
And axillae          [ ] normal [ ] abnormal _____

**Lymphatic**
Cervical   [ ] normal [ ] adenopathy _____
Axillary   [ ] normal [ ] adenopathy _____
Inguinal   [ ] normal [ ] adenopathy _____

**Psychiatric**
Judgement and Insight [ ] normal [ ] abnormal _____
Orientation           [ ] time [ ] place [ ] person _____
Memory                [ ] normal [ ] abnormal _____

Jan-23-06 02:32P                                                                    P.04

Patient's Name _Billy Bob_                              Date: _1/18/06_

**Gastrointestinal**
Masses, Tenderness          [] none    [] abnormal _____
Liver and Spleen            [] normal  [] abnormal _____
Hernias                     [] none    [] abnormal _____
Anus and Rectum             [] normal  [] abnormal _____
Occult Blood                [] negative [] positive _____
**Genitourinary**
Male
Scrotal contents            [] normal  [] abnormal _____
Penis                       [] normal  [] abnormal _____
Prostate                    [] normal  [] abnormal _____
Female
External genitalia          [] normal  [] abnormal _____
Bladder                     [] normal  [] abnormal _____
Adnexa                      [] normal  [] abnormal _____
Uterus                      [] normal  [] abnormal _____
**Neurologic**
Cranial Nerves              [] normal  [] abnormal _____
Deep Tendon Reflexes        [] normal  [] abnormal _____
Sensation                   [] normal  [] abnormal _____
**Skin**
Inspection                  [] normal  [] abnormal _____
Palpation                   [] normal  [] abnormal _____
**Musculoskeletal**
Gait and Station            [] normal  [] abnormal [] antalgic _____
Digits and Nails            [] normal  [] abnormal _____

Head / Neck   or   Spine / Ribs / Pelvis   or   Extremities: _____
Inspection/ palpation   [] normal  [] abnormal [] cervical / [] thoracic / [] lumbar spinal subluxations
Range of Motion         [] normal  [] abnormal _____
Joint Stability         [] normal  [] abnormal _____
Muscle Stength/Tone     [] normal  [] abnormal [] cervical/ [] thoracic / [] lumbar paraspinal muscular spasm ____

**Assessment:** 1. _Counseling_ _____
2. _____
3. _____
4. _____

**Plan:** 1. _Could not reach his employer, L + left a message_
2. _on her voicemail to call me_ _____
3. _____
4. _____
5. _____
6. _____

                                           **Imaging Studies Ordered** _____
Labs Ordered: _____

                                           [✓] Call if problem/question/concern
[] Increased Fluids, Increased Rest, Daily multivitamin, Healthy Diet
[] Patient confidently denies pregnancy at the current time.   Follow-up: _____
                                                               signature _____

Nurses Notes: _____                                    00058



# Enterprise Medical Clinic

101 Professional Lane
Enterprise, Alabama 36330
(334) 347-3404

## Clinical Notes

PATIENT NAME: _Billy Britt_          Chart #: _8556?_     Date of Service: _____

Date of Birth: _12/16/86_   Latex Allergies: ☐ Yes ☐ No   Drug Allergies: ☐ Yes ☐ No ☐ See Med List   Nurse/CMA: _____

Current Meds: _____

**PAIN ASSESSMENT**   Current Pain Level = _0_ (0-10)

**CHIEF COMPLAINT:** _____

History of Chief Complaint: _____

**MEDICAL HISTORY (chronic dz)** _____

**R.O.S.**

1. _Endo  fasting glucose was 173 on 6-9-05 chem panel_

2. _____

3. _____

4. _____

5. _____

**PHYSICAL EXAM:**

**Constitutional:**
Vital Signs: blood pressure _170/40_ pulse _76_ respiratory rate _3_ temperature _97_ weight _113_ height ___ LMP ___

General Appearance: ☐ normal ☐ abnormal ☐ NAD ☐ Obese _____

**Eyes:**
Conjunctive and Lids: ☐ normal ☐ abnormal _____
Pupils and irises: ☐ normal ☐ abnormal _____
Optic discs: ☐ normal ☐ abnormal _____

**ENT:**
Nasal mucosa, septum: ☐ normal ☐ abnormal ☐ congested _____
TM's and EAC's: ☐ normal ☐ abnormal ☐ retracted ☐ erythema ☐ bulging _____
Oropharynx: ☐ normal ☐ abnormal ☐ erythema ☐ edema ☐ exudate ☐ Tonsitar hypertrophy
Hearing (subjective): ☐ normal ☐ abnormal _____
Lips, teeth, gums: ☐ normal ☐ abnormal _____
Ext. ears and nose: ☐ normal ☐ abnormal _____

**Neck**
Soft Tissues: ☑ normal ☐ abnormal _____
Thyroid: ☑ normal ☐ abnormal _____

**Respiratory**
Auscultation: ☑ normal ☐ abnormal ☐ rhonchi ☐ wheezing ☐ rales
Effort: ☐ normal ☐ increased _____

**Cardiovascular**
Auscultation: ☑ normal ☐ abnormal _____
Pedal Pulses: ☐ normal ☐ diminished ☐ absent _____
Carotids: ☐ normal ☐ abnormal _____

00059

DEA # _____

**Edward C. Riley, D.O.**
101 Professional Lane
Enterprise, AL 36330
334-347-3404
CLARK.RILEY@SAMC.ORG

Name _____

Address _____  Date 8-16-05

℞ (Please Print)  Billy Britt was taking
Remeron (mirtazapine) around
the 1st week of August '05.
This medication can cause
drowsiness as a side effect.

☐ Label

Refill _____ Times _____ PRN _____ NR _____

_____ D.O.        _____ D.O.
Product Selection Permitted                Dispense As Written

24-JUN-05                                   TRI050624_100666653-1_00_46576_0001

00101



*Southeast Alabama*

# MEDICAL CENTER

E: BRION, KEVIN JAMES          ACCOUNT: 1639538    M/R: 152093

'o Whom It May Concern:

'he patient has severe obstructive sleep apnea syndrome. This condition
ill cause excessive daytime sleepiness and inappropriate falling
sleep. His condition was diagnosed through a night time sleep study. He
s currently going to be treated with CPAP. This will prevent the sleep
pneas and allow him to daytime alertness. I fell that his falling
sleep on the job was uncontrollable in the past but should not occur in
he future.

f you have any questions please let me know.

Sincerely,

ALAN D. PRINCE, M.D.



: 6516
: ac
ICTATED: 04/30/99
RANSCRIBED: 05/01/99    0928
): 000053477
I'R

:: ALAN D. PRINCE, M.D. (06516)



Personnel Discharged for Cause
August 2004 - October 2005

| Name | Race | Job Title | DOH | Supervisor | Violation | Discharge |
|---|---|---|---|---|---|---|
| Huey, Michael | White | Mechanic | 4/7/2003 | Wallace, Archie | Drug Screen | 3/21/2005 |
| Britt, Billy | Black | Avionics | 12/6/1999 | Robison, Mark | Sleeping | 8/1/2005 |
| Benton, Richard | White | Avionics | 9/12/2005 | Robison, Mark | Drug Screen | 9/14/2005 |
| | | | | | | |
| | | | | | | |
| | | | | | | |



00322


EXHIBIT
U

# The selected item(s) have been marked as "read."

## User's Information - id:5640

| | |
|---|---|
| Date/Time Entered: | May 13, 2005 2:08:51 PM |
| Prefix: | MR |
| First Name: | Billy |
| MI: | - |
| Last Name: | Britt |
| Suffix: | - |
| Address Line 1: | 100 Semiinole Drive |
| Address Line 2: | - |
| City: | Enterprise |
| State: | AL |
| Zip Code: | 36330 |
| Home Phone: | (334) 347-6708 |
| Work Phone: | - |
| E-mail: | none |
| SSN: | 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 |

## Other Party's Information - id:5640

No Alternate Party Data

## Employer Information - id:5640

| | |
|---|---|
| Employer Name: | US Helicopter |
| Address Line 1: | Valentine Road |
| Address Line 2: | - |
| City: | Ozark |
| State: | AL |
| Zip Code: | 00000 |
| County: | - |

## Complaint Information - id:5640

Description of Action Against Person:

I have worked for US Helicopter for almost 6 years. I believe I am being discriminated against based on my race. I am African American and my job is a mechanic. I do not get overtime and sometimes I am assigned to clean up an area or clean up

00071

the offices. It seems I am working on a helicopter on Monday and then by Friday when I could get weekend or morning overtime, I am moved to another helicopter. Everyone gets overtime but me. I have gotten only 8 hours of overtime in the last three years.

Why was this discriminatory?: Race - African American - Overtime and some job assignments

Filed before?: NO

Agency: -

Date: -

Result of Complaint: -

Outside Assistance: NO

Source Name: -

Source Date: -

Type of Assistance Received: -

**Walkthrough Data - id:5640**

Basis Selections: Rac

Job Status: current

Complaining Org: -

Filing Deadline: 180

**ID:5640**

http://201.1.24.57:8080/...

| CHARGE # 130-2005-04553C | FORMALIZED OFFICE 130 | UNIT 1 | STAFF Murry Gosa | |
|---|---|---|---|---|
| LEAD CHARGE # | ACCOUNTABLE OFFICE 130 | | | |

| | | DATE INITIAL INQUIRY | 05/13/2005 |
|---|---|---|---|
| | | DATE FIRST OFFICE | 09/27/2005 |
| | | DATE DISTRICT | 09/27/2005 |
| | | THIS OFFICE DATE | 09/27/2005 |

**CHARGING PARTY INFORMATION**

Britt, Billy F
100 Seminole Drive

Enterprise    AL   36330   Country   USA
Home (334) 347-6708   Work
SSN   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   Date Of Birth   12/16/1946
Sex   M   Race   B   Nat Origin   O

C O N T A C T

Phone
Email Address     Country

**EXHIBIT**

V

**RESPONDENT INFORMATION**

U.S. HELICOPTER
Valentine Road

Ozark     AL     Country   USA
Phone     FAX
R Type E   EEO #   EEO FUN   SMSA
SIC Codes   899   Misc. Services

C O N T A C T

Phone      Country
Email Address

**PROCESSING INFORMATION**

| Deferral Office | Source Of Complaint A | Processing Type O | Processing Category |
|---|---|---|---|
| Staff Linda-Sue Ross | Staff Assigned Date 05/16/2005 | | Staff Function/Unit I1 |
| Last Action 09/27/2005 3 AB Formalize Charge Office: 130 F/U: I1 Det:A | | | |
| Final Closure Action | | | |
| Subpoena: | Suspense: | Transfer From: | |

**ALLEGATIONS**

| Alleg # 1 | SBI: T RB D2 | Cont Act? | Litigation? | Cause? | First DOV 08/03/2005 | Last DOV 08/03/2005 |
|---|---|---|---|---|---|---|
| Alleg # 2 | SBI: D UB T2 | Cont Act? | Litigation? | Cause? | First DOV 08/03/2005 | Last DOV 08/03/2005 |

**BENEFITS**

**ACTION HISTORY**

| Date | Seq | Code | Description | Attributes | | Office | F/U | Del |
|---|---|---|---|---|---|---|---|---|
| 05/16/2005 | 1 | G1 | Assigned To Staff | 1:LSR 2:W | | 130 | I1 | |
| 06/02/2005 | 2 | XA | Inquiry Closed | 1:D | | 130 | I1 | |
| 09/27/2005 | 3 | AB | Formalize Charge | | | 130 | I1 | Y |

EXHIBIT

W

tabbies®

## ADDENDUM TO EMPLOYMENT APPLICATION

DATE _2 June 05_

separate from your application and confidential. Your employment record keeping, reporting and the other legal requirements, please answer all questions below. This addendum will be kept blocks 6, 8 and statement #3 on the reverse side. Information requested in blocks 4 and 5 are intended to assist Bell/Aerospace with its Affirmative Action Plan and submission of the information is voluntary. Refusal to provide it will not affect your consideration for employment.

### PERSONAL HISTORY DATA: (PRINT IN INK)

**1. LAST NAME** _Bell_ **(FULL) FIRST** _Billy_ **(FULL) MIDDLE** _Fred_

**2. SOCIAL SECURITY NUMBER** _XXX-XX-XXXX_

**3. STREET ADDRESS** _100 Seminole Dr, Enterprise_ **CITY** _Enterprise_ **STATE** _AL_ **ZIP CODE+4 DIGITS** _36330_

**TELEPHONE NUMBERS WITH AREA CODES**
HOME _(334) 347-6708_
OFFICE _(334) 347-6708_
CELL

**4. BIRTHDATE** _12-16-46_  **AGE** _58_  **GENDER (CHECK ONLY 1 BOX)** ☒ MALE  ☐ FEMALE

**5. ETHNIC GROUP (CHECK ONLY 1 BOX)**
☐ ASIAN/PACIFIC ISLANDER
☒ BLACK
☐ AMERICAN INDIAN/ESKIMO/ALEUT
☐ HISPANIC
☐ WHITE

**6. ARE YOU PRESENTLY AUTHORIZED TO WORK IN THE UNITED STATES ON A FULL TIME BASIS FOR ANY COMPANY?**
☒ YES  ☐ NO

I UNDERSTAND I MUST PRESENT PROOF OF US CITIZENSHIP OR AUTHORIZATION TO WORK IN THE UNITED STATES ON A FULL TIME BASIS AT THE BELL/AEROSPACE OFFICE PRIOR TO EMPLOYMENT.
_Billy Bell_ SIGNATURE

### 7. CONVICTION/MISCELLANEOUS DATA:

**7. CONVICTIONS:** Have you, in the last 10 years, been convicted of a crime? Include any convictions by military court martial for said offenses (You may omit: minor traffic violations; any offenses committed before your 18th birthday which was finally adjudicated in a juvenile court or under a youth offender law.) Indicate all said convictions where a fine was paid or probation received.
(Note: A positive response will not necessarily bar employment.)
CHECK ONE: ☐ YES ☒ NO
DATE _____ PLACE _____ CHARGE _____ DISPOSITION _____

**NOW CONVICTIONS:** Have you in the last ten years, as a result of a criminal charge or indictment, forfeited bail, had adjudication deferred, which resulted in a fine or probation, or participated in a pretrial diversion program, which resulted in a fine or probation?
(NOTE: A positive response will not necessarily bar employment.)
CHECK ONE: ☐ YES ☒ NO
DATE _____ PLACE _____ CHARGE _____ DISPOSITION _____

**8. HAVE YOU EVER HAD A SECURITY CLEARANCE SUSPENDED, DENIED OR REVOKED BY THE U.S. GOVERNMENT? (DO NOT REPORT ADMINISTRATIVE TERMINATION OF CLEARANCE)** ☐ YES ☒ NO
IF YES, STATE REASON FOR SUSPENSION, DENIAL, OR REVOCATION AND WHERE EMPLOYED AT THE TIME. _NO_

### 8.

VIETNAM ERA VETERANS READJUSTMENT ACT OF 1974 AND REHABILITATION ACT OF 1973 DATA: Bell/Aerospace is a government contractor subject to Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974 and to Section 503 of the Rehabilitation Act of 1973 which require government contractors to take affirmative action to employ and advance in employment qualified disabled veterans, veterans of the Vietnam Era, and qualified individuals with a disability. If you are a Vietnam Era Veteran or an individual with a disability and would like to be considered under our Affirmative Action Program(s), please complete the items listed below which apply. This information is voluntary and refusal to provide it will not affect your consideration for employment. It may assist you in obtaining employment and advancement of employment with Bell/Aerospace.

**Are you an individual with a disability?** ☐ Yes ☒ No

An individual with a disability means a person who (1) has a record of such impairment, (2) is regarded as having such impairment, or (3) has a physical or mental impairment, which substantially limits one or more of such person's major life activities.

**If yes, do you require any special accommodations to perform the job for which you applied?** ☐ Yes ☐ No

**Are you a Disabled Veteran?** ☐ Yes ☒ No
A Disabled Veteran means an individual who served on active duty for more than 180 days between August 5, 1964 and May 7, 1975, from active duty was a disability incurred in the line of duty.

**Are you a Vietnam Era Veteran?** ☐ Yes ☒ No
**10. With certain exceptions, a Vietnam Era Veteran means an individual entitled to disability compensation under Veterans Administration guidelines for disability rated at 30 percent or more or a person whose discharge or release from active duty was a disability incurred in the line of duty.**

**If you are a Disabled Veteran, what is your Disability Rating?** _____

7025 65099 REV 05/03 Page 5 of 6

00385



EXHIBIT

X

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

BILLY F. BRITT,                          )
                                         )
                                         )
    Plaintiff,                           )
                                         )
v.                                       )    CASE NO.:1:07CV696-MEF
                                         )
U.S. HELICOPTER, d/b/a HELICOPTER        )
SUPPORT COMPANY, INC.                    )
                                         )
    Defendant.                           )

## PLAINTIFF'S RESPONSE TO DEFENDANT U.S. HELICOPTER'S FIRST INTERROGATORIES TO PLAINTIFF

**COMES NOW** Plaintiff Billy F. Britt, and responds to Defendant U.S. Helicopter's First Interrogatories to Plaintiff as follows:

### GENERAL OBJECTIONS

1. Plaintiff objects to any and all discovery requests to the extent that they are vague, overly broad, unduly burdensome, harassing and not calculated to lead to the discovery of admissible evidence.

2. Plaintiff objects to any and all discovery requests to the extent that they seek information protected from discovery by any privilege, including the attorney/client privilege, the attorney-work product doctrine or any other applicable privilege or immunity.

3. Plaintiff objects to any and all discovery requests to the extent that they require Plaintiff to prepare Defendant's case, and to determine what Defendant should

deem relevant to, supportive of or pertinent to certain claims and allegations; as

such, the discovery requests are not a proper method of discovery.

4. Plaintiff objects to any and all discovery requests that are not reasonably limited

in time and/or scope.

These "General Objections" are applicable to and incorporated into each of

Plaintiff's responses, infra, as if specifically stated therein. The stating of specific

objections to a particular request shall not be construed as a waiver of Plaintiff's "General

Objections." Unless otherwise specifically stated, Plaintiff's objections to each discovery

request applies to the entire request, including each and every subsection and/or subpart

of the request.

## RESPONSES TO INTERROGATORIES

1.    Please state your name, resident address, date of birth, Social Security

Number and marital status, including the name, address and place of employment of your

spouse.

**RESPONSE**:        **Billy Fred Britt**
                     **1313 14th Street**
                     **Columbus, GA 31901**
                     **SSN: 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**
                     **Divorced**

2.    Please list all addresses at which you have resided during the past five

years, and the dates you resided at each place.

**RESPONSE**:        **September 2007 – Present**
                     **1313 14th Street**
                     **Columbus, GA 31901**

April 2006 – September 2007
House of Restoration
1200 12th Court
Phenix City, AL 36867

January 2003 – April 2006
100 Seminole Drive
Enterprise, AL 36330

3.    Have you ever been married? If so, state the dates, places of marriage and names of spouses. If you have been married and are not currently married, please state the date of your divorce.

RESPONSE: Yes.   **Plaintiff was divorced in 1982. The name of his ex-wife is Loria Jean Underwood.**

4.    Please state the name and address of your present employer.

RESPONSE:    **Plaintiff is currently unemployed, but received nominal compensation as a participant in therapy programs affiliated with the VA Administration.**

5.    Please state the name and address of each school, college or other educational institution, including any trade schools, which you have attended, listing the dates of your attendance at each and the courses or subject of study pursued at each institution.

a)    Specifically, please describe any education or training you have received in the area of avionics.

RESPONSE:    **George C. Wallace Technical School at Napier Field in Dothan, AL.   Filed of Study: Radio and TV**

**United States Army
Field of Study and Job Classification: Radio and Repair
Hawk Missile Repair School**

6.    Have you ever been convicted of any crime?

3

a)     If so, please state the crime of which you were convicted, the place

of the conviction and the time of the conviction.

**RESPONSE:  Plaintiff objects to this request to the extent that it is not reasonably**

**calculated to lead to the discovery of relevant information and constitutes and**

**invasion of Plaintiff's privacy.  Plaintiff further objects to this interrogatory to the**

**extent that it is not reasonably limited in time and/or scope.  Without waiving this**

**objection, Plaintiff will provide relevant information, if any exists, upon entry of an**

**acceptable confidentiality agreement with Defendant.**

7.     In your Complaint, you state that Mr. Ellis demonstrated his racial

animosity toward African-Americans and yourself by the assignments he gave

employees.  With regard to this allegation, please state:

a)     Any witness to this alleged racial animosity toward you and other

African-Americans.

b)     All assignments that you were given by Mr. Ellis.

**RESPONSE:  Plaintiff objects to this request to the extent it requires Plaintiff to**

**prepare Defendant's case and to determine what Defendant should deem relevant**

**to, supportive of or pertinent to certain claims and allegations.  Without waiving**

**these objections, see Plaintiff's Complaint and documents produced with Plaintiff's**

**Initial Disclosures.   Further, Plaintiff states that Mr. Ellis always assigned Plaintiff**

**the job of taking out the wiring in the Avionics Equipment and refused to assign**

**Plaintiff duties associated with installing equipment in part because these types of**

**assignments required overtime.  Ellis also assigned Yvette Williams menial and less**

4

desirable jobs. As a result of Ellis' treatment, Williams resigned from her employment.

8.    In your Complaint, you allege that you complained about the cleaning assignments given to you by Mr. Ellis. With regard to this allegation, please state:

      a)    The date and time of each occasion when you complained about the cleaning assignments.

      b)    Any witness to the alleged complaints regarding the cleaning assignments.

**RESPONSE: Plaintiff does not recall the exact dates of each such complaint made to Mr. Ellis, but states that he complained to Mr. Ellis on several occasions regarding the demeaning assignments given to him.   Ron Brown, Louis Carter and any other person working in the avionics section would be a witness to Plaintiff performing the cleaning assignments.  Plaintiff further states that he intends to determine through the discovery process the names of other individuals who may be witnesses to the discriminatory assignments.**

9.    In your Complaint, you allege that you requested a transfer back to your position as an aircraft mechanic.  With regard to this allegation, please state:

      a)    The date and time when you brought your request to Jim Ellis and Bob Nessler.

**RESPONSE:  Plaintiff does not recall the exact date and time of this request, but states that he requested to be transferred back to the mechanic section so that he could work under Bob Nessler.**

10.     In your Complaint, you allege that Jim Ellis was aware of your Charge of Discrimination. With regard to this allegation, please state:

           a)     When Mr. Ellis became aware of your Charge of Discrimination with the EEOC.

           b)     Whether or not you were still employed at the time you filed your Charge of Discrimination.

**RESPONSE**: **Plaintiff states that he personally made Mr. Ellis aware the he had filed a charge of discrimination with the EEOC during his employment with U.S. Helicopter. Plaintiff did so in a conversation with Mr. Ellis wherein he informed Ellis that he had contacted the EEOC complaining of discrimination and the lack of overtime. Plaintiff does not recall the exact date and time of the conversation. Plaintiff specifically told Mr. Ellis that he believed he was being discriminated against by Ellis.**

11.     In your Complaint, you allege that you saw the phrase "KKK is still alive" written on the walls of the restroom. With regard to this allegation, please state:

           a)     The dates and times of each occasion when you saw this phrase written on the walls in the restroom.

           b)     What other African-American employees you discussed the fact that the phrase had been written on the walls in the restroom.

           c)     Whom you reported the phrase to in management.

           d)     What other African-American employees reported the phrase to

management.

**RESPONSE**: Plaintiff states that the first time this phrase appeared was in 2000 or 2001. At this time, Plaintiff reported the incident to Bob Nessler. The phrase was painted over at that time. The phrase subsequently reappeared on the walls of the restroom, however, Plaintiff does not recall the exact date and time of the second occurrence.

12.    In your Complaint, you allege that you told Jim Ellis that you were taking Remeron, a prescription medicine for depression and that drowsiness was one of the side effects of this medication. With regard to this allegation, please state:

a)    The date and time you told Mr. Ellis you were taking Remeron.

b)    Mr. Ellis' response to same statement.

**RESPONSE**:  Plaintiff states that he does not remember the exact date and time that he made Mr. Ellis aware that he was taking the prescription drug Remeron, but it was clear that Mr. Ellis understood that the drug caused drowsiness. In response to Plaintiff, Mr. Ellis told him that he would let Kim Durden know that Plaintiff was taking the drug.

13.    In your Complaint you allege that you were able to perform your job but the side effects of the medication required reasonable accommodations from Defendants. With regard to this allegation, please state:

a)    What reasonable accommodations were needed.

**RESPONSE**:  Plaintiff is not aware of all of the accommodations that Defendant could have provided to him after being informed by Plaintiff that he was taking

prescription medication that caused drowsiness. Defendant failed to make a reasonable accommodation or otherwise articulate how any accommodation would cause Defendant an undue hardship.

14.     In your Complaint, you allege that you are substantially impaired in several major life activities. With regard to this allegation, please state:

    a)     Which life activities are you impaired.

    b)     How are you impaired.

    c)     What medication and treatment you received for your impairment.

**RESPONSE:**   **Plaintiff objects to this request to the extent that it is vague and overly broad. Without waiving these objections, Plaintiff was impaired in the major life activity of working.**

15.     In your Complaint you allege that other white employees were observed sleeping on the job at the same time as you, however, these employees were not terminated or otherwise disciplined. With regard to this allegation, please state:

    a)     The names and addresses of the white employees who were sleeping on the job.

    b)     The dates and time each occasion when you observed the white employees sleeping.

**RESPONSE:** **See Plaintiff's Complaint and Initial Disclosures.**

16.     Please state the name and address of each and every person who has given

or provided the plaintiff or the plaintiff's attorney a statement, either oral or in writing, pertaining to the allegations as contained in the plaintiff's Complaint. Also state the following:

    a)    The date which each respective statement was obtained;

    b)    The substance of each respective statement.

**RESPONSE: Plaintiff objects to this request to the extent that it is vague or seeks information protected by the attorney/client privilege and or the attorney-work product doctrine. Without waiving this objection, Plaintiff states that with the exception to the statements provided to the EEOC, he has obtained no statements as described in this request.**

17.    Please provide the name and addresses of every African-American employee of Bell Helicopter, either past or present, which you believe have been the subject of race discrimination or violation of the ADA.

**RESPONSE: Plaintiff objects to this request to the extent that it is vague and requires Plaintiff to prepare Defendant's case and to determine what Defendant should deem relevant to, supportive of, or pertinent to certain claims and allegations. Without waiving these objections, see Plaintiff's Complaint and Initial Disclosures. Plaintiff further states that he intends to request documents from Defendant that Plaintiff believes may lead to relevant evidence.**

18.    Please state each and every complaint you made to any supervising person on behalf of Bell Helicopter that went uninvestigated or unanswered by Bell Helicopter.

**RESPONSE:  Plaintiff objects to this request to the extent that it is vague and overly broad.  Without waiving these objections, Plaintiff complained about the words on the walls of the bathroom, overtime and job assignments.  See also Plaintiff's Complaint and Initial Disclosures.**

19.  Please give the name and address of every employment agency or potential employer that you have interviewed with for employment since your employment ended with Bell Helicopter.

**RESPONSE:  Plaintiff's unlawful termination caused him to suffer severe depression.  As a result, he was unable to work and the loss in income caused Plaintiff to lose his home.  Plaintiff became homeless and lived in a homeless shelter. Plaintiff interviewed with the Alabama State Employment Agency and the Industrial Relations Department affiliated with the V.A. Administration.**

20.  Please identify and describe in detail all jobs or positions (including self-employment) that you have held since you left U.S. Helicopter.  For each job or position held, your answer should include, but not be limited to:

a)  the name, address and telephone number of the employer;

b)  the position held with the employer;

c)  the date your employment began;

d)  the rate or rates of pay or salary that you received for such employment; and

e)  whether you are still employed by that employer.

**RESPONSE**: See Plaintiff's Responses to Interrogatory No. 19. Plaintiff states that since his termination from U.S. Helicopter, he has been participating in the CWT (Compensated Work Therapy) and the IT (Incentive Therapy) programs which are affiliated with the Veterans' Administration.

---

21.    List and provide each and every item of compensatory damages to which you contend you are entitled, detailing the calculation and amounts so claimed.

**RESPONSE**: Plaintiff claims damages as set forth in his Complaint. Plaintiff has not yet made precise calculations, but will provide a more detailed response after calculating back pay, front pay, interest, loss of benefits and liquidated damages. A portion of Plaintiff's claims for compensatory damages and for punitive damages are not subject to precise calculation. In Counts I and II and V of Plaintiff's Complaint, he seeks to be made whole for the earnings he would have received but for Defendant's discriminatory treatment, liquidated damages, costs, interest and attorney fees. No other compensatory or punitive damages are sought under those counts.    In Counts III and IV (ADA), Plaintiff seeks back pay and attorney fees.

22.    Please provide in narrative fashion, with specificity and detail, any information that supports your allegations that you were racially discriminated on the job at Bell Helicopter.

a)    List each and every fact you contend supports this contention;

b)    List and identify each and every item of specific documentary evidence that you will use in support of your claim.

11

**RESPONSE:  Plaintiff objects to this request to the extent that it is vague, overly broad and burdensome.  Without waiving this Objection, see Plaintiff's Complaint and Initial Disclosures.**

23.   If you have ever been a party to a lawsuit, either as a Plaintiff or a Defendant, please state with respect to each lawsuit.

           a)   The style of the case, including the name of the court and jurisdiction where the case was filed;

           b)   The nature of the case; and

           c)   The results of the case, including the amount of any settlement or judgment.

**RESPONSE:  Plaintiff objects to this request to the extent that it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving these objections, Plaintiff was a member of a class action lawsuit pertaining to insurance fraud.  Plaintiff does not recall the name of the court where the case was filed.**

24.   Provide the name, and, if available to you, the address and phone number of each and every person who has or may have knowledge of discoverable matters pertaining to the Plaintiff's employment with Defendants and/or the basis for your claim that Defendants have discriminated against you in any way.  This interrogatory is continuing in nature pursuant to Federal Rules of Civil Procedure 26(e).

**RESPONSE:  Plaintiff objects to this request to the extent that it is vague or seeks**

information protected by the attorney/client privilege and/or the attorney-work
product doctrine. Without waiving this request, see Plaintiff's Complaint and
Initial Disclosures.

25.    With respect to each and every person listed above and in your Rule 26
Initial Disclosures, state in detail what knowledge you believe each could have related to
your claim against Defendant.

RESPONSE:  See Plaintiff's Complaint and Initial Disclosures.

26.    Describe in detail, and please include each date, every person contacted,
the nature of the contact, and the result every effort you have made to secure employment
since your separation from employment with Defendant including, but not limited to,
every application or resume you submitted to a prospective employer or employment
agency, every visit you made to a prospective employer or employment agency, and any
other contact you have had with a prospective employer or employment agency.

RESPONSE:   See Plaintiff's Responses to Interrogatories Nos. 19 and 20.

27.    Since your separation from employment with Defendant to the present,
state whether you have declined, resigned, refused or otherwise rejected any opportunity
or offer of new or continued employment.

RESPONSE:  Plaintiff has not declined, resigned, refused or otherwise rejected any
opportunity or offer of new or continued employment since his unlawful
termination.

28.    If the answer to the preceding interrogatory is in the affirmative, state each and every date, the name of each employer offering employment, the terms and conditions of employment offered and every reason you did not accept the offered employment.

**RESPONSE:  Not applicable.**

29.    From the time of your separation from employment with Defendant to the present, state the name of each of your employers, the dates you were employed by each employer, your total compensation to date from each employer, and every reason for your separation from the employer.

**RESPONSE:  See Plaintiff's Responses to Interrogatories Nos. 19 and 20.  Plaintiff has had to utilize his retirement and pension following his unlawful termination. As a participant in the Compensated Work therapy and the Incentive Therapy programs with the Veterans Administration, Plaintiff receives nominal compensation.**

30.    For each employer listed in the preceding interrogatory, state each and every position you held with each employer, the dates you held each position, your duties and responsibilities in each position and any changes therein, your rate of pay in each position and any changes therein, all other benefits you received in each position and any changes therein, and the number of hours per week you worked in each position and any changes therein.

14

**RESPONSE:  As a participant in the Compensated Work therapy and the Incentive Therapy programs with the Veterans Administration, Plaintiff receives compensation in the form of therapy.  Additionally, in the CWT program, Plaintiff receives $ 5.60 per hour.  As a participant in the IT program, Plaintiff receives $2.90 per hour and works a maximum of 15 hours per week.**

31.    If any person has given a statement to you, your attorneys or anyone acting on your behalf regarding the facts and circumstances underlying this lawsuit, please provide the name and address of each person giving a statement, the substance of each statement and the manner in which each statement was given.

**RESPONSE:  Plaintiff objects to this request to the extent it seeks information protected by the attorney/client privilege, the attorney work product doctrine or any other applicable privilege or immunity.  Without waiving this objection, see documents produced with Plaintiff's Initial Disclosures.**

32.    State all persons with whom you have discussed the allegations of your Complaint.  Give the name, address, and telephone number of each person.

**RESPONSE:  Plaintiff objects to this request to the extent it seeks information protected by the attorney/client privilege, the attorney work product doctrine or any other applicable privilege or immunity.  Without waving this objection, Plaintiff has discussed this matter with his attorneys and the EEOC.  See also persons identified in Plaintiff's Initial Disclosures.**

15

33.    Identify every person you intend to call as an expert witness at the trial of this case, and for each expert please state:

  a) His or her name and business address;

  b) The subject matter on which he or she is expected to testify;

  c) The substance of the fact and opinions to which he or she is expected to testify;

  d) A summary of the grounds for each opinion;

  e) His or her occupation; and

  f) The education and experience or other background which you contend qualifies such person to testify as an expert witness.

**RESPONSE: Plaintiff objects to this request to the extent that it seeks information protected by the attorney/client privilege and/or the attorney work product doctrine. Without waiving these objections, Plaintiff states that he has not yet determined the persons, if any, he plans to call as expert witnesses at trial. The Plaintiff intends to provide said information pursuant to the deadlines enumerated in the Court's Scheduling Order.**

34.    Described, in detail, each item of damage you claim you sustained as a result of the alleged discrimination and/or retaliation. Please provide the calculations upon which you base your damages and the evidence and facts in support thereof.

**RESPONSE: See Plaintiff's response to Interrogatory No. 21.**

35.    Identify and describe in detail (including but not limited to, the date, author, recipient, whereabouts if known, and substance) of each and every document of

which you are aware that reflects in any way the damages suffered by you related to your claims in this lawsuit, or in the alternative, attach a copy of each document to your response to these interrogatories.

**RESPONSE:**        **Plaintiff objects to this request to the extent that it is vague and overly broad. Plaintiff further objects to this request to the extent that it seeks information protected by the attorney/work product doctrine and the attorney client privilege. Without waiving these objections, see Plaintiff's Initial Disclosures. Plaintiff further states that he intends to make request for other documents that may be supportive of his claims through the discovery process.**

36.    Identify by name and address each and every doctor, therapist, counselor or other professional that you have seen or consulted for the last five years.

**RESPONSE:**        **Plaintiff objects to this request to the extent that it is overly broad, not properly limited in time or scope and not reasonably calculated to lead to discovery of admissible evidence. Without waiving this objection, Plaintiff has been treated by Dr. Clark Riley with the Enterprise Medical Clinic, 101 Professional Lane, Enterprise, AL 36330, and medical personnel affiliated with the VA Hospital, Southeast District.**

37.    With respect to each person identified in the preceding interrogatory, state the reason you saw or consulted each person identified and the results, outcome, advice, diagnosis, treatment and/or conclusions given to you by each person identified.

**RESPONSE:**        **Plaintiff objects to this request to the extent that it is vague, overly broad and not reasonably calculated to lead to the discovery of admissible**

17

evidence. Without waiving this request, Plaintiff was treated by Dr. Clark Riley and the VA for depression.

38.    Please provide a listing of all your full-time employers from the time period of when you graduated high school to your employment with Defendants. Please include addresses, telephone numbers and rates of pay.

**RESPONSE:**    Plaintiff objects to this request to the extent that it is overly broad, unduly burdensome, harassing and not calculated to lead to the discovery of admissible evidence. Without waiving this objection, Plaintiff has been employed with the following entities since graduation from high school:

United Stated Army
Hawk Missile Repair (E-5)

Paige Aircraft Inc. – Aircraft Mechanic
Fort Rucker, AL

Paige Aircraft, Inc. Avionic Mechanic
Fort Rucker, AL

Northrop Aircraft Inc. – E&I Mechanic, Fort Rucker, AL

Utility Trailer – Wireman
Enterprise, AL

V.A. Hospital – Pipefitter
Tuskegee, AL

U.S. Helicopter – Aircraft Mechanic and Avionic Mechanic
Fort Rucker, AL

39.    Do you understand that these answers are given under oath and may be used against you at the trial of this matter?

**RESPONSE:**     Yes.

TOTAL P.03

I, Billy F. Britt, certify that the foregoing is true and correct to the best of my

knowledge, information and belief.

*Billy F. Britt*

BILLY F. BRITT
Plaintiff

Respectfully submitted this 8th day of February, 2008.

As to Objections,

*Maricia Woodham*

Maricia Woodham (BEN050)
One of the Attorneys for
Plaintiff Billy F. Britt

OF COUNSEL:

SABEL & SABEL, P.C.
2800 Zelda Road, Suite 100-5
Montgomery, Alabama 36106
Telephone: (334) 271-2770
Facsimile: (334) 277-2882

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon the following listed persons by facsimile and U.S. Mail on this the 7th day of February, 2008.

Christopher S. Rogers
Martha Leach Thompson
Huie, Fernambucq & Stewart, LLP
2801 Highway 280 South, Suite 200
Birmingham, Alabama 35223
Telephone: (205) 251-1193
Facsimile: (205) 251-1256

*Maricia Woodham*
OF COUNSEL

**BILLY FRED BRITT**
**1200 12TH COURT**
**PHENIX CITY, ALABAMA 36867**
**334-214-5522**



**EXHIBIT**
_Y_

**WORK HISTORY:**

**US Helicopter**                                    **December 1999-August 2005**

**Aircraft Mechanic**

Inspected electronic equipment for defects
Assembled and installed electrical, mechanical, hydraulic, and structural components.
Disassembled engines and inspect parts for corrosion and other defects.
Cleaned, refueled and changed oil in aircraft
Repaired and tuned engines

**Central Alabama Veterans Health Care System**    **November 1996-February 1998**

**Pipe Fitter**

Laid out, assembled, cut, and installed various pieces of pipes.
Disassembled and removed damaged or worn pipes.
Fit fitting valves and couplings on tanks and pumps.
Mounted brackets and hangers on walls and ceilings to hold pipes

**Greg Construction Company**                       **January 1996-February 1998**

**Plumber**

Operated pipe-threading and pipe-bending machines.
Assembled and disassembled pipes.
Examined pipes for damage.
Repaired damaged pipes and worn parts.

**Self-Employed Plumber**                           **March 1991- December 1996**

Located under and above ground pipes and examined for leaks.
Cut and bent pipes.
Replaced worn and damaged pipes or couplings.
Installed pipes using a variety of hand and power tools.